**Fill in this information to identify the case:**

United States Bankruptcy Court for the:

**Southern District of Texas**

(State)

Case number *(if known)*: _____  Chapter  __11__

☐ Check if this is an amended filing

Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy

06/22

If more space is needed, attach a separate sheet to this form.  On the top of any additional pages, write the debtor's name and the case number (if known).  For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals*, is available.

| | | |
|---|---|---|
| 1. | **Debtor's Name** | **Venator P&A Spain S.L.U.** |

| | | |
|---|---|---|
| 2. | **All other names debtor used in the last 8 years**<br><br>Include any assumed names, trade names, and *doing business as* names | **Huntsman P&A Spain, S.L.U.** |

| | | |
|---|---|---|
| 3. | **Debtor's federal Employer Identification Number** (EIN) | **N/A** |

| | | |
|---|---|---|
| 4. | **Debtor's address** | |

**Principal place of business**

**Poligono Industrial Nuevo Puerto**
Number          Street

**Calle A s/n, Palos de la Frontera**

**Huelva, 21810, Spain**
City                      State      Zip Code

_____
County

**Mailing address, if different from principal place of business**

_____
Number          Street

_____
P.O. Box

_____
City                      State      Zip Code

**Location of principal assets, if different from principal place of business**

_____
Number          Street

_____
City                      State      Zip Code

| | | |
|---|---|---|
| 5. | **Debtor's website** (URL) | https://www.venatorcorp.com |

| | | |
|---|---|---|
| 6. | **Type of debtor** | ☒ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))<br><br>☐ Partnership (excluding LLP)<br><br>☐ Other. Specify: _____ |

| Debtor | **Venator P&A Spain S.L.U.** | Case number *(if known)* | |
|---|---|---|---|
| | Name | | |

**7. Describe debtor's business**

A. *Check One:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

☒ None of the above

B. *Check all that apply:*

☐ Tax-exempt entity (as described in 26 U.S.C. § 501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)

☐ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.uscourts.gov/four-digit-national-association-naics-codes .
**2819**

**8. Under which chapter of the Bankruptcy Code is the debtor filing?**

A debtor who is a "small business debtor" must check the first sub- box. A debtor as defined in § 1182(1) who elects to proceed under subchapter V of chapter 11 (whether or not the debtor is a "small business debtor") must check the second sub-box.

*Check One:*

☐ Chapter 7

☐ Chapter 9

☒ Chapter 11. *Check all that apply:*

☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,024,725. If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ The debtor is a debtor as defined in 11 U.S.C. § 1182(1), its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $7,500,000, and it chooses to proceed under Subchapter V of Chapter 11. If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return, or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☒ A plan is being filed with this petition.

☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

☒ No

☐ Yes.

| District | | When | MM/DD/YYYY | Case number | |
|---|---|---|---|---|---|
| District | | When | MM/DD/YYYY | Case number | |

Debtor   **Venator P&A Spain S.L.U.**                                    Case number *(if known)* _____
         Name

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

List all cases. If more than 1, attach a separate list.

☐ No
☒ Yes.    Debtor   **See Rider 1**                    Relationship   **Affiliate**

          District   **Southern District of Texas**

          Case number, if known _____   When   **05/14/2023**
                                                          MM / DD / YYYY

**11. Why is the case filed in *this* district?**

*Check all that apply:*

☐   Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☒   A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☒ No
☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** (*Check all that apply.*)

☐   It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

    What is the hazard?  _____

☐   It needs to be physically secured or protected from the weather.

☐   It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐   Other _____

**Where is the property?** _____
                          Number      Street

                          _____
                          City                    State     Zip Code

**Is the property insured?**

☐ No

☐ Yes.   Insurance agency   _____

         Contact name       _____

         Phone              _____

---

**Statistical and administrative information**

**13. Debtor's estimation of available funds**

*Check one:*

☒ Funds will be available for distribution to unsecured creditors.
☐ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors.

**14. Estimated number of creditors (on a consolidated basis)**

☐ 1-49              ☐ 1,000-5,000          ☐ 25,001-50,000
☐ 50-99             ☒ 5,001-10,000         ☐ 50,001-100,000
☐ 100-199           ☐ 10,001-25,000        ☐ More than 100,000
☐ 200-999

Debtor    **Venator P&A Spain S.L.U.**                    Case number *(if known)*
Name

| 15. Estimated assets (on a consolidated basis) | ☐ $0-$50,000 | ☐ $1,000,001-$10 million | ☐ $500,000,001-$1 billion |
|---|---|---|---|
| | ☐ $50,001-$100,000 | ☐ $10,000,001-$50 million | ☒ $1,000,000,001-$10 billion |
| | ☐ $100,001-$500,000 | ☐ $50,000,001-$100 million | ☐ $10,000,000,001-$50 billion |
| | ☐ $500,001-$1 million | ☐ $100,000,001-$500 million | ☐ More than $50 billion |

| 16. Estimated liabilities (on a consolidated basis) | ☐ $0-$50,000 | ☐ $1,000,001-$10 million | ☐ $500,000,001-$1 billion |
|---|---|---|---|
| | ☐ $50,001-$100,000 | ☐ $10,000,001-$50 million | ☒ $1,000,000,001-$10 billion |
| | ☐ $100,001-$500,000 | ☐ $50,000,001-$100 million | ☐ $10,000,000,001-$50 billion |
| | ☐ $500,001-$1 million | ☐ $100,000,001-$500 million | ☐ More than $50 billion |

## Request for Relief, Declaration, and Signatures

**WARNING --** Bankruptcy fraud is a serious crime.  Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.  18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    **05/14/2023**
MM/ DD / YYYY

✖    **/s/ Kurt Ogden**                                    **Kurt Ogden**
Signature of authorized representative of debtor          Printed name

Title    **Authorized Signatory**

**18. Signature of attorney**

✖    **/s/ Matthew D. Cavenaugh**        Date    **05/14/2023**
Signature of attorney for debtor                MM/DD/YYYY

**Matthew D. Cavenaugh**
Printed name

**Jackson Walker LLP**
Firm name

**1401 McKinney Street, Suite 1900**
Number                Street

**Houston**                              **Texas**        **77010**
City                                      State          ZIP Code

**(713) 752-4200**                        **mcavenaugh@jw.com**
Contact phone                            Email address

**24062656**                              **Texas**
Bar number                                State

**Fill in this information to identify the case:**

United States Bankruptcy Court for the:

**Southern District of Texas**
(State)

Case number *(if known)*: _____   Chapter _____11____

☐ Check if this is an
amended filing

**Rider 1**
**Pending Bankruptcy Cases Filed by the Debtor and Affiliates of the Debtor**

On the date hereof, each of the entities listed below (collectively, the "Debtors") filed a petition in the United States Bankruptcy Court for the Southern District of Texas for relief under chapter 11 of title 11 of the United States Code.  The Debtors have moved for joint administration of these cases under the case number assigned to the chapter 11 case of Venator Materials PLC.

Venator Materials PLC
Venator Americas Holdings LLC
Venator Chemicals France SAS
Venator Chemicals LLC
Venator Finance S.à r.l.
Venator France SAS
Venator Germany GmbH
Venator Group
Venator Group Canada Inc.
Venator Group Services Limited
Venator Holdings Germany GmbH
Venator International France SAS
Venator International Holdings UK Limited
Venator Investments Ltd
Venator Investments UK Limited
Venator Materials International UK Limited
Venator Materials UK Limited
Venator Materials LLC
Venator P&A Finland Oy
Venator P&A Holdings UK Limited
Venator P&A Spain S.L.U.
Venator Pigments France SAS
Venator Uerdingen GmbH
Venator Wasserchemie Holding GmbH

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VENATOR P&A SPAIN S.L.U., | ) | Case No. 23-[_____] (___) |
| | ) | |
| Debtor. | ) | |
| | ) | |

## LIST OF EQUITY SECURITY HOLDERS[1]

| Equity Holder | Address of Equity Holder | Percentage of Equity Held |
|---|---|---|
| Venator Materials International UK Limited | Hanzard Drive, Titanium House, Stockton on Tees, Wynyard Park, TS22 5FD, United Kingdom | 100% |

---

[1]   This list serves as the disclosure required to be made by the debtor pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedure.  All equity positions listed indicate the record holder of such equity as of the date of commencement of the chapter 11 case.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| VENATOR P&A SPAIN S.L.U., | ) Case No. 23-[_____] (____) |
| | ) |
| Debtor. | ) |
| | ) |

<u>**CORPORATE OWNERSHIP STATEMENT**</u>

Pursuant to Rules 1007(a)(1) and 7007.1 of the Federal Rules of Bankruptcy Procedure, the following are corporations, other than a government unit, that directly or indirectly own 10% or more of any class of the debtor's equity interest:

| Shareholder | Approximate Percentage of Shares Held |
|---|---|
| Venator Materials International UK Limited | 100% |

Fill in this information to identify the case and this filing:

Debtor Name      **Venator P&A Spain S.L.U.**

United States Bankruptcy Court for the:      **Southern District of Texas**

(State)

Case number (If known):

# Official Form 202
# Declaration Under Penalty of Perjury for Non-Individual Debtors     12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.

WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

## Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

- ☐ *Schedule A/B: Assets-Real and Personal Property (Official Form 206A/B)*
- ☐ *Schedule D: Creditors Who Have Claims Secured by Property (Official Form 206D)*
- ☐ *Schedule E/F: Creditors Who Have Unsecured Claims (Official Form 206E/F)*
- ☐ *Schedule G: Executory Contracts and Unexpired Leases (Official Form 206G)*
- ☐ *Schedule H: Codebtors (Official Form 206H)*
- ☐ *Summary of Assets and Liabilities for Non-Individuals (Official Form 206Sum)*
- ☐ Amended Schedule
- ☒ *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 30 Largest Unsecured Claims and Are Not Insiders (Official Form 204)*
- ☒ Other document that requires a declaration **List of Equity Security Holders, Corporate Ownership Statement, and Certification of Creditor Matrix**

I declare under penalty of perjury that the foregoing is true and correct.

| | | |
|---|---|---|
| Executed on | **05/14/2023** | ☒ */s/ Kurt Ogden* |
| | MM/ DD/YYYY | Signature of individual signing on behalf of debtor |
| | | **Kurt Ogden** |
| | | Printed name |
| | | **Authorized Signatory** |
| | | Position or relationship to debtor |

Official Form 202          Declaration Under Penalty of Perjury for Non-Individual Debtors

*Execution Version*

## MINUTES OF THE RESOLUTIONS OF THE BOARD OF DIRECTORS OF
## VENATOR P&A SPAIN, S.L.U.

On 13 May 2023, all the members of the Company's Board of Directors of Venator P&A Spain, S.L.U. (the "**Company**"), namely, Mr. James Willian Holden, Mr. Kurt David Ogden and Mr. Richard Justin James Phillipson, none of whom raise any objections, have accepted voting by writing and without holding a meeting (*por escrito y sin sesión*) for approving the resolutions transcribed below. Written communications from all the members of the Board of Directors have been received in the registered office, in which the members adhere to such procedure and cast their vote as set forth below.

As all the written votes cast by all the members of the Board of Directors were the same, the following resolutions have been unanimously passed by the Board of Directors, with effect from 13 May 2023 at the registered office, pursuant to article 100.1 of the Commercial Registry Regulations:

### RESOLUTIONS

### 1. BACKGROUND

The Board of Directors of the Company acknowledges that:

A. Venator Materials PLC ("**Venator**"), the ultimate parent company of the Company, and its group (the **Venator Group**") have received financing through several instruments under which the Company is a party (either as a borrower, guarantor and security provider), the main instruments being (i) an asset-based lending facility agreement dated 8 August 2017, governed by the laws of the state of New York, for an initial amount up to $300,000,000 (as amended and restated from time to time, the "**ABL Facility**") entered with a pool of lenders, financial institutions and other entities; (ii) a term loan agreement dated 8 August 2017, governed by the laws of the state of New York, for an initial amount up to $375,000,000 entered with a pool of lenders, financial institutions and other entities (as amended and restated from time to time, the "**Term Loan Facility**"); (iii) senior secured notes governed by the laws of the United States of America, for an amount of $225,000,000 due 2025; and (iv) senior unsecured notes governed by the laws of the United States of America, for an amount of $375,000,000 due 2025 (jointly with (iii), the "**Senior Notes**"). Hereinafter, the ABL Facility, the Term Loan Facility and the Senior Notes will be referred to as the "**Compromised Debt**".

B. Several unforeseen events, such as a rapid and dramatic TiO2 industry downturn demonstrated by a nearly forty percent (40%) volume decrease in the second half of 2022 and unprecedented energy and cost dynamics in Europe, as further explained in the memorandum prepared by Kirkland and Ellis LLP and shared with the Board of Directors (the "**Memorandum**"), have impacted Venator Group's business.

C. Separately, Venator Group was unable to deliver an unqualified audit opinion constituting a default under the ABL Facility and the Term Loan Facility. Left uncured, such technical default have ripened into an actual "Event of Default" under the ABL Facility and Term Loan Facility on April 30, 2023, being the lenders thereunder entitled to accelerate the Term Loan Facility and the ABL Facility (the "**Default Situation**"). Therefore, the obligor entities of the Venator Group have entered into forbearance agreements with the lenders under the ABL Facility and the Term Loan Facility in order to extend the grace periods for such Default Situation under the ABL Facility and the Term Loan Facility until 8 May 2023. This forbearance was subsequently extended again until 14 May 2023.

D.  As a consequence of the foregoing, Venator Group has exchanged restructuring proposals with organized groups of its secured creditors, and Venator Group is in the process of finalizing a restructuring support agreement with certain creditors under the Compromised Debt (the "**Supporting Creditors**"). A draft of such Restructuring Support Agreement has been reviewed by the directors and is attached hereto as <u>**Annex 1**</u> (the "**Restructuring Support Agreement**"). The Restructuring Support Agreement outlines the main terms and principles of the restructuring of the Compromised Debt (the "**Restructuring**").

E.  In addition, in the context of the Restructuring, Venator Group is in the process of negotiating with some of the lenders a debtor-in-possession financing agreement for an amount of $275 million in order to obtain financing which is necessary and convenient to fund the liquidity needs of Venator Group during Chapter 11 process and to ensure that Venator Group (including the Company) runs business as usual.

F.  The provisions of title 11 of the United States Code (the "**Bankruptcy Code**") (Chapter 11) has been selected as the most appropriate tool by Venator Group and the Supporting Creditors in order to achieve the Restructuring, considering that parent is a US company and the Compromised Debt instruments are governed by New York law. In addition, as the thresholds needed under Venator Group current debt require nearly full consensus among all the lenders and equity holders, a "pre-packaged" US Chapter 11 procedure will enable the agreed transactions under the Restructuring and will bind a limited number of potential holdouts under the Compromised Debt.

G.  It should be noted that:

    i.  The envisaged Restructuring will provide Venator Group with more liquidity, will reduce the debt amount and will extend the maturities, with substantially the same security package. Therefore, the Restructuring is aimed at achieving viability of the Company.

    ii.  No debt other than the Compromised Debt would be compromised (e.g. suppliers, Tax and Social Security payments, salaries, etc.) and would remain due and payable according to existing terms (the "**Non-Compromised Debt**").

    iii.  During the restructuring process and the Chapter 11, the Company will operate in the ordinary course of business and will regularly pay all its obligations under the Non-Compromised Debt and of the obligations of the Company under the Compromised Debt would not be due and payable as a consequence of the forbearance granted by Supporting Creditors.

    iv.  Chapter 11 would not be enforceable in Spain, as no recognition would be carried out.

    v.  The Company is not (and will not be during the Restructuring and Chapter 11 process) in an actual insolvency situation according to Spanish Insolvency Law, this is, the Company is and will not be unable to pay its debts as they fall due.

H.  As a consequence of the foregoing, the Board of Directors considers in this meeting the (i) entry into the Restructuring Support Agreement and/or any other agreements, certificates, instruments, powers of attorney, letters, forms transfer, deeds and other documents in furtherance of the Restructuring; (ii) the entry into the DIP Facility and/or any other agreements, certificates, instruments, powers of

attorney, letters, forms transfer, deeds and other documents in furtherance of the DIP Financing; and (ii) the filing of a voluntary petition for relief under the provisions of chapter 11 of the Bankruptcy Code for the Company ((i), (ii) and (iii) together, the "**Restructuring Matters**").

I.  The Board of Directors has reviewed and considered certain materials presented by the management of the Company and the Company's financial and legal advisors, including, but not limited to, materials regarding the liabilities and obligations of the Company, its liquidity, strategic alternatives available to it, and the effect of the foregoing on the Company's business, and has had adequate opportunity to consult such persons regarding the materials presented, obtain additional information, and to fully consider each of the strategic alternatives available to the Company.

J.  The Board of Directors acknowledges that, in order to implement the Restructuring, it will be necessary that Venator's Board of Directors approve the Restructuring, the Restructuring Matters, the Chapter 11 process, the DIP Financing and other related resolutions.

## 2.   APPROVAL OF THE RESTRUCTURING AND THE RESTRUCTURING DOCUMENTS

Acknowledging the previous background, the Board of Directors unanimously agree to approve the entry into the Restructuring by the Company, considering that the Restructuring will in the best interest of the Company and the Venator Group as a whole. In particular, the Board of Directors unanimously agree to approve:

a.  the entry into by the Company of the Restructuring Support Agreement (as described above) in substantially the form included in **Annex 1**; The Board of Directors acknowledges that the Restructuring Support Agreement may be subject to amendments and further negotiation and authorize any Authorized Persons (pursuant to the power of attorney included in resolution number 7) to agree to changes in his or their absolute discretion deem appropriate, provided that the main principles of the Restructuring remain unchanged;

b.  the entry into by the Company in the restructuring transaction or series of restructuring transactions (which may include a recapitalization transaction) by which the Company will restructure its debt obligations and other liabilities, including but not limited to the restructuring transactions as described in the Restructuring Support Agreement (collectively, the "**Restructuring Transactions**");

c.  the entry into and filing by the Company of any and all such agreements, certificates, instruments, and other documents in furtherance of the Restructuring Transactions to which the Company is or will be a party, including, but not limited to, the Restructuring Support Agreement and all agreements and documents contemplated thereby (collectively, the "**Restructuring Documents**");

d.  to obtain by the Company approval by a court of competent jurisdiction or any other regulatory or governmental entity of the Restructuring Documents and the Restructuring Transactions; and

e.  the payment of certain fees in connection therewith as per the quotes received by the directors.

The Board of Directors acknowledges that this resolution shall be subject and conditional upon approval

of the Restructuring, the Restructuring Matters, the Chapter 11 process, the DIP Financing and other related resolutions by Venator's Board of Directors.

**3.      VOLUNTARY PETITION FOR RELIEF UNDER APPLICABLE BANKRUPTCY LAW AND SEEKING NECESSARY RELIEF UNDER THE CHAPTER 11 PROCESS**

The Board of Directors considers that it is in the best interest of the Company and the Venator Group as a whole and, therefore, unanimously approves that the Company files or causes to be filed voluntary petitions for relief (the "**Bankruptcy Petitions**") under the provisions of the US Bankruptcy Code for the Company and in accordance with the requirements in the Company's governing documents and applicable law, in order for the Restructuring to be implemented through the Chapter 11 process.

The Board of Directors unanimously approves the execution and filing of petitions, schedules, lists, and other motions, papers, or documents, by the Company and carrying out any action that an Authorized Person deems necessary or proper to obtain such relief, including, but not limited to, any action necessary or proper to maintain the ordinary course operations of the Company's business.

The Board of Directors acknowledges that, from a Spanish Law point of view, Chapter 11 would not be enforceable in Spain, as no recognition would be carried out. The Board of Directors also considers that the Company is not (and will not be during the Restructuring and Chapter 11 process) in an actual insolvency situation according to Spanish Insolvency Law.

The Board of Directors acknowledges that this resolution shall be subject and conditional upon approval of the Restructuring, the Restructuring Matters, the Chapter 11 process, the DIP Financing and other related resolutions by Venator's Board of Directors.

**4.      RETENTION OF PROFESSIONALS**

In order to carry out the Restructuring, the Board of Directors unanimously approves that the Company enters into agreements with: (i) the law firm of Kirkland & Ellis LLP as general bankruptcy counsel, (ii) the law firm of Jackson Walker LLP as co-bankruptcy counsel**,** (iii) Moelis & Company as investment banker, (iv) Alvarez & Marsal as restructuring advisor, (v) Epiq Corporate Restructuring, LLC as notice and claims agent, and (vi) any other legal counsel, accountants, financial advisors, restructuring advisors or other professionals the Authorized Persons deem necessary, appropriate or advisable; each to represent and assist the Company in carrying out its duties and responsibilities and exercising its rights under the Bankruptcy Code and any applicable law (including, but not limited to, the law firms filing any pleadings or responses) (the "**Advisers**"). Likewise, it is approved the execution by the Company of retention agreements, paying appropriate retainers, and to cause to be filed appropriate applications for authority to retain such services; the filing of all petitions, schedules, motions, lists, applications, pleadings, and other papers, in connection with the above.

The Board of Directors acknowledges that this resolution shall be subject and conditional upon approval of the Restructuring, the Restructuring Matters, the Chapter 11 process, the DIP Financing and other related resolutions by Venator's Board of Directors.

**5.      APPROVAL OF THE DIP FINANCING AND THE USE OF CASH COLLATERAL**

The Board of Directors considers that it is in the best interest of the Company, and the Venator Group and, therefore, unanimously approves that the Company:

a. incurs the debtor-in-possession (DIP) financing for an amount of $275 million and the entry into a superpriority senior secured debtor in possession term loan facility by and among Venator Materials PLC, certain of its affiliates (including the Company) and certain financial institutions (collectively the "**DIP Lenders**") and a third party agent in its capacity as administrative agent and collateral agent for the DIP Lenders (the "**DIP Agent**") on the terms set forth therein (together with all exhibits, schedules, and annexes thereto, as amended, amended and restated, supplemented, or otherwise modified from time to time, the "**DIP Facility**" and the financing made available under the DIP Facility, the "**DIP Financing**"). A term sheet including the main terms and conditions of the DIP Financing has been reviewed by the directors and is attached hereto as **Annex 2**.

b. obtains the benefits from the use of cash collateral, as such term is defined in section 363(a) of the Bankruptcy Code (the "**Cash Collateral**"), which is security for certain of the Company's prepetition secured lenders the "**Prepetition Secured Lenders**" (i.e., the secured lenders under the Compromised Debt which hold debt pre-filing of the Chapter 11 process) by and among the Company, the guarantors party thereto and the lenders party thereto; and

c. the entry into such other agreements, certificates, instruments, receipts, petitions, motions, or other papers or documents required to consummate the transaction considered by the Financing Orders (as defined below) (collectively, the "**DIP Facility Documents**"), including without limitation the granting of security interests under the DIP Facility Documents (the "**DIP Obligations**") as outlined in the term sheet of the DIP Financing.

The Board of Directors acknowledges that, in order to use and obtain the benefits of DIP Financing and the Cash Collateral, and in accordance with section 363 of the Bankruptcy Code, the Company will provide certain adequate protection to the Prepetition Secured Lenders (the "**Adequate Protection Obligations**") as documented in proposed interim and final orders (collectively, the "**Financing Orders**") to be submitted for approval of the Bankruptcy Court, and, to the extent that the Company is required to obtain consent from the Prepetition Secured Lenders to enter into any of the DIP Facility Documents, as defined herein, such consent has been (or will be) obtained from the Prepetition Secured Lenders. Such Adequate Protection Obligations are detailed in the DIP Financing term sheet, as approved above.

The Board of Directors acknowledges that the DIP Facility Documents may be subject to amendments and further negotiation and authorize any Authorized Persons (pursuant to the power of attorney included in resolution number 7) to agree to changes in his or their absolute discretion deem appropriate, provided that the main principles of the DIP Financing remain unchanged.

The Board of Directors acknowledges that this resolution shall be subject and conditional upon approval of the Restructuring, the Restructuring Matters, the DIP Financing, the Chapter 11 process and other related resolutions by Venator's Board of Directors.

6. **RATIFICATION OF PRIOR ACTIONS AND APPROVING THE FURTHER ACTIONS REGARDING THE RESTRUCTURING**

The Board of Directors approves and ratify all acts, actions, and transactions relating to the matters contemplated by these Resolutions done in the name of and on behalf of the Company (including the any act, action and transaction related to the Compromised Debt), which acts would have been approved by

the Resolutions except that such acts were taken before the adoption of these Resolutions, are hereby in all respects approved, confirmed and ratified as the acts of the Company with the same force and effect as if each such act, transaction, agreement, or certificate had been specifically authorized in advance by resolution of the Board of Directors.

Likewise, and in relation to the foregoing, the Board of Directors approves to authorize and approve the entering, signing, execution, filing and formalization by the Company of the Restructuring, the DIP Financing and the Chapter 11 process and of any of the documents, agreements, certificates, instruments, security agreements, powers of attorney, letters, forms, transfer, deeds and other documents whatsoever that are necessary, and to take any other actions that are appropriate or advisable for the purpose of the Restructuring, the DIP Financing and the Chapter 11 filing and in connection with them.

The Board of Directors acknowledges that this resolution shall be subject and conditional upon approval of the Restructuring, the Restructuring Matters, the Chapter 11 process, the DIP Financing and other related resolutions by Venator's Board of Directors.

## 7.    GRANTING OF SPECIAL POWERS OF ATTORNEY

In order to carry out the Restructuring, the Board of Directors unanimously agree to grant special power of attorney, as broad and sufficient as may be necessary in law, in favour of each of the board members of the Company (the **"Authorized Persons"** and, each individually, an **"Authorized Person"**) so that any of the Authorized Persons acting individually (*solidariamente*), in the name and on behalf of the Company and regarding the Restructuring, carry out any of the following acts on the terms and conditions that the Authorized Person may deem appropriate (even when doing so under the legal notion of self-contracting, multirepresentation or conflict of interest):

A.   execute, sign, modify, restate, novate, ratify, amend, extend, assign, fulfil, grant or cancel the Restructuring Support Agreement, the DIP Facility, any of the Restructuring Documents and any of the DIP Facility Documents, with such changes and in such form as the Authorized Person or Authorized Persons executing the same shall in his or their absolute discretion deem appropriate, including granting liens, collaterals and security interests to secure the obligations arising pursuant to the DIP Facility Documents;

B.   enter on behalf of the Company into the Restructuring, an any of the restructuring transaction or series of restructuring transactions by which the Company will restructure its debt obligations and other liabilities, including but not limited to the restructuring transactions as described in the Restructuring Support Agreement;

C.   enter on behalf of the Company into the DIP Financing, incur the DIP Obligations and enter into any guarantees as described or contemplated by the DIP Facility Documents or any other documents, certificates, instruments, agreements, intercreditor agreements, any extension amendment, any incremental agreement, or any other amendment required to consummate the transactions contemplated by the DIP Facility Documents and perform its obligations thereunder and to guarantee the payment and performance of the DIP Obligations of the Company and any other guarantor thereunder;

D.   to incur and pay or cause to be paid all fees and expenses and engage and execute retention

agreements with any person, firm or advisor, legal counsel, accountant, financial advisor or other professional in connection with the Restructuring and the DIP Financing;

E.   take or cause to be taken any and all such other and further action, and to sign, execute, acknowledge, deliver, and file any and all such agreements, certificates, instruments, and other documents in furtherance of the Restructuring, the DIP Financing and the Chapter 11 to which the Company is or will be a party;

F.   take any and all actions to (i) obtain approval by a court of competent jurisdiction or any other regulatory or governmental entity of the Restructuring, the Restructuring Documents or the Restructuring Transactions; (ii) obtain approval by a court of competent jurisdiction or any other regulatory or governmental entity of the DIP Financing, the DIP Facility Documents and the Cash Collateral; and (iii) obtain approval by any court of competent jurisdiction or any other regulatory or governmental entity of the Chapter 11; and (iv) obtain approval by a court of competent jurisdiction of the Financial Orders;

G.   execute, sign and file, all petitions, schedules, lists, and other motions, papers, or documents, certificates, instruments and to take any and all further actions that they deem necessary or proper (such as payment of any fees) in connection with the Restructuring, the DIP Financing and the Chapter 11, including, but not limited to, any Bankruptcy Petitions and any action necessary or proper to maintain the ordinary course operations of the Company's or any of its subsidiary's businesses;

H.   execute appropriate retention agreements, pay appropriate retainers, fees and expenses, and to cause to be filed appropriate applications for authority to retain such services;

I.   execute any document or pleading in order to seek approval of the use of any cash collateral and any agreements, instruments, or documents, by or on behalf of the Company, necessary or advisable to incur the DIP Obligations, to use the Cash Collateral pursuant to the Financing Orders, including the Adequate Protection Obligations to the Prepetition Secured Lenders in accordance with section 363 of the Bankruptcy Code, as well as any additional or further agreements for the entry into the DIP Facility Documents and the use of Cash Collateral in connection with the Chapter 11;

J.   execute and file all petitions, schedules, motions, lists, applications, pleadings, and other papers, and to perform such further actions and execute such further documentation necessary, appropriate or desirable in accordance with these resolutions;

K.   do all such other acts, deeds and other things as the Company itself may lawfully do, in accordance with its governing documents and applicable law, howsoever arising in connection with the matters of these resolutions, or in furtherance of the intentions expressed in the foregoing resolutions, including, but not limited to, the negotiation, finalization, execution and delivery of any other agreements, certificates, instruments, powers of attorney, letters, forms, transfer, deeds and other documents whatsoever deem or determine necessary, appropriate or advisable, such approval, deeming or determination to be conclusively evidenced by said individual taking such action or the execution thereof;

L.   execute and deliver any amendments, supplements, modifications, renewals, replacements, consolidations, substitutions, and extensions of the Restructuring Support Agreement, the DIP Facility, the Cash Collateral, the Bankruptcy Petitions and any of the Restructuring Documents and the DIP Facility Documents, or to do such other things which shall be necessary, desirable, proper, or

advisable to give effect to the foregoing resolutions, which determination shall be conclusively evidenced by his or their execution thereof;

M. to grant in favour of any third party all or part of the representative capacity and authority granted hereunder, within the limits established under this power of attorney, and to execute any powers of attorney documenting the authorisation;

N. in connection with the DIP Financing, to file or to authorize the DIP Agent to file any Uniform Commercial Code financing statements or any other equivalent filings, including lists of assets of the Company, financing statement containing a generic description of collateral, such as "all assets," "all property now or hereafter acquired" or any other documents in the name of the Company that is necessary or appropriate to perfect any lien or security interest granted under the Financing Orders, any other document or action (including the registration of such security interests), to the extent necessary to create or perfect security over any assets of the Company under the Financing Orders or the DIP Financing;

O. to take all such further actions, including, without limitation, to pay or approve the payment of all fees and expenses payable in connection with the DIP Facility and all fees and expenses incurred by or on behalf of the Company in connection with the foregoing resolutions, in accordance with the terms of the DIP Facility Documents, which shall in their sole judgment be necessary, proper, or advisable to perform any of the Company's obligations under or in connection with the Financing Orders or any of the other DIP Facility Documents and the transactions contemplated therein and to fully carry out the intent of the foregoing resolutions;

P. (a) prepare any amendments, waivers, consents, supplements, or other modifications under the DIP Facility Documents and/or all other agreements, instruments, documents, notices and certificates constituting exhibits to or that may be required, necessary, appropriate, desirable or advisable to be executed and delivered pursuant to the DIP Facility Documents or otherwise permitted thereunder or related thereto (each an "**Additional DIP Facility Document**") to which the Company is a party as may be necessary, convenient, advisable, desirable or appropriate at any time from time to time, which amendments, waivers, consents or supplements may provide for modifications or relief under such agreements or documents and may require consent payments, fees or other amounts payable in connection therewith, and (b) execute and deliver such amendments, waivers, consents, supplements, or other modifications under such agreements or documents that deem to be necessary, convenient, advisable, desirable or appropriate;

Q. to sign the Restructuring Support Agreement, the DIP Facility, the Cash Collateral, the Bankruptcy Petitions and any of the Restructuring Documents and the DIP Facility Documents, the Additional DIP Facility Documents, and any amendments, waivers, consents, supplements, or other modifications to which the Company is a party; and

R. carry out any related or complementary actions necessary for the complete fulfilment of the power of attorney received.

The Board of Directors acknowledges that this resolution shall be subject and conditional upon approval of the Restructuring, the Restructuring Matters, the Chapter 11 process, the DIP Financing and other related resolutions by Venator's Board of Directors.

## 8.      APPROVAL OF THE MINUTES

The foregoing resolutions shall be deemed to be duly adopted when, all the Directors have communicated, through their signature, their approval, both as to the form of approving such resolutions (i.e. to the proceeding of passing the resolutions in writing without a meeting) as well as to their content, within ten (10) days from the date on which each of the Directors received the vote request in relation to the items included on the Agenda, all in line with article 100.3 of the Regulation of the Commercial Registry.

Acknowledging the foregoing, these Minutes are drafted and signed by the Chairman and the Secretary non Director of the Board of Directors of the Company. The approval of the remaining members of the Board of Directors in relation to these Minutes, the proceeding for passing resolutions in writing without a meeting and the resolutions contained herein is evidenced by means of their signature at the end of these Minutes.

These minutes have been drafted in English language as it is the language known by all directors of the Company.

*[Signature pages follow]*

THE CHAIRMAN                              THE SECRETARY NON MEMBER OF THE BOARD

_____          _____
D. James William Holden                  Mr. Manuel Cuaresma Garfia

The members of the Board of Directors sign these minutes to evidence their approval of the transcribed resolutions and to the proceeding of approving such resolutions in writing and without holding a meeting

_____
D. / Mr. Richard Justin James Phillipson

_____
D. / Mr. Kurt David Ogden

_____
D. / Mr. James William Holden

THE CHAIRMAN                                    THE SECRETARY NON MEMBER OF THE BOARD

_____          _____

D. James William Holden                        Mr. Manuel Cuaresma Garfia

The members of the Board of Directors sign these minutes to evidence their approval of the transcribed resolutions and to the proceeding of approving such resolutions in writing and without holding a meeting

_____

D. / Mr. Richard Justin James Phillipson

_____

D. / Mr. Kurt David Ogden

_____

D. / Mr. James William Holden

**ANNEX 1 - RESTRUCTURING SUPPORT AGREEMENT**

*Execution Version*

ᵐTHIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

### *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 14.04, this "**Agreement**")[1] is made and entered into as of May 13, 2023 (the "**Execution Date**"), by and among the following parties (each of the following described in sub-clauses (i) through (iv) of this preamble, collectively, the "**Parties**"):

i.     Venator Materials PLC, a company incorporated under the Laws of England and Wales ("**Venator**"), and each of its affiliates listed on **Exhibit A** to this Agreement that have executed and delivered counterpart signature pages to this Agreement to counsel to the Consenting Creditors (the Entities in this clause (i), collectively, the "**Company Parties**");

ii.     the undersigned holders of Term Loan Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the Entities in this clause (ii), collectively, the "**Consenting Term Lenders**");

iii.     the undersigned holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, Senior Secured Notes Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the Entities in this clause (iii), collectively, the "**Consenting Secured Noteholders**"); and

iv.     the undersigned holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, Senior Unsecured Notes Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the Entities in this clause (v), collectively, the "**Consenting Unsecured Noteholders**" and, together with the other entities in clause (ii) through this clause (iv), the "**Consenting Creditors**").

---

[1]    Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings set forth in Section 1 of this Agreement.

## RECITALS

**WHEREAS**, the Company Parties and the Consenting Creditors have in good faith and at arms' length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the *Joint Prepackaged Plan of Reorganization of Venator Materials PLC and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* attached as **Exhibit B** hereto (the "**Plan**" and the debtor in possession financing term sheet attached hereto as **Exhibit C** (the "**DIP Term Sheet**") and, such transactions as described in this Agreement and the Plan, the "**Restructuring Transactions**");

**WHEREAS**, the Company Parties intend to implement the Restructuring Transactions, including through the commencement by the Debtors of voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the cases commenced, the "**Chapter 11 Cases**"); and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Plan;

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

## AGREEMENT

**Section 1.**   *Definitions and Interpretation*.

1.01.   Definitions.  The following terms shall have the following definitions:

"**ABL Guaranty Agreement**" means that certain ABL Guaranty Agreement, dated as of August 8, 2017, among Venator Materials PLC, as Holdings, each of the borrowers, and JPMorgan Chase Bank, N.A., as administrative agent and collateral agent.

"**ABL Forbearance Agreement**" means that certain forbearance agreement, dated as of April 30, 2023, executed by, among others, Venator Materials PLC, Venator Finance S.à r.l. and Venator Materials LLC, as borrowers, JPMorgan Chase Bank, N.A., as administrative agent, and the lenders under the Prepetition ABL Credit Agreement constituting the Required Lenders (as defined in the Prepetition ABL Credit Agreement).

"**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code as if such entity was a debtor in a case under the Bankruptcy Code.

"**Agent**" means any administrative agent, collateral agent, or similar Entity under the Prepetition ABL Facility or the Term Loan Facility, including any successors thereto.

"**Agents/Trustee**" means, collectively, each of the Agents and Notes Trustee.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 14.04 (including the Plan and the DIP Term Sheet).

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Alternative Restructuring Proposal**" means any plan, inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, asset sale, share issuance, consent solicitation, exchange offer, tender offer, recapitalization, plan of reorganization, share exchange, business combination, joint venture, or similar transaction involving any one or more Company Parties or their Affiliates or the debt, equity, or other interests in any one or more Company Parties or their Affiliates that is an alternative to any of the Restructuring Transactions.

"**Backstop Commitment Agreement**" shall have the meaning set forth in the Plan.

"**Backstop Exit Term Loan Facility**" means the secured term loan facility (if any) to be entered into by the Backstop Parties and the Reorganized Debtors on the Plan Effective Date.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York or the City of London.

"**Cash Collateral Order**" means the interim or final, as applicable, order of the Bankruptcy Court setting forth the terms of the Company Parties' use of cash collateral (which may be included in the interim DIP Order or final DIP Order, as applicable), which shall be consistent in all material respects with the DIP Credit Agreement and this Agreement, including the Plan and the DIP Term Sheet.

"**Causes of Action**" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort,

law, equity, or otherwise.  Causes of Action also include:  (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any avoidance actions arising under chapter 5 of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Company Claims/Interests**" means any Claim against, or Equity Interest in, a Company Party, including the Term Loan Claims, Senior Secured Notes Claims, and Senior Unsecured Notes Claims.

"**Company Parties**" has the meaning set forth in the recitals to this Agreement.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions.

"**Confirmation Order**" means the order of the Bankruptcy Court approving the adequacy of the Disclosure Statement and confirming the Plan.

"**Consenting Creditors**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Secured Noteholders**" has the meaning set forth in the preamble of this Agreement.

"**Consenting Term Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Unsecured Noteholders**" has the meaning set forth in the preamble of this Agreement.

"**Cross-Holder Group**" means that certain ad hoc group of holders of Term Loan Claims, Senior Secured Notes Claims, and Senior Unsecured Notes Claims represented by the Cross-Holder Group Advisors.

"**Cross-Holder Group Advisors**" means Gibson, Dunn & Crutcher LLP, Lazard Frères & Co. LLC, Howley Law PLLC, Krogerus Attorneys Ltd, and Legance – Avvocati Associati.

"**Debtors**" means the Company Parties that commence Chapter 11 Cases.

"**Definitive Documents**" means the following:  (A) the Plan (including the Releases); (B) the Confirmation Order; (C) the Disclosure Statement (and any documents or Solicitation Materials related to the solicitation thereof, including applicable motions and orders); (D) the First Day Pleadings and the Second Day Pleadings (and all orders sought pursuant thereto, including

the DIP Orders); (E) any KEIP or KERP; (F) the Plan Supplement (including, the New Corporate Governance Documents, any Management Incentive Plan, and any restructuring steps plan or tax matters agreements); (G) the DIP Documents; (H) the Cash Collateral Orders (together with any related stipulations and cash collateral motion); (I) the Exit ABL Facility Documents; (J) the Exit Term Loan Facility Documents; (K) the Backstop Commitment Agreement; (L) any other documents relating to the Rights Offering; and (M) the Rights Offering Procedures.

"**DIP Credit Agreement**" means the certain senior secured superpriority debtor-in-possession credit agreement that governs the DIP Facility (as may be amended, supplemented, or otherwise modified from time to time) among, Venator Finance S.à r.l. and Venator Materials LLC, as borrowers, the Company Party guarantors that are party thereto, Acquiom Agency Services LLC and Seaport Loan Products LLC, as co-administrative agents, and Acquiom Agency Services LLC, as collateral agent, and the lenders party thereto, that shall be in all material respects consistent with the DIP Term Sheet and otherwise in form and substance satisfactory to the Required Consenting Creditors; *provided* that, unless and until the DIP Credit Agreement is executed by the applicable parties, references herein to the DIP Credit Agreement shall refer to the DIP Term Sheet.

"**DIP Documents**" means the DIP Credit Agreement and any related documents or agreements governing the DIP Facility, including the DIP Motion, the DIP Orders and all security and collateral documents, which documents shall be consistent in all material respects with this Agreement, including the DIP Term Sheet, and otherwise in form and substance satisfactory to the Required Consenting Creditors.

"**DIP Facility**" means the $275 million debtor-in-possession credit facility to be provided to the Company Parties on the terms and subject solely to the conditions of the DIP Term Sheet, the DIP Credit Agreement, and the DIP Orders.

"**DIP Lenders**" shall have the meaning set forth in the DIP Term Sheet.

"**DIP Motion**" means the motion filed by the Company Parties seeking entry of an interim and final DIP Order.

"**DIP Order**" means the interim or final, as applicable, order of the Bankruptcy Court setting forth the terms of debtor-in-possession financing, which shall be consistent in all material respects with the DIP Credit Agreement and this Agreement.

"**DIP Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Disclosure Statement**" means the related disclosure statement with respect to the Plan.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Equity Interests**" means, collectively, the shares (or any class thereof), common stock, ordinary shares, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, ordinary shares, preferred stock, limited liability company

interests, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Exit ABL Facility**" means the asset-backed revolving facility to be entered into by the Reorganized Debtors on the Plan Effective Date, consistent in all material respects with the Plan, as applicable.

"**Exit ABL Facility Documents**" means any documents governing the Exit ABL Facility and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

"**Exit Financing Documents**" means the Exit ABL Facility Documents and the Exit Term Loan Facility Documents.

"**Exit Term Loan Facility**" means, as applicable, either the Backstop Exit Term Loan Facility or the Raised Exit Term Loan Facility.

"**Exit Term Loan Facility Documents**" means any documents governing the Exit Term Loan Facility and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

"**First Day Pleadings**" means the first-day pleadings that the Company Parties determine are necessary or desirable to file.

"**KEIP**" means any key executive insider plan or similar proposal or documentation that would require Bankruptcy Court approval to make payments to "insiders" during the course of the Chapter 11 Cases.

"**KERP**" means any key employee retention plan or similar proposal or documentation that would require Bankruptcy Court approval to make payments to non-"insiders" during the course of the Chapter 11 Cases.

"**Joinder**" means a joinder to this Agreement substantially in the form attached hereto as **Exhibit D**.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**New Board**" has the meaning set forth in the Plan.

"**New Corporate Governance Documents**" means the form of certificate or articles of incorporation, bylaws, limited liability company agreement, partnership agreement, and such other applicable formation, organizational and governance documents (if any) of the Reorganized Debtors, the material terms of each of which shall be included in the Plan Supplement.

"**Notes Indentures**" means, collectively, the Senior Secured Notes Indenture and the Senior Unsecured Notes Indenture.

"**Notes Trustee**" means Wilmington Trust, National Association, solely in its capacity as trustee under the Notes Indentures, or any successor trustee under the Notes Indentures.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transferee**" means each transferee of any Company Claims/Interests who meets the requirements of Section 9.01.

"**Petition Date**" means the first date any of the Company Parties commences a Chapter 11 Case.

"**Plan**" has the meaning set forth in the recitals to this Agreement.

"**Plan Effective Date**" means the occurrence of the effective date of the Plan according to its terms.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Debtors with the Bankruptcy Court.

"**Prepetition ABL Credit Agreement**" means that certain Amended and Restated Revolving Credit Agreement, dated as of October 15, 2021, among Venator Materials PLC, as Holdings, the borrowers and guarantors party thereto, the lenders party thereto, and JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, which amends and restates that certain Revolving Credit Agreement, dated as of August 8, 2017 (as amended, restated, amended and restated, supplemented and/or otherwise modified).

"**Prepetition ABL Facility**" means the revolving credit facility under that certain Amended and Restated Revolving Credit Agreement, dated October 15, 2021 among Venator Materials PLC, as holdings, the borrowers and guarantors party thereto, the lenders party thereto and JPMorgan Chase Bank, N.A.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Raised Exit Term Loan Facility**" means an Exit Term Loan Facility provided by third parties through a comprehensive marketing process, acceptable to the Debtors and the Required

Consenting Creditors, which shall provide for an all-in yield through maturity, as calculated in a manner acceptable to the Required Consenting Creditors and in good faith by the Debtors, using an internal rate of return basis after accounting for all reasonably expected and associated fees of such Raised Exit Term Loan Facility, of at least 250 basis points lower than the Backstop Exit Term Loan Facility.

"**Releases**" means the releases set forth in Article VIII of the Plan.

"**Reorganized Debtors**" has the meaning set forth in the Plan.

"**Required Consenting Creditors**" shall mean, at any applicable time of determination, (a) the Required Consenting Term Lenders and (b) the Required Consenting Cross-Holders; *provided* that (i) if, at any applicable time of determination, the Restructuring Support Agreement has been terminated by the Required Consenting Term Lenders, then the definition of "Required Consenting Creditors" shall not include clause (a) above, and (ii) if, at any applicable time of determination, the Restructuring Support Agreement has been terminated by the Required Consenting Cross-Holders, then the definition of "Required Consenting Creditors" shall not include clause (b) above.

"**Required Consenting Cross-Holders**" shall mean, at any applicable time of determination, members of the Cross-Holder Group holding: (i) at least 50.1% of the claims in the Cross-Holder Group and (ii) at least two members of the Cross-Holder Group.

"**Required Consenting Term Lenders**" shall mean, at any applicable time of determination, members of the Term Lender Group holding at least 70.0% (or such other percentage as may be agreed in writing by all members of the Term Lender Group) of the aggregate outstanding principal amount of Term Loan Claims and Senior Secured Notes Claims held by all members of the Term Lender Group.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**Rights Offering**" shall have the meaning set forth in the Plan.

"**Rights Offering Procedures**" shall have the meaning set forth in the Plan.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**Second Day Pleadings**" means any "second day" pleadings that the Company Parties determine are necessary or desirable to file; *provided* that retention applications shall not be considered "second day" pleadings.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Senior Secured Notes**" means the first lien secured notes, due July 1, 2025, issued by Venator Finance S.à.r.l. and Venator Materials LLC.

"**Senior Secured Notes Claim**" means any Claim on account of the Senior Secured Notes.

"**Senior Secured Notes Indenture**" means that certain indenture, dated as of May 22, 2020, between Venator Finance S.à.r.l, as co-issuer, Venator Materials LLC, as co-issuer, and Wilmington Trust, National Association, as trustee, including all amendments, modifications, and supplements thereto.

"**Senior Unsecured Notes**" means the notes, due July 15, 2025, issued by Venator Finance S.à.r.l. and Venator Materials LLC.

"**Senior Unsecured Notes Claim**" means any Claim on account of the Senior Unsecured Notes.

"**Senior Unsecured Notes Indenture**" means that certain indenture, dated as of July 14, 2017, between Venator Finance S.à.r.l., as co-issuer, Venator Materials LLC, as co-issuer, and Wilmington Trust, National Association, as trustee, including all amendments, modifications, and supplements thereto.

"**Solicitation Materials**" means, as applicable, any documents, forms, ballots, notices, and other materials provided in connection with the solicitation of votes on the Plan, as approved by the Bankruptcy Court pursuant to sections 1125 and 1126 of the Bankruptcy Code.

"**Term Lender Group**" means that certain group of holders of Company Party indebtedness represented by the Term Lender Group Advisors.

"**Term Lender Group Advisors**" means White & Case LLP, as primary counsel, local counsel in each relevant jurisdiction, any special regulatory or other specialist counsel, Houlihan Lokey, as financial advisor, and any other non-legal advisors that the Term Lender Group engages in connection with the Restructuring Transactions.

"**Term Lender Group Forbearance Agreement**" means that certain forbearance agreement dated as of April 30, 2023, executed by, among others, Venator Materials PLC, Venator Finance S.à r.l. and Venator Materials LLC, as borrowers, and the Term Lender Group.

"**Term Loans**" means any loans outstanding under the Term Loan Facility.

"**Term Loan Claim**" means any Claim on account of the Term Loans.

"**Term Loan Credit Agreement**" means that certain Term Loan Credit Agreement, dated as of August 8, 2017 (as amended, restated, amended and restated, supplemented and/or otherwise modified), among Venator Materials PLC, as Holdings, Venator Finance S.à.r.l., as borrower, Venator Materials LLC, as borrower, Acquiom Agency Services LLC and Seaport Loan Products LLC, as co-administrative agents, and Acquiom Agency Services LLC, as collateral agent.

"**Term Loan Facility**" means that certain term loan facility under the loan agreement, dated August 8, 2017 (as amended, restated, amended and restated, supplemented and/or otherwise modified), between Venator Finance S.à.r.l., as borrower, Venator Materials LLC, as borrower, Acquiom Agency Services LLC and Seaport Loan Products LLC, as co-administrative agents, and Acquiom Agency Services LLC, as collateral agent.

"**Term Loan Guaranty Agreement**" means that certain Term Loan Guaranty Agreement, dated as of August 8, 2017 (as amended, restated, amended and restated, supplemented and/or otherwise modified), among Venator Materials PLC, as Holdings, Venator Finance S.à.r.l., as borrower, Venator Materials LLC, as borrower, Acquiom Agency Services LLC and Seaport Loan Products LLC, as co-administrative agents, and Acquiom Agency Services LLC, as collateral agent.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 12.01, 12.02, 12.03, or 12.04.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit E**.

1.02.   Interpretation.  For purposes of this Agreement:

(a)   in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)   capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)   unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)   unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof; provided that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)   unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)   the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)   captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)     references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)     the use of "include" or "including" is without limitation, whether stated or not; and

(j)     the phrase "counsel to the Consenting Creditors" refers in this Agreement to each counsel specified in Section 14.12 other than counsel to the Company Parties.

**Section 2.     *Effectiveness of this Agreement*.**  This Agreement shall become effective and binding upon each of the Parties immediately at the time and on the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)     each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties;

(b)     holders of at least two-thirds of the aggregate outstanding principal amount of Term Loans shall have executed and delivered counterpart signature pages of this Agreement;

(c)     holders of at least two-thirds of the aggregate outstanding principal amount of Senior Secured Notes shall have executed and delivered counterpart signature pages of this Agreement;

(d)     holders of at least two-thirds of the aggregate outstanding principal amount of Senior Unsecured Notes shall have executed and delivered counterpart signature pages of this Agreement;

(e)     the Company Parties shall have paid all accrued and outstanding, reasonable and documented fees and expenses of the Term Lender Group Advisors and the Cross-Holder Group Advisors, in each case, to the extent then invoiced and due; and

(f)     counsel to the Company Parties shall have given notice to counsel to the Consenting Creditors in the manner set forth in Section 14.12 hereof (by email or otherwise) that the other conditions to the Agreement Effective Date set forth in Section 2(a) through (e) have occurred.

**Section 3.     *Definitive Documents*.**

3.01.   The Restructuring Transactions contemplated herein will be implemented pursuant to the Definitive Documents, in each case on substantially the same terms set forth in and otherwise consistent in all material respects with this Agreement, including the DIP Term Sheet, and the Plan and each Definitive Document shall be in form and substance reasonably acceptable to the Required Consenting Creditors; *provided*, that the Exit Financing Documents, the DIP Documents, the Backstop Commitment Agreement, any other documents relating to the Rights Offering, any KEIP or KERP, and the New Corporate Governance Documents shall be in form and substance acceptable to the Required Consenting Creditors.

3.02.   The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion.  Upon completion, the

Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 13, and shall otherwise be in form and substance reasonably acceptable to the Company Parties and the Required Consenting Creditors; *provided* that the Exit Financing Documents, the DIP Documents, the Backstop Commitment Agreement, any other documents relating to the Rights Offering, any KEIP or KERP, and the New Corporate Governance Documents shall be in form and substance acceptable to the Required Consenting Creditors.

**Section 4.** *Milestones.*

On and after the Agreement Effective Date, the Company Parties shall use commercially reasonable efforts to implement the Restructuring Transactions in accordance with the following milestones (the "Milestones"), as applicable, unless extended or waived in writing (which may be by electronic mail between applicable counsel) by the Company Parties and the Required Consenting Creditors; provided that the Outside Date may only be waived or extended with the consent of the Required Consenting Creditors in their sole discretion:

(a)     no later than May 13, 2023, the Parties shall have entered into this Agreement, including the exhibits attached hereto;

(b)     no later than May 14, 2023, the Company Parties shall have commenced the Chapter 11 Cases in the Bankruptcy Court and shall have filed the Plan;

(c)     if the Debtors do not commence solicitation prior to the Petition Date, within five (5) Business Days after the Petition Date, the Debtors shall file a motion seeking conditional approval of the Disclosure Statement;

(d)     no later than three (3) Business Days after the Petition Date, the Bankruptcy Court shall have entered the interim DIP Order and the interim Cash Collateral Order;

(e)     no later than thirty-five (35) days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order and the final Cash Collateral Order;

(f)     no later than sixty (60) days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order; and

(g)     no later than sixty-five (65) days after the Petition Date (the "**Outside Date**"), the Plan Effective Date shall have occurred.

**Section 5.** *Commitments of the Consenting Creditors.*

5.01.   General Commitments, Forbearances, and Waivers.

(a)     During the Agreement Effective Period, each Consenting Creditor agrees, in respect of all of its Company Claims/Interests, to:

(i)      to the extent permitted by law and subject to the terms hereof, support the Restructuring Transactions and vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions;

(ii)     to the extent practicable and subject to the terms hereof, to use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders;

(iii)    prior to the Plan Effective Date, take all commercially reasonable actions to preserve the New Board's ability to implement the strategic transactions set forth in the business plan delivered to the members of the Term Lender Group and the Cross-Holder Group on February 23, 2023;

(iv)     give any notice, order, instruction, or direction to the applicable Agents/Trustee necessary to give effect to the Restructuring Transactions; *provided* that nothing in this Agreement shall limit the right of any Consenting Creditor to exercise any right or remedy provided under the DIP Documents, Confirmation Order or any other document related to the Restructuring Transactions; and

(v)      negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with this Agreement to which it is required to be a party; *provided* that nothing in this Section 5.01(a) shall require any Consenting Creditor to incur any expenses, liabilities or other obligations, or agree to any commitments, undertakings, concessions, indemnities or other arrangements, that could result in expenses, liabilities or other obligations to any such Party, other than as specifically stated in this Agreement or the Plan.

(b)      During the Agreement Effective Period, each Consenting Creditor agrees, in respect of all of its Company Claims/Interests, to the extent practicable and subject to the terms hereof, that it shall not directly or indirectly:

(i)      object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(ii)     object to or commence any legal proceeding challenging the liens or claims (including the priority thereof) (i) granted pursuant to the Term Loan Credit Agreement, Senior Secured Notes Indenture, or the Senior Unsecured Notes Indenture (as applicable) or (ii) granted or proposed to be granted to the DIP Lenders under the DIP Order;

(iii)    propose, file, support, or vote for any Alternative Restructuring Proposal;

(iv)     file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan;

13

(v)     initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the other Restructuring Transactions contemplated herein against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

(vi)     exercise, or direct any other person to exercise, any right or remedy, directly or indirectly, for the enforcement, collection of outstanding debt or guarantees, or recovery of any of the Claims against or Interests in the Company Parties, including in connection with any obligations of the Company Parties under the Prepetition ABL Credit Agreement, the Term Loan Credit Agreement, the Senior Secured Notes Indenture, and/or the Senior Unsecured Notes Indenture, the ABL Guaranty Agreement and/or the Term Loan Credit Guaranty Agreement that are in effect on or prior to the Execution Date or that may arise after the Execution Date; or

(vii)     object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code.

5.02.   <u>Commitments with Respect to Chapter 11 Cases</u>.

(a)     During the Agreement Effective Period, each Consenting Creditor that is entitled to vote to accept or reject the Plan, as approved by the Bankruptcy Court as containing "adequate information" as such term is defined in section 1125 of the Bankruptcy Code, whether before or after the commencement of the Chapter 11 Cases, pursuant to its terms agrees that it shall, subject to receipt by such Consenting Creditor (in each case, solely in respect of the Plan that complies with the terms of this Agreement), of the Solicitation Materials:

(i)     vote each of its Company Claims/Interests to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot;

(ii)     to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, elect not to opt out of the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election; and

(iii)     not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i) and (ii) above; *provided* that such vote may be revoked (and, upon such revocation, deemed void *ab initio*) by such Consenting Creditor at any time if this Agreement is terminated (it being understood by the Parties that any modification of the Plan that results in a termination of this Agreement pursuant to the terms hereof shall entitle such Consenting Creditor to an opportunity to change its vote in accordance with section 1127(d) of the Bankruptcy Code, and the Solicitation Materials shall be consistent with this proviso).

(b)     During the Agreement Effective Period, each Consenting Creditor, in respect of each of its Company Claims/Interests, will support, and will not directly or indirectly object to, delay, impede, or take any other action to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement.

**Section 6.**     *Additional Provisions Regarding the Consenting Creditors' Commitments*.

6.01.     Notwithstanding anything contained in this Agreement, nothing in this Agreement shall: (a) affect the ability of any Consenting Creditor to consult with any other Consenting Creditor, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee); (b) impair or waive the rights of any Consenting Creditor to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; (c) prevent any Consenting Creditor from enforcing any right, remedy, condition, consent, or approval under this Agreement or any other Definitive Document to the extent not inconsistent with this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement; (d) limit under any applicable bankruptcy, insolvency, foreclosure or similar proceeding, including, appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, in each case provided that such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and do not hinder, delay or prevent consummation of the Restructuring Transactions; (e) limit any right to take or direct any action relating to maintenance, protection, or preservation of any collateral provided that such action is not inconsistent with this Agreement and does not hinder, delay or prevent consummation of the Restructuring Transactions; and (f) limit any right to purchase, sell or enter into any transactions in connection with respect to any claims or interests held by the Consenting Creditors, subject to the terms of this Agreement.

6.02.     The Parties understand that the Consenting Creditors are engaged in a wide range of financial services and businesses. In furtherance of the foregoing, the Parties acknowledge and agree that, to the extent a Consenting Creditor expressly indicates on its signature page hereto that it is executing this Agreement on behalf of specific trading desk(s) and/or business group(s) of the Consenting Creditor, the obligations set forth in this Agreement shall only apply to such trading desk(s) and/or business group(s) and shall not apply to any other trading desk or business group of the Consenting Creditor, so long as they are not acting at the direction or for the benefit of Consenting Creditor, or such entities' investment in the Company Parties.

**Section 7.**     *Commitments of the Company Parties*.

7.01.     <u>Affirmative Commitments</u>.  Except as set forth in Section 8, during the Agreement Effective Period, the Company Parties agree to:

(a)     support and take all steps reasonably necessary and desirable to consummate the Restructuring Transactions in accordance with this Agreement;

(b)     pursue the Restructuring Transactions on the terms set forth in this Agreement, including all exhibits attached hereto and not sign any agreement to pursue any auction, sale process or other restructuring transaction of any of the Company Parties or any of its Affiliates.

(c)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, take all steps reasonably necessary and desirable to address any such impediment;

(d)     use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Restructuring Transactions;

(e)       implement the Restructuring Transactions in such a manner that is tax-efficient and reasonably acceptable to the Consenting Creditors;

(f)       negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(g)       complete the Restructuring Transactions in a timely and expeditious manner, and as otherwise required by this Agreement, including compliance with each Milestones contained herein;

(h)       (A) operate the business of each of the Company Parties (and their Affiliates) in the ordinary course and materially consistent with past practice and in a manner that is materially consistent with this Agreement and the business plan of the Company Parties and their Affiliates and confer with the Consenting Creditors and their respective representatives, as reasonably requested, on operational matters and the general status of ongoing operations, and (B) provide the Consenting Creditors with any information reasonably requested regarding the Company Parties (and their Affiliates) and reasonable access to management and advisors of the Company Parties (and their Affiliates) for the purposes of evaluating the Company Parties' (and their Affiliates) assets, liabilities, operations, businesses, finances, strategies, prospects and affairs. Notwithstanding the generality of the foregoing, the Company Parties (and their Affiliates, if applicable) shall, except as expressly contemplated by this Agreement or with the prior written consent of the Required Consenting Creditors, not to be unreasonably withheld or delayed, and, subject to applicable bankruptcy law, use commercially reasonable efforts consistent with the Restructuring Transactions to (1) maintain their physical assets, properties and facilities in their current working order, condition and repair as of the date hereof, ordinary wear and tear excepted, (2) perform all obligations required to be performed by the Company Parties under any executory contracts or unexpired leases that have not been rejected by order of the Bankruptcy Court, (3) maintain their books and records on a basis consistent with prior practice, (4) bill for products sold or services rendered and pay accounts payable in a manner generally consistent with past practice, but taking into account the Restructuring Transactions, (5) maintain all insurance policies, or suitable replacements therefor, in full force and effect through the close of business on the Plan Effective Date, and (6) neither encumber nor enter into any material new leases, licenses or other use or occupancy agreements for real property or any part thereof;

(i)       provide prompt written notice to the Consenting Creditors between the date hereof and the Plan Effective Date of (A) the occurrence, or failure to occur, of any event of which the Company Parties (or their Affiliates) have actual knowledge and which such occurrence or failure would likely cause (1) any representation of the Company Parties contained in this Agreement to be untrue or inaccurate in any material respect, (2) any covenant of the Company Parties contained in this Agreement not to be satisfied in any material respect or (3) any condition precedent contained in the Plan or this Agreement not to occur or become impossible to satisfy, (B) receipt of any written notice from any third party alleging that the consent of such party is or may be required in connection with the Restructuring Transactions, (C) receipt of any written notice from any governmental body that threatens to impede, frustrate, or delay in a material respect the implementation of the Restructuring Transactions, (D) receipt of any written notice of any proceeding commenced, or, to the actual knowledge of the Company Parties, threatened against

the Company Parties (or their Affiliates), to impede, frustrate, or delay in a material respect the implementation of the Restructuring Transactions, and (E) any failure of the Company Parties to comply with or satisfy in a material respect any covenant, condition, or agreement to be complied with or satisfied hereunder;

(j)　　promptly notify the Consenting Creditors in writing of any governmental or third party complaints, litigations, investigations, or hearings (or communications indicating that the same may be contemplated or threatened) against the Company Parties;

(k)　　comply in all material respects with the terms and conditions of the DIP Term Sheet, the DIP Credit Agreement and the DIP Orders and any amendments related thereto;

(l)　　pay in full all fees, costs, and expenses (i) in cash in accordance with Section 14.01 of this Agreement, and (ii) in cash or in kind, as applicable, in accordance with the DIP Orders;

(m)　　cause the Confirmation Order to become effective and enforceable immediately upon its entry and to have the period in which an appeal thereto must be filed commence immediately upon its entry;

(n)　　use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent;

(o)　　provide counsel to the Consenting Creditors with at least three (3) calendar days (or such shorter review period if necessary in light of exigent circumstances) with draft copies of all material motions, proposed orders, or amended versions thereof that the Company Parties intend to file with the Bankruptcy Court and, at least five (5) calendar days (or such shorter review period if necessary in light of exigent circumstances) prior to the date when the applicable Company Party intends to file, provide draft copies of any Definitive Documents and related motions, the Confirmation Order, and any supplements to the Plan. The Company Parties shall consult in good faith with counsel to the Consenting Creditors regarding all material proposed filings with the Bankruptcy Court; *provided* that the consent requirements set forth in this Section 7.01(o) shall apply with respect to any motions, declarations, proposed orders or other filings with the Bankruptcy Court; and

(p)　　promptly notify the Consenting Creditors in writing if the ABL Forbearance Agreement or the Term Lender Group Forbearance Agreement are terminated for any reason, or are adversely modified, amended, or waived without the prior written consent of the Required Consenting Creditors, at any time prior to the commencement of the Chapter 11 Cases.

7.02.　Negative Commitments. Except as set forth in Section 8, during the Agreement Effective Period, each of the Company Parties, shall not directly or indirectly:

(a)　　object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)　　take any action that is inconsistent in any material respect with, and is intended to, or is likely to, frustrate or impede approval, implementation and consummation of the Restructuring Transactions described in, this Agreement or the Plan;

(c)     object to or commence any legal proceeding challenging the liens or claims (including the priority thereof): (i) granted pursuant to the Term Loan Credit Agreement, Senior Secured Notes Indenture, or the Senior Unsecured Notes Indenture (as applicable) or (ii) granted or proposed to be granted to the DIP Lenders under the DIP Order;

(d)     (i) declare or make any non-ordinary course payments to any insiders (as such term is defined in section 101(31) of the Bankruptcy Code) of the Company Parties or any Affiliate thereof, (ii) otherwise adjust, amend, supplement, alter or otherwise modify the compensation programs, structure, incentives, awards, or rewards owed to any insiders (as such term is defined in section 101(31) of the Bankruptcy Code) of such Company Party or any Affiliate thereof, and (iii) file any motion with the Bankruptcy Court seeking to approve and implement any KEIP or KERP, in each case of the foregoing clauses (i) through (iii), absent the prior written consent of the Required Consenting Creditors;

(e)     modify the DIP Orders or the Plan, in whole or in part, in a manner that is not consistent with this Agreement in all material respects; or

(f)     file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan.

**Section 8.**     *Additional Provisions Regarding Company Parties' Commitments*.

8.01.     Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, after consulting with counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 8.01 shall not be deemed to constitute a breach of this Agreement. The Company Parties shall provide written notice within two (2) calendar days to counsel to the Consenting Creditors of any determination made in accordance with this Section 8.01 to take or refrain from taking any action.

8.02.     Notwithstanding anything to the contrary in this Agreement (but subject to Section 8.01), each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to:  (a) consider, respond to, and facilitate Alternative Restructuring Proposals; (b) provide access to non-public information concerning any Company Party to any Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Entity; (c) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternative Restructuring Proposals; and (e) enter into or continue discussions or new negotiations with holders of Claims against or Equity Interests in a Company Party (including any Consenting Creditor), any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Entity regarding the Restructuring Transactions or Alternative Restructuring Proposals.  If (x) any Company Party receives an Alternative Restructuring Proposal, or any update to an Alternative Restructuring Proposal from

the counterparty thereto, or (y) the board of directors, board of managers, or such similar governing body of any Company Party, in the exercise of its fiduciary duties, approves an Alternative Restructuring Proposal, then such Company Party shall within two (2) calendar days of receiving or approving such a proposal, provide counsel to the Consenting Creditors with all documentation received in connection with such Alternative Restructuring Proposal, and, in the case of clause (y), notice that such board of directors, board of managers, or such similar governing body of such Company Party has approved an Alternative Restructuring Proposal.

8.03.    Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 9.**     *Transfer of Interests and Securities*.

9.01.    During the Agreement Effective Period, no Consenting Creditor shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Company Claims/Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

(a)     in the case of any Company Claims/Interests, the authorized transferee is either (1) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (2) a non-U.S. person in an offshore transaction as defined under Regulation S under the Securities Act, (3) an institutional accredited investor (as defined in the Rules), or (4) a Consenting Creditor; and

(b)     either (i) the transferee executes and delivers to counsel to the Company Parties, at or before the time of the proposed Transfer, a Transfer Agreement or (ii) the transferee is a Consenting Creditor and the transferee provides notice of such Transfer (including the amount and type of Company Claim/Interest Transferred) to counsel to the Company Parties at or before the time of the proposed Transfer.

9.02.    Upon compliance with the requirements of Section 9.01, transferee shall be deemed a "Consenting Creditor" and a "Party" under this Agreement, and the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests.  Any Transfer in violation of Section 9.01 shall be void *ab initio*.

9.03.    This Agreement shall in no way be construed to preclude the Consenting Creditors from acquiring additional Company Claims/Interests; provided, however, that (a) such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Creditor be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the Consenting Creditors) and (b) such Consenting Creditor must provide notice of such acquisition (including the amount and type of Company Claim/Interest acquired) to counsel to the Company Parties within five (5) Business Days of such acquisition.

9.04.    This Section 9 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Creditor to Transfer any of its Company Claims/Interests.  Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

9.05.    Notwithstanding Section 9.01, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims/Interests if (i) such Qualified Marketmaker subsequently transfers such Company Claims/Interests (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (ii) the transferee otherwise is a Permitted Transferee under Section 9.01; and (iii) the Transfer otherwise is a Permitted Transfer under Section 9.01.  To the extent that a Consenting Creditor is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting Creditor without the requirement that the transferee be a Permitted Transferee.

9.06.    Notwithstanding anything to the contrary in this Section 9, the restrictions on Transfer set forth in this Section 9 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

**Section 10.** *Representations and Warranties of Consenting Creditors*.  Each Consenting Creditor severally, and not jointly, represents and warrants that, as of the date such Consenting Creditor executes and delivers this Agreement and as of the Plan Effective Date:

(a)    it is the beneficial or record owner of the face amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Company Claims/Interests other than those reflected in, such Consenting Creditor's signature page to this Agreement, a Joinder, or a Transfer Agreement, as applicable (as may be updated pursuant to Section 9);

(b)    it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Company Claims/Interests;

(c)    such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Creditor's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)      it has the full power to vote, approve changes to, and transfer all of its Company Claims/Interests referable to it as contemplated by this Agreement subject to applicable Law;

(e)      solely with respect to holders of Company Claims/Interests, (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in the Rules), and (ii) any securities acquired by the Consenting Creditor in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act;

**Section 11.**      *Mutual Representations, Warranties, and Covenants*.   Each of the Parties represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement, a Joinder, or Transfer Agreement on the Plan Effective Date:

(a)      it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)      except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)      the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)      except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)      except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

**Section 12.**      *Termination Events*.

12.01.   <u>Consenting Creditor Termination Events</u>.   This Agreement may be terminated (a) with respect to the Term Lender Group, by the Required Consenting Term Lenders and (b) with respect to the Cross-Holder Group, by the Required Consenting Cross-Holders, in each case, by

the delivery to the Company Parties of a written notice in accordance with Section 14.12 hereof upon the occurrence of the following events:[2]

(a)     upon the failure to meet any of the Milestones;

(b)     upon delivery of a notice by any Company Party in accordance with Section 14.12 regarding (i) the determination by such Company Party's board of directors, board of managers, or such similar governing body to exercise its termination right set forth in Section 12.02(b), or (ii) in accordance with Section 8.02, such Company Party's board of directors, board of managers, or such similar governing body having approved, on due and proper authority of such board of directors, board of managers, or such similar governing body, an Alternative Restructuring Proposal;

(c)     the breach in any material respect by a Company Party of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that (i) is adverse to the Consenting Creditors seeking termination pursuant to this provision and (ii) remains uncured for ten (10) Business Days after such terminating Consenting Creditors transmit a written notice in accordance with Section 14.12 hereof detailing any such breach;

(d)     the occurrence and continuance of any Event of Default (as defined in DIP Credit Agreement) that is not cured in accordance with the DIP Credit Agreement;

(e)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for twenty (20) Business Days after such terminating Consenting Creditors transmit a written notice in accordance with Section 14.12 hereof detailing any such issuance; *provided that* this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(f)     any of the Definitive Documents, after execution or approval of the Court, as applicable, (i) contain terms, conditions, representations, warranties or covenants that are not materially consistent with the terms of this Agreement; (ii) shall have been amended or modified in a manner that is material and adverse to such Consenting Creditor seeking termination pursuant to this provision; or (iii) shall have been withdrawn, in each case, without the consent of the applicable Party in accordance with its approval rights under this Agreement, and in the case of a Definitive Document that is also an order, including the Confirmation Order, such order shall have been materially stayed, reversed, vacated or adversely modified, without the prior written consent of the Required Consenting Creditors, unless the Company Parties have sought a stay of such order within five (5) Business Days after the date of such issuance, and such order is stayed, reversed or vacated within fifteen (15) Business Days after the date of such issuance;

---

[2]     No party may terminate this Agreement if such party failed to perform or comply in all material respects with the terms and conditions of this Agreement or the DIP Documents with such failure to perform or comply causing, or resulting in, the occurrence of one or more termination events (including cross-defaults) specified herein.

(g)     the Bankruptcy Court enters an order avoiding, disallowing, subordinating or recharacterizing any claim, lien or interest held by any Consenting Creditor, unless the Company Parties have sought a stay of such order within five (5) Business Days after the date of such issuance, and such order is stayed, reversed or vacated within fifteen (15) Business Days after the date of such issuance;

(h)     any of the Company Parties file a pleading (or support, assist, or solicit any other person to file a pleading) seeking approval of any Alternative Restructuring Proposal (or any approval of any sales, voting, or other procedures in connection with an Alternative Restructuring Proposal) without the prior written consent of the Required Consenting Creditors;

(i)     the Bankruptcy Court grants relief that (i) is inconsistent with this Agreement in any material respect and (ii) would, or would reasonably be expected to, materially frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring Transactions, unless the Company Parties have sought a stay of such relief within five (5) Business Days after the date of such issuance, and such order is stayed, reversed or vacated within fifteen (15) Business Days after the date of such issuance;

(j)     the Bankruptcy Court enters an order denying confirmation of the Plan; or

(k)     the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Creditors), (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, or (iii) rejecting this Agreement.

12.02.  <u>Company Party Termination Events</u>. Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 14.12 hereof upon the occurrence of any of the following events:[3]

(a)     the breach in any material respect by one or more of the Consenting Creditors of any provision set forth in this Agreement that remains uncured for a period of ten (10) Business Days after the receipt by the Consenting Creditors of written notice of such breach from the Company Parties;

(b)     the board of directors, board of managers, or such similar governing body of any Company Party determines in good faith, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(c)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the

---

[3]     No party may terminate this Agreement if such party failed to perform or comply in all material respects with the terms and conditions of this Agreement or the DIP Documents with such failure to perform or comply causing, or resulting in, the occurrence of one or more termination events (including cross-defaults) specified herein.

consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for twenty (20) Business Days after such terminating Company Party transmits a written notice in accordance with Section 14.12 hereof detailing any such issuance; *provided*, that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement; or

(d)      the Bankruptcy Court enters an order denying confirmation of the Plan, and such order remains in effect for fourteen (14) days after entry of such order.

12.03.   <u>Mutual Termination</u>.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following:  (a) the Required Consenting Creditors; and (b) each Company Party.

12.04.   <u>Automatic Termination</u>.  This Agreement shall terminate automatically without any further required action or notice immediately after the Plan Effective Date.

12.05.   <u>Effect of Termination</u>.  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action.  Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by a Bankruptcy Court, any and all consents or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise; *provided, however*, any Consenting Creditor withdrawing or changing its vote pursuant to this Section 12.05 shall promptly provide written notice of such withdrawal or change to counsel to each other Party to this Agreement. Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Creditors from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Creditor, and (b) any right of any Consenting Creditor, or the ability of any Consenting Creditor, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Creditor.  No purported termination of this Agreement shall be effective under this Section 12.05 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to Section 12.02(b) or Section 12.02(d).  Nothing in this Section 12.05 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 12.02(b).

**Section 13.**     *Amendments and Waivers*.

(a)     This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 13.

(b)     This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by:  (i) each Company Party and (ii) either (A) the following Parties, solely with respect to any modification, amendment, waiver, or supplement that affects the rights of only such Parties and unless otherwise specified in this Agreement: (y) the Required Consenting Term Lenders or (z) the Required Consenting Cross-Holders; or (B) the Required Consenting Creditors with respect to any other modification, amendment, waiver, or supplement; *provided* that, if the proposed modification, amendment, waiver, or supplement has a material, disproportionate, and adverse effect on any of the Company Claims/Interests (including any Claims under the DIP Facility) held by a Consenting Creditor, then the consent of each such affected Consenting Creditor shall also be required to effectuate such modification, amendment, waiver or supplement.  If a Consenting Creditor does not consent to a waiver, change, modification, or amendment to this Agreement requiring the consent of such Consenting Creditor (a "**Non-Consenting Creditor**") pursuant to this paragraph but such waiver, change, modification, or amendment receives the consent of the Required Consenting Term Lenders or the Required Consenting Cross-Holders, as applicable, then this Agreement shall be deemed to have been terminated only as to such Non-Consenting Creditor, and this Agreement shall continue in full force and effect in respect to all other Consenting Creditors. No Consenting Creditor shall have any liability to any other Consenting Creditor arising from or related to any waivers, modifications, amendments or supplements pursuant to the terms of this Agreement.

(c)     Any proposed modification, amendment, waiver or supplement that does not comply with this Section 13 shall be ineffective and void *ab initio*.

(d)     The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 14.**     *Miscellaneous*

14.01.  <u>Transaction Expenses</u>.  During the Agreement Effective Period, the Company Parties agree to pay all accrued and outstanding, reasonable and documented fees and expenses of the Cross-Holder Group Advisors and the Term Lender Group Advisors.  The Plan shall provide that, as a condition to the Plan Effective Date, the Company Parties shall have paid all accrued and outstanding, reasonable and documented fees and expenses of the Cross-Holder Group Advisors and the Term Lender Group Advisors, including the success fees of any applicable advisors.

14.02. <u>Holdings Information</u>. Except as required by applicable law, no Party or its advisors shall disclose to any person or entity (including, for the avoidance of doubt, any other Consenting Creditor), other than the Company Parties or advisors to the Company Parties, the principal amount or percentage of claims and/or interests held by the applicable Consenting Creditor without such Consenting Creditors' prior written consent; *provided* that (a) if such disclosure is required by law, subpoena or other legal process or regulation, the disclosing Party shall afford the relevant Consenting Creditor a reasonable opportunity to review and comment before such disclosure and shall take all reasonable measures to limit such disclosure, (b) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount held by all Consenting Creditors collectively, and (c) any Party may disclose information requested by a U.S. federal or state regulatory authority with jurisdiction over its operations to such authority without limitation or notice to any Party or other person or entity. Any public filing of this Agreement which includes executed signature pages to this Agreement shall include such signature pages only in redacted form with respect to the holdings of each Consenting Creditors.

14.03. <u>Acknowledgement</u>. Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

14.04. <u>Exhibits Incorporated by Reference; Conflicts</u>. Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules. In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

14.05. <u>Further Assurances</u>. Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

14.06. <u>Complete Agreement</u>. Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

14.07. <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF. Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims

arising under this Agreement:  (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

14.08.  <u>TRIAL BY JURY WAIVER</u>.  EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

14.09.  <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

14.10.  <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Company Parties and the Consenting Creditors, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Company Parties and the Consenting Creditors were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

14.11.  <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

14.12.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)      if to a Company Party, to:

Venator Materials PLC
Titanium House
Hanzard Drive
Wynyard Park
Stockton-On-Tees
United Kingdom
TS22 5FD
Attention: Russ Stolle, Executive Vice President, General Counsel
and Chief Compliance Officer
E-mail address: russ_stolle@venatorcorp.com

with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:  Steven Serajeddini, P.C.
E-mail address:  steven.serajeddini@kirkland.com

and

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Attention:  Jeff Michalik and Ashley Surinak
E-mail address: jeff.michalik@kirkland.com; ashley.surinak@kirkland.com

(b)     if to a member of the Cross-Holder Group, to:

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
Attention:     Scott J. Greenberg and Steven Domanowski
E-mail address: sgreenberg@gibsondunn.com; sdomanowski@gibsondunn.com

and

Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue
Washington, DC 20036
Attention: AnnElyse Scarlett Gains
E-mail address: agains@gibsondunn.com

(c)     if to a member of the Term Lender Group, to:

White & Case LLP
1221 Avenue of the Americas
New York, NY 10020
Attention:     Harrison Denman
               Scott Greissman
E-mail address: harrison.denman@whitecase.com; sgreissman@whitecase.com

Any notice given by delivery, mail, or courier shall be effective when received.

14.13.  <u>Independent Due Diligence and Decision Making</u>.   Each Consenting Creditor hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.

14.14.  <u>Enforceability of Agreement</u>.  Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

14.15.  <u>Waiver</u>.  If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

14.16.  <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

14.17.  <u>Several, Not Joint, Claims</u>.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

14.18.  <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

14.19.  <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

14.20.  <u>Capacities of Consenting Creditors</u>.  Each Consenting Creditor has entered into this agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

14.21.  <u>Survival</u>.  Notwithstanding (i) any Transfer of any Company Claims/Interests in accordance with this Agreement or (ii) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Section 15 and the Confidentiality Agreements (as applicable pursuant to the terms of the Confidentiality Agreement) shall survive such Transfer and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof.

14.22.  <u>Relationship Among Parties</u>.

(a)     Notwithstanding anything herein to the contrary, (i) the duties and obligations of the Parties under this Agreement shall be several, not joint, (ii) no Party shall have any responsibility by virtue of this Agreement for any trading by any other entity; (iii) no prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this Agreement; (iv) the Parties hereto acknowledge that this Agreement does not constitute an agreement, arrangement or understanding with respect to acting together for the purpose of acquiring, holding, voting or disposing of any equity securities of the Company Parties and the Parties do not constitute a "group" within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended; (v) none of the Parties shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities in any kind or form to each other, including as a result of this Agreement or the transactions contemplated herein or in the Plan; and (vi) no action taken by any Party pursuant to this Agreement shall be deemed to constitute or to create a presumption by any of the Parties that the Parties are in any way acting in concert or as such a "group."

(b)     Notwithstanding anything to the contrary herein, this Agreement (including the Plan) and the transactions contemplated hereby shall not create any fiduciary duties between and among the Consenting Creditors (in their capacity as holders of claims), or other duties or responsibilities to each other, the Company Parties, or any Company Parties' creditors or other stakeholders.

14.23.  <u>Reporting of Claims</u>. The Parties agree and acknowledge that the Consenting Creditors' rights are reserved with respect to the reported amount of the Company Claims/Interests in each Consenting Creditor's signature block (including, without limitation, any reporting or lack of reporting with respect to principal, accrued and unpaid interest, makewhole fees and expenses) and any disclosure made on any signature block shall be without prejudice to any subsequent assertion by or on behalf of such Consenting Creditor of the full amount of its Company Claims/Interests; *provided* that, notwithstanding the foregoing, this Section 14.23 shall in no way limit any commitments or obligations of the Consenting Creditors with respect to their Company Claims/Interests, including, without limitation, as set forth in Section 5, Section 9, and Section 10 hereof.

14.24.  <u>Claim Resolution Matters</u>. Prior to the Plan Effective Date, the Company Parties shall not enter into any agreements with holders of material claims (as defined in the Bankruptcy Code) other than as contemplated in this Agreement, relating to the allowance, estimation, validity, extent, or priority of such material claims, or the treatment and classification of such material claims under the Plan without the prior written consent of the Required Consenting Creditors, except with respect to (a) material claims which the Debtors are authorized to resolve or pay pursuant to any applicable first day orders or (b) material claims as otherwise contemplated herein.

14.25.  <u>Settlement Discussions</u>. This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties.  Pursuant to Rule 408 of the Federal Rules of Evidence, any applicable state rules of evidence, and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible

into evidence in any proceeding for the purposes prohibited by such rules, other than in a proceeding to enforce the terms of this Agreement.

14.26. <u>Email Consents</u>.   Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3, Section 13, or otherwise, including a written approval by the Company Parties or the Required Consenting Creditors, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.

**Company Parties' Signature Page to
the Restructuring Support Agreement**

**VENATOR MATERIALS PLC**
**VENATOR GROUP CANADA INC**
**VENATOR INVESTMENTS LTD**
**VENATOR P&A FINLAND OY**
**VENATOR FRANCE SAS**
**VENATOR PIGMENTS FRANCE SAS**
**VENATOR CHEMICALS FRANCE SAS**
**VENATOR INTERNATIONAL FRANCE SAS**
**VENATOR GERMANY GMBH**
**VENATOR UERDINGEN GMBH**
**VENATOR HOLDINGS GERMANY GMBH**
**VENATOR WASSERCHEMIE HOLDING GMBH**
**VENATOR FINANCE S.A.R.L.**
**VENATOR P&A SPAIN S.L.U.**
**VENATOR MATERIALS UK LIMITED**
**VENATOR GROUP**
**VENATOR GROUP SERVICES LIMITED**
**VENATOR INTERNATIONAL HOLDINGS UK LIMITED**
**VENATOR INVESTMENTS UK LIMITED**
**VENATOR MATERIALS INTERNATIONAL UK LIMITED**
**VENATOR MATERIALS LLC**
**VENATOR CHEMICALS LLC**
**VENATOR AMERICAS HOLDINGS LLC**
**VENATOR P&A HOLDINGS UK LIMITED**


By: _____

Name:   Kurt Ogden

Authorized Signatory

**Consenting Creditor Signature Page to
the Restructuring Support Agreement**

**[CONSENTING CREDITOR]**

_____
Name:
Title:

Address:

E-mail address(es):

| _Aggregate Amounts Beneficially Owned or Managed on Account of:_ | |
|---|---|
| Term Loans | |
| Senior Secured Notes | |
| Senior Unsecured Notes | |
| Equity Interests | |

## EXHIBIT A

## Company Parties

1. Venator Group Canada Inc
2. Venator Investments Ltd
3. Venator P&A Finland Oy
4. Venator France SAS
5. Venator Pigments France SAS
6. Venator Chemicals France SAS
7. Venator International France SAS
8. Venator Germany GmbH
9. Venator Uerdingen GmbH
10. Venator Holdings Germany GmbH
11. Venator Wasserchemie Holding GmbH
12. Venator Finance S.a.r.l.
13. Venator P&A Spain S.L.U.
14. Venator Materials UK Limited
15. Venator Group
16. Venator Group Services Limited
17. Venator International Holdings UK Limited
18. Venator Investments UK Limited
19. Venator Materials International UK Limited
20. Venator Materials LLC
21. Venator Chemicals LLC
22. Venator Americas Holdings LLC
23. Venator P&A Holdings UK Limited

**<u>EXHIBIT B</u>**

**Chapter 11 Plan**

*Solicitation Version*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VENATOR MATERIALS PLC, *et al.*,[1] | ) | **IMPORTANT**: No chapter 11 case has been commenced as of the date of distribution of this notice. |
| Debtors. | ) | |
| | ) | |

## JOINT PREPACKAGED PLAN OF REORGANIZATION OF
## VENATOR MATERIALS PLC AND ITS DEBTOR AFFILIATES
## PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

> **THIS CHAPTER 11 PLAN IS BEING SOLICITED FOR ACCEPTANCE OR REJECTION IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND WITHIN THE MEANING OF SECTION 1126 OF THE BANKRUPTCY CODE. THIS CHAPTER 11 PLAN WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTORS' FILING FOR CHAPTER 11 BANKRUPTCY.**

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Victoria Argeroplos (TX Bar No. 24105799)
Beau Butler (TX Bar No. 24132535)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone:   (713) 752-4200
Facsimile:   (713) 752-4221
        mcavenaugh@jw.com
        jwertz@jw.com
        vargeroplos@jw.com
        bbutler@jw.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Steven N. Serajeddini, P.C. (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900
Email:       steven.serajeddini@kirkland.com

-and-

Jeffrey T. Michalik (*pro hac vice* pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:   (312) 862-2200
Email:       jeff.michalik@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

Dated:  May 14, 2023

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at http://dm.epiq11.com/Venator. The Debtors' service address in these chapter 11 cases is: Hanzard Drive, Titanium House, Stockton on Tees, Wynyard Park, TS22 5FD, United Kingdom.

# **TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
      GOVERNING LAW ............................................................................................................1
    A.     Defined Terms. ........................................................................................................1
    B.     Rules of Interpretation. ..........................................................................................15
    C.     Computation of Time. ............................................................................................16
    D.     Governing Law. .....................................................................................................16
    E.     Reference to Monetary Figures. .............................................................................16
    F.     Reference to the Debtors or the Reorganized Debtors. ..........................................16
    G.     Controlling Document. ..........................................................................................16
    H.     Consent Rights. ......................................................................................................17

ARTICLE II. ADMINISTRATIVE CLAIMS, PRIORITY CLAIMS, DIP CLAIMS, AND
      RESTRUCTURING EXPENSES .....................................................................................17
    A.     Administrative Claims. ..........................................................................................17
    B.     Priority Tax Claims. ..............................................................................................17
    C.     DIP Claims. ...........................................................................................................18
    D.     Professional Fee Claims. ........................................................................................18
    E.     Payment of Restructuring Expenses. ......................................................................19

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ....................19
    A.     Classification of Claims and Interests. ..................................................................19
    B.     Treatment of Claims and Interests. ........................................................................20
    C.     Special Provision Governing Unimpaired Claims. ................................................23
    D.     Elimination of Vacant Classes. ..............................................................................23
    E.     Voting Classes, Presumed Acceptance by Non-Voting Classes. ...........................23
    F.     Intercompany Interests. .........................................................................................23
    G.     Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. .................23
    H.     Controversy Concerning Impairment. ...................................................................23
    I.     Subordinated Claims. ............................................................................................24

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN .........................................................24
    A.     General Settlement of Claims and Interests. ..........................................................24
    B.     Restructuring Transactions. ...................................................................................24
    C.     The Reorganized Debtors. .....................................................................................25
    D.     Sources of Consideration for Plan Distributions. ..................................................25
    E.     Corporate Existence. .............................................................................................27
    F.     Vesting of Assets in the Reorganized Debtors. .....................................................28
    G.     Cancellation of Existing Agreements and Interests. ..............................................28
    H.     Corporate Action. ..................................................................................................29
    I.     New Corporate Governance Documents. ...............................................................29
    J.     Directors and Officers of the Reorganized Debtors. .............................................29
    K.     Effectuating Documents; Further Transactions. ....................................................30
    L.     Certain Securities Law Matters. .............................................................................30
    M.    Section 1146 Exemption. .......................................................................................31
    N.     Employment Obligations. ......................................................................................31
    O.     Management Incentive Plan. ..................................................................................32
    P.     Preservation of Causes of Action. .........................................................................32
    Q.     DTC Eligibility. .....................................................................................................33
    R.     Closing the Chapter 11 Cases. ...............................................................................33

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .............33
    A.     Assumption of Executory Contracts and Unexpired Leases. .................................33

|   | B. | Claims Based on Rejection of Executory Contracts or Unexpired Leases. | 34 |
|   | C. | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. | 34 |
|   | D. | Insurance Policies. | 35 |
|   | E. | Indemnification Policies. | 36 |
|   | F. | Reservation of Rights. | 36 |
|   | G. | Nonoccurrence of Plan Effective Date. | 36 |
|   | H. | Contracts and Leases Entered Into After the Petition Date. | 36 |

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ....................................................... 36
|   | A. | Timing and Calculation of Amounts to Be Distributed. | 36 |
|   | B. | Disbursing Agent. | 37 |
|   | C. | Rights and Powers of Disbursing Agent. | 37 |
|   | D. | Delivery of Distributions and Undeliverable or Unclaimed Distributions. | 37 |
|   | E. | Manner of Payment. | 38 |
|   | F. | Section 1145 Exemption. | 39 |
|   | G. | Compliance with Tax Requirements. | 39 |
|   | H. | Allocations. | 39 |
|   | I. | Foreign Currency Exchange Rate. | 39 |
|   | J. | Setoffs and Recoupment. | 39 |
|   | K. | Claims Paid or Payable by Third Parties. | 40 |

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND DISPUTED CLAIMS ............................................... 41
|   | A. | Disputed Claims Process. | 41 |
|   | B. | Allowance of Claims. | 41 |
|   | C. | Claims Administration Responsibilities. | 41 |
|   | D. | Estimation of Claims and Interests. | 42 |
|   | E. | Adjustment to Claims or Interests without Objection. | 42 |
|   | F. | Disallowance of Claims or Interests. | 42 |
|   | G. | No Distributions Pending Allowance | 43 |
|   | H. | Distributions After Allowance. | 43 |
|   | I. | No Postpetition Interest on Claims. | 43 |

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ............ 43
|   | A. | Discharge of Claims and Termination of Interests. | 43 |
|   | **B.** | **Release of Liens.** | 44 |
|   | **C.** | **Releases by the Debtors.** | 44 |
|   | **D.** | **Releases by Third Parties.** | 46 |
|   | **E.** | **Exculpation.** | 47 |
|   | **F.** | **Injunction.** | 49 |
|   | G. | Protections Against Discriminatory Treatment. | 49 |
|   | H. | Document Retention. | 50 |
|   | I. | Reimbursement or Contribution. | 50 |

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ......................... 50
|   | A. | Conditions Precedent to the Plan Effective Date. | 50 |
|   | B. | Waiver of Conditions. | 51 |
|   | C. | Substantial Consummation | 51 |
|   | D. | Effect of Failure of Conditions. | 51 |

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ................... 51
|   | A. | Modification and Amendments. | 51 |
|   | B. | Effect of Confirmation on Modifications. | 52 |
|   | C. | Revocation or Withdrawal of Plan. | 52 |

ARTICLE XI. RETENTION OF JURISDICTION ......................................................................... 52

ARTICLE XII. MISCELLANEOUS PROVISIONS ................................................................................54
    A.    Immediate Binding Effect. ..............................................................................................54
    B.    Additional Documents. ....................................................................................................54
    C.    Payment of Statutory Fees. ..............................................................................................55
    D.    Statutory Committee and Cessation of Fee and Expense Payment. ................................55
    E.    Reservation of Rights. .....................................................................................................55
    F.    Successors and Assigns....................................................................................................55
    G.    Notices. ............................................................................................................................55
    H.    Term of Injunctions or Stays...........................................................................................57
    I.    Entire Agreement. ...........................................................................................................57
    J.    Exhibits. ..........................................................................................................................57
    K.    Nonseverability of Plan Provisions. ................................................................................57
    L.    Votes Solicited in Good Faith. .........................................................................................58
    M.    Closing of Chapter 11 Cases. ..........................................................................................58
    N.    Waiver or Estoppel...........................................................................................................58

## INTRODUCTION

The Debtors propose this Plan for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used herein and not otherwise defined have the meanings ascribed to such terms in Article I.A of this Plan. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. Holders of Claims against or Interests in the Debtors may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of this Plan, the Restructuring Transactions, and certain related matters. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

### ARTICLE I.
### DEFINED TERMS, RULES OF INTERPRETATION,
### COMPUTATION OF TIME, AND GOVERNING LAW

A.    *Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

1.    "*1125(e) Exculpation Parties*" means, each in their capacities as such, each of: (a) the Debtors; (b) the directors and officers of any of the Debtors; (c) the Reorganized Debtors, (d) the Consenting Creditors; (e) the DIP Agent and the DIP Lenders; (f) the Backstop Parties; (g) the members of the Cross-Holder Group; (h) the members of the Term Lender Group; (i) the ABL Agent and the Holders of DIP Roll-Up Claims; and (j) with respect to the foregoing parties, the Related Parties thereof.

2.    "*ABL Agent*" means JPMorgan Chase Bank, N.A. in its capacities as administrative agent and collateral agent under the Prepetition ABL Credit Agreement.

3.    "*ABL Guaranty Agreement*" means that certain ABL Guaranty Agreement, dated as of August 8, 2017, among Venator Materials PLC, as Holdings, each of the borrowers, and JPMorgan Chase Bank, N.A., as administrative agent and collateral agent.

4.    "*ABL Lender Group Advisors*" means Simpson Thacher & Bartlett, LLP and AlixPartners, LLP and any other advisors retained by the ABL Agent.

5.    "*Administrative Claim*" means a Claim for costs and expenses of administration of the Estates under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Fee Claims in the Chapter 11 Cases; (c) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930; (d) any adequate protection Claim provided for in the DIP Orders; and (e) Restructuring Expenses.

6.    "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code as if the reference Entity was a debtor in a case under the Bankruptcy Code.

7.      "*Agent*" means any administrative agent, collateral agent, or similar Entity under the Prepetition ABL Facility or the Term Loan Facility, including any successors thereto.

8.      "*Agents/Trustees*" means, collectively, each of the Agents and Trustees.

9.      "*Allowed*" means, as to a Claim or an Interest, a Claim or an Interest expressly allowed under the Plan, under the Bankruptcy Code, or by a Final Order, as applicable.  For the avoidance of doubt, (a) there is no requirement to File a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim under the Plan, and (b) the Debtors, with the consent of the Required Consenting Creditors, which shall not be unreasonably withheld, delayed, or conditioned, may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable nonbankruptcy law; *provided*, *however* that the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan.

10.     "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other Claims and Causes of Actions that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under chapter 5 of the Bankruptcy Code or under similar or related state or federal statutes and common law.

11.     "*Backstop Commitment Agreements*" means, collectively, the Exit Term Loan Facility Backstop Commitment Agreement (if any) and the Rights Offering Backstop Commitment Agreement (if any).

12.     "*Backstop Exit Term Loan Amount*" means, collectively, an amount equal to, as applicable: (i) the amount of Cash that the Debtors elect to pay pursuant to the DIP New Money Claims; and/or (ii) the amount of Cash required to satisfy the DIP Roll-Up Claims in full in Cash on the Plan Effective Date.

13.     "*Backstop Exit Term Loan Facility*" means the secured term loan facility (if any) to be entered into by the Backstop Parties and the Reorganized Debtors on the Plan Effective Date.

14.     "*Backstop Parties*" means, collectively, all members of the Term Lender Group that execute the Restructuring Support Agreement and all members of the Cross-Holder Group that execute the Restructuring Support Agreement.

15.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended from time to time.

16.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division, or another United States Bankruptcy Court with jurisdiction over the Chapter 11 Cases.

17.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

18.     "*Business Day*" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York or the City of London.

19.     "*Cash*" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the United States of America.

20.     "*Cause of Action*" or "*Causes of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or otherwise.  Causes of Action also include:  (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any avoidance actions arising under chapter 5 of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

21.     "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

22.     "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code.

23.     "*Claims and Noticing Agent*" means Epiq Corporate Restructuring, LLC, the claims, noticing, and solicitation agent retained by the Debtors in the Chapter 11 Cases, pursuant to an order of the Bankruptcy Court.

24.     "*Claims Register*" means the official register of Claims and Interests in the Debtors maintained by the Claims and Noticing Agent.

25.     "*Class*" means a class of Claims or Interests as set forth in Article III hereof pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code.

26.     "*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

27.     "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

28.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

29.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court on confirmation of the Plan, pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

30.     "*Confirmation Order*" means the order of the Bankruptcy Court approving the Disclosure Statement and confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

31.     "*Consenting Creditors*" has the meaning set forth in the Restructuring Support Agreement.

32.     "*Consummation*" means the occurrence of the Plan Effective Date.

33.    "*Cross-Holder Group*" means that certain ad hoc group of holders of Term Loan Claims, Senior Secured Notes Claims, and Senior Unsecured Notes Claims represented by the Cross-Holder Group Advisors.

34.    "*Cross-Holder Group Advisors*" means Gibson, Dunn & Crutcher LLP, Lazard Frères & Co. LLC, Howley Law PLLC, Krogerus Attorneys Ltd, Loyens & Loeff N.V., and Legance – Avvocati Associati, and any other advisors hired by the Cross-Holder Group.

35.    "*Cure*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

36.    "*Debtor Release*" means the release set forth in Article VIII.C of this Plan.

37.    "*Debtors*" means, collectively, each of the following:  Venator Materials PLC, Venator Group Canada Inc.; Venator Investments Ltd; Venator P&A Finland Oy; Venator France SAS; Venator Pigments France SAS; Venator Chemicals France SAS; Venator International France SAS; Venator Germany GmbH; Venator Uerdingen GmbH; Venator Holdings Germany GmbH; Venator Wasserchemie Holding GmbH; Venator Finance S.à.r.l.; Venator P&A Spain S.L.U.; Venator Materials UK Limited; Venator Group; Venator Group Services Limited; Venator International Holdings UK Limited; Venator Investments UK Limited; Venator Materials International UK Limited; Venator Materials LLC; Venator Chemicals LLC; Venator Americas Holdings LLC; and Venator P&A Holdings UK Limited.

38.    "*Definitive Documents*" means, collectively, the following:  (A) the Plan (including the Releases set forth in Article VIII of this Plan); (B) the Confirmation Order; (C) the Disclosure Statement (and any documents or Solicitation Materials related to the solicitation thereof, including applicable motions and orders); (D) the First Day Pleadings and the Second Day Pleadings (and all orders sought pursuant thereto, including the DIP Orders); (E) any KEIP or KERP; (F) the Plan Supplement (including, the New Corporate Governance Documents, any Management Incentive Plan, and any restructuring steps plan or tax matters agreements); (G) the DIP Documents; (H) the Cash Collateral Orders (together with any related stipulations and cash collateral motion); (I) the Exit ABL Facility Documents; (J) the Exit Term Loan Facility Documents; (K) the Backstop Commitment Agreements; (L) any other documents relating to the Rights Offering; and (M) the Rights Offering Procedures.

39.    "*DIP Agent*" means the administrative agent, collateral agent, or similar Entity under the DIP Credit Agreement.

40.    "*DIP Claim*" means, collectively, the DIP New Money Claims, the DIP Roll-Up Claims, and accrued but unpaid interest and fees arising under the DIP Credit Agreement.

41.    "*DIP Credit Agreement*" means that certain senior secured super priority debtor-in-possession credit agreement by and among the Debtors party thereto, as borrowers or guarantors, the DIP Agent, and the DIP Lenders, as approved by the DIP Orders, as may be amended, restated, supplemented, or otherwise modified from time to time.

42.    "*DIP New Money Facility*" means the $275 million debtor-in-possession credit facility to be provided to the Company Parties on the terms and subject solely to the conditions of the DIP Term Sheet, the DIP Credit Agreement, and the DIP Orders.

43.     "*DIP Documents*" means any documents governing the DIP New Money Facility and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

44.     "*DIP Lenders*" means the lenders providing the DIP New Money Facility under the DIP Documents.

45.     "*DIP New Money Claim*" means any Claim on account of the $275 million loans provided under the DIP New Money Facility (including any and all accrued but unpaid interest and fees arising under the DIP Credit Agreement), including, but not limited to, any Backstop Fee, Commitment Fee, Exit Fee, and Extension Fee, payable on the terms provided for in the DIP Credit Agreement, DIP Orders, and this Plan.

46.     "*DIP Orders*" means, collectively, the Interim DIP Order and the Final DIP Order.

47.     "*DIP Roll-Up Claim*" means any Claims that are rolled up into the DIP Facility pursuant to the DIP Orders, which, for the avoidance of doubt, shall include all obligations under clauses (1), (2), (3), and (4) of the definition of "Obligations" under the Prepetition ABL Credit Agreement and any and all fees and interests payable in respect of such Claims pursuant to the terms of the ABL Credit Agreement.

48.     "*DIP Roll-Up Facility*" means the Prepetition ABL Facility upon the entry of the Interim DIP Order, pursuant to which the Prepetition ABL Claims shall be rolled up and deemed post-petition, debtor-in-possession financing obligations of the Company Parties on the terms and subject solely to the conditions of the DIP Term Sheet and the DIP Orders.

49.     "*DIP Shares*" means the New Ordinary Shares at the Discount Value to be issued to the Holders of DIP Claims, subject to dilution only on account of the MIP Shares.

50.     "*Disbursing Agent*" means, as applicable, the Reorganized Debtors or any Entity the Reorganized Debtors select, as applicable, to make or to facilitate distributions in accordance with the Plan.

51.     "*Disclosure Statement*" means the disclosure statement with respect to the Plan, including all exhibits and schedules thereto, as approved by the Confirmation Order.

52.     "*Discount Value*" means 25.0% of the Plan Equity Value.

53.     "*Disputed*" means, as to a Claim or an Interest, a Claim or an Interest:  (a) that is not Allowed; (b) that is not disallowed under the Plan, the Bankruptcy Code, or a Final Order, as applicable; and (c) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

54.     "*Distribution Record Date*" means the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be the date that is five (5) Business Days prior to the Plan Effective Date or such other date agreed to by the Debtors and the Required Consenting Creditors.

55.     "*DTC*" means The Depository Trust Company.

56.     "*Employment Obligations*" means any existing obligations to employees to be assumed, reinstated, or honored, as applicable, in accordance with Article IV.N of the Plan.

57.     "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

58.     "*Equity Interests*" means collectively, the shares (or any class thereof), common stock, ordinary shares, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Debtor, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, ordinary shares, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor (in each case whether or not arising under or in connection with any employment agreement).

59.     "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code upon the commencement of such Debtor's Chapter 11 Case.

60.     "*Executory Contract*" means a contract to which one or more of the Debtors are a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

61.     "*Existing Equity Interests*" means the Equity Interests in Venator Materials PLC existing immediately prior to the Petition Date.

62.     "*Exit ABL Facility*" means the asset-backed revolving facility to be entered into by the Reorganized Debtors on the Plan Effective Date on terms reasonably satisfactory to the Required Consenting Creditors.

63.     "*Exit ABL Facility Documents*" means any documents governing the Exit ABL Facility and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

64.     "*Exit Backstop Commitment Premium*" means the backstop commitment fee of 10.0% of the Backstop Exit Term Loan Amount payable to the Backstop Parties, at the election of the Required Consenting Creditors, in either Exit Backstop Shares or Cash.

65.     "*Exit Backstop Shares*" means the Exit Backstop Commitment Premium, payable in New Ordinary Shares, if any, issued pursuant to the Exit Term Loan Facility Backstop at the Discount Value, if any.

66.     "*Exit Facilities*" means, collectively, the Exit ABL Facility and the Exit Term Loan Facility.

67.     "*Exit Financing Documents*" means, collectively, the Exit ABL Facility Documents and the Exit Term Loan Facility Documents.

68.     "*Exit Term Loan Facility*" means, as applicable, either the Backstop Exit Term Loan Facility or the Raised Exit Term Loan Facility.

69.     "*Exit Term Loan Facility Backstop*" means the Backstop Parties' commitment to backstop the Backstop Exit Term Loan Facility, if any.

70.     "*Exit Term Loan Facility Backstop Commitment Agreement*" means that certain Exit Term Loan Facility Backstop Commitment Agreement, between Venator and the Backstop Parties, as may be further amended, modified, or supplement from time to time, in accordance with its terms, pursuant to which the Backstop Parties shall have agreed to backstop the Backstop Exit Term Loan Facility.

71.     "*Exit Term Loan Facility Documents*" means any documents governing the Exit Term Loan Facility and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

72.     "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date.

73.     "*File*," "*Filed*," or "*Filing*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

74.     "*Final DIP Order*" means one or more orders entered on a final basis approving the DIP New Money Facility, the DIP Roll-Up Facility, and the DIP Documents and authorizing the Debtors' use of cash collateral.

75.     "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, vacated, stayed, modified, or amended, and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and no appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing thereof has been timely sought, or, if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied, or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; *provided*, however, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

76.     "*First Day Pleadings*" means the pleadings and related documentation requesting certain emergency relief, or supporting the request for such relief, Filed by the Debtors on or around the Petition Date and heard at the "first day" hearing.

77.     "*General Unsecured Claim*" means any Claim that is not:  (a) paid in full prior to the Plan Effective Date; (b) an Administrative Claim; (c) a Professional Fee Claim; (d) a Priority Tax Claim; (e) a Secured Tax Claim; (f) a DIP Claim; (g) an Other Secured Claim; (h) an Other Priority Claim, (i) a Prepetition ABL Claim; (j) a Term Loan Claim; (k) a Senior Secured Notes Claim; (l) a Senior Unsecured Notes Claim; or (m) an Intercompany Claim.

78.     "*Governing Body*" means, in each case in its capacity as such, the board of directors, board of managers, manager, managing member, general partner, investment committee, special committee, or such similar governing body of any of the Debtors or the Reorganized Debtors, as applicable.

79.     "*Governmental Unit*" means any governmental unit, as defined in section 101(27) of the Bankruptcy Code.

80.     "*Holder*" means an Entity that is the record owner of a Claim or Interest.  For the avoidance of doubt, affiliated record owners of Claims or Interests managed or advised by the same institution shall constitute separate Holders.

81.     "*Impaired*" means, with respect to a Claim or Interest, or a Class of Claims or Interests, impaired within the meaning of section 1124 of the Bankruptcy Code.

82.     "*Indemnification Provisions*" means each of the Debtors' indemnification provisions currently in place, whether in the Debtors' bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment agreements, engagement letters, or other contracts, for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals, and agents of the Debtors and such current and former directors', officers', managers', employees', attorneys', other professionals', and agents' respective Affiliates.

83.     "*Intercompany Claim*" means any Claim against a Debtor held by another Debtor.

84.     "*Intercompany Interest*" means an Interest in a Debtor held by another Debtor.

85.     "*Interest*" means any common stock, ordinary shares, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in a Debtor, including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtors and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor (in each case whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security).

86.     "*Interim DIP Order*" means one or more orders entered on an interim basis approving the DIP New Money Facility, the DIP Roll-Up Facility, and the DIP Documents and authorizing the Debtors' use of cash collateral.

87.     "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as now in effect or hereafter amended, and the rules promulgated thereunder.

88.     "*KEIP*" means any key executive insider plan or similar proposal or documentation that would require Bankruptcy Court approval to make payments to "insiders" during the course of the chapter 11 cases.

89.     "*KERP*" means any key employee retention plan or similar proposal or documentation that would require Bankruptcy Court approval to make payments to non-"insiders" during the course of the chapter 11 cases.

90.     "*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

91.     "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

92.     "*Management Incentive Plan*" means the equity incentive plan providing for the issuance of MIP Shares to the members of management of Reorganized Venator from the Management Incentive Plan Pool.

93.     "*Management Incentive Plan Participants*" means Simon Turner, Kurt Ogden, Russ Stolle, Stefano Soccol, Rob Portsmouth, and Kevin Wilson.

94.     "*Management Incentive Plan Pool*" means a pool of up to 10.0% of the New Ordinary Shares, determined on a fully diluted and distributed basis (*i.e.*, assuming conversion of all outstanding convertible securities and full distribution of the Management Incentive Plan Pool), reserved for issuance pursuant to the Management Incentive Plan.

95.     "*MIP Shares*" means the New Ordinary Shares issued to the members of management of Reorganized Venator pursuant to the Management Incentive Plan.

96.     "*New Board*" means the board of directors or similar governing body of Reorganized Venator.

97.     "*New Corporate Governance Documents*" means, as applicable, the organizational and governance documents for the Reorganized Debtors, which will give effect to the Restructuring Transactions, including, without limitation, certificates of incorporation, certificates of formation or certificates of limited partnership (or equivalent organizational documents), bylaws, limited liability company agreements, shareholder agreements (or equivalent governing documents), and the identities of proposed members of the board of directors of Reorganized Venator.

98.     "*Notes Indentures*" means, collectively, the Senior Secured Notes Indenture and the Senior Unsecured Notes Indenture.

99.     "*New Ordinary Shares*" means the Equity Interests in Reorganized Venator to be issued on the Plan Effective Date in accordance with the Plan.

100.    "*Notes Trustee*" means Wilmington Trust, National Association, solely in its capacity as trustee under the Notes Indentures, or any successor trustee under the Notes Indentures.

101.    "*Other Priority Claim*" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

102.    "*Other Secured Claim*" means any Secured Claim against the Debtors other than the DIP Claims, the Priority Tax Claims, the Prepetition ABL Claims, the Term Loan Claims, or the Senior Secured Notes Claims.

103.    "*Parties*" has the meaning set forth in the preamble to this Agreement.

104.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

105.    "*Petition Date*" means the date on which the Debtors commenced the Chapter 11 Cases.

106.    "*Plan"* means this joint prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code, either in its present form or as it may be altered, amended, modified, or supplemented from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Restructuring Support Agreement, or the terms hereof, as the case may be, and the Plan Supplement, which is incorporated herein by reference, including all exhibits and schedules hereto and thereto.

107.    "*Plan Distribution*" means a payment or distribution to Holders of Allowed Claims, Allowed Interests, or other eligible Entities under and in accordance with the Plan.

108.    "*Plan Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent to the occurrence of the Plan Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan.  Any action contemplated by the Plan to be taken on the Plan Effective Date may be taken on or as soon as reasonably practicable thereafter.

109.    "*Plan Equity Value*" means the equity value as implied by a Plan total enterprise value of $600 million.

110.    "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and the Restructuring Support Agreement and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed by the Debtors prior to the Confirmation Hearing to the extent available, as applicable:   (a) the New Corporate Governance Documents; (b) the identity and members of the New Board; (c) the Rights Offering Procedures (if any); (d) the Schedule of Retained Causes of Action; (e) the Exit Financing Documents; (f) the Restructuring Steps Memorandum, which shall, for the avoidance of doubt, remain subject to modification until the Plan Effective Date and may provide for certain actions to occur prior to the Plan Effective Date; (g) the Rejected Executory Contract and Unexpired Lease List; (h) the tax matters agreement (if any), and (i) any additional documents Filed with the Bankruptcy Court prior to the Plan Effective Date as amendments to the Plan Supplement.

111.    "*Prepetition ABL Claims*" means any Claim on account of, in respect of, or under the Prepetition ABL Credit Agreement.

112.    "*Prepetition ABL Credit Agreement*" means that certain Amended and Restated Revolving Credit Agreement, dated as of October 15, 2021, among Venator Materials PLC, as Holdings, the borrowers and guarantors party thereto, the lenders party thereto, and JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, which amends and restates that certain Revolving Credit Agreement, dated as of August 8, 2017 (as amended, restated, amended and restated, supplemented and/or otherwise modified).

113.    "*Prepetition ABL Facility*" means the revolving credit facility under that certain Amended and Restated Revolving Credit Agreement, dated October 15, 2021 among Venator Materials PLC, as holdings, the borrowers and guarantors party thereto, the lenders party thereto and JPMorgan Chase Bank, N.A., including any standby letter of credit facility and/or other facility or facilities for the making of loans, issuing of bonds, guarantees and indemnitees and/or making other extensions of credit between Barclays Bank PLC and/or any of its Affiliates and Holdings or any of its Subsidiaries and any Swap Obligations (as defined therein) thereunder and any cash management obligations held by any agent, any lender, or any affiliate thereof.

114.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

115.    "*Pro Rata*" means, unless otherwise specified, the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

116.    "*Professional*" means an Entity:  (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the

Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

117.     "*Professional Fee Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses of Professionals estimate they have incurred or will incur in rendering services to the Debtors as set forth in Article II.D of the Plan.

118.     "*Professional Fee Claim*" means a Claim by a professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

119.     "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Debtors with Cash on the Plan Effective Date in an amount equal to the Professional Fee Amount.

120.     "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

121.     "*Raised Exit Term Loan Facility*" means an Exit Term Loan Facility provided by third parties through a comprehensive marketing process, acceptable to the Debtors and the Required Consenting Creditors.

122.     "*Reinstate*" means reinstate, reinstated, or reinstatement with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code. "Reinstated" and "Reinstatement" shall have correlative meanings.

123.     "*Rejected Executory Contract and Unexpired Lease List*" means the list, as determined by the Debtors and reasonably satisfactory to the Required Consenting Creditors, of Executory Contracts and Unexpired Leases that will be rejected by the Reorganized Debtors pursuant to the Plan, which list, as may be amended from time to time, with the consent of the Debtors and the Required Consenting Creditors, shall be included in the Plan Supplement.

124.     "*Related Party*" means with respect to any Person or Entity, each of, and in each case in its capacity as such, current and former directors, managers, officers, committee members, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by a special committee or any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees.  For the avoidance of doubt, the members of each Governing Body are Related Parties of the Debtors.

125.     "*Released Parties*" means, collectively, and in each case in its capacity as such:  (a) each Debtor; (b) each Reorganized Debtor; (c) each Consenting Creditor; (d) each DIP Lender; (e) the DIP Agent; (f) the DIP Agent and each Holder of a Prepetition ABL Claim or DIP Roll-Up Claim; (g) each Backstop Party; (h) each member of the Cross-Holder Group; (i) each member of the Term Lender Group; (j) each of the Agents/Trustees; (k) each current and former Affiliate of each Entity in clause (a) through the following clause (l); and (l) each Related Party of each Entity in clause (a) through this clause (l) (and, in addition to each of the foregoing, where any of the foregoing is an investment manager or advisor for a

beneficial holder, such beneficial holder); *provided* that, in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the Third Party Release; or (y) timely objects to the Third Party Release and such objection is not withdrawn before Confirmation.

126. "*Releasing Parties*" means collectively, and in each case in its capacity as such: (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) each Consenting Creditor; (d) each DIP Lender; (e) each Backstop Party; (f) each member of the Cross-Holder Group; (g) each member of the Term Lender Group; (h) each of the Agents/Trustees; (i) all Holders of Claims; (j) all Holders of Interests; (k) each current and former Affiliate of each Entity in clause (a) through the following clause (l); and (l) each Related Party of each Entity in clause (a) through this clause (l) (and, in addition to each of the foregoing, where any of the foregoing is a depository trust company, securities clearinghouse, investment manager, or advisor for a beneficial holder, such beneficial holder); *provided* that, in each case, an Entity shall not be a Releasing Party if it: (x) elects to opt out of the Third Party Release; or (y) timely objects to the Third Party Release and such objection is not withdrawn before Confirmation.

127. "*Reorganized Debtor*" means a Debtor on and after the Plan Effective Date.

128. "*Reorganized Venator*" means Venator Materials PLC, on and after the Plan Effective Date.

129. "*Required Consenting Creditors*" has the meaning set forth in the Restructuring Support Agreement.

130. "*Restructuring Expenses*" means the reasonable and documented fees and expenses accrued since the inception of their respective engagements related to the implementation of the Restructuring Transactions and not previously paid by, or on behalf of, the Debtors of: (a) the ABL Lender Group Advisors; (b) the Cross-Holder Group; (c) the Term Lender Group Advisors; in each case, in accordance with the engagement letters of such consultant or professional or other agreements signed by the Debtors, and in each case, without further order of, or application to, the Bankruptcy Court by such consultant or professionals.

131. "*Restructuring Steps Memorandum*" means the summary of transaction steps to complete the restructuring (including., but not limited to, the Restructuring Transactions) contemplated by the Plan, as set forth in the Plan Supplement, as the same may be amended, supplemented, and modified through the Effective Date (with the consent of the Required Consenting Creditors).

132. "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, by and among the Debtors and the other parties thereto, including all exhibits thereto, as may be amended, modified, or supplemented from time to time, in accordance with its terms, attached to the Disclosure Statement as <u>Exhibit B</u>.

133. "*Restructuring Transactions*" means the transactions described in Article IV.B of the Plan and the Restructuring Steps Memorandum.

134. "*Rights Offering*" means the rights offering to purchase the Rights Offering Shares on the terms set forth in the Rights Offering Documents.

135. "*Rights Offering Backstop Commitment Agreement*" means that certain Rights Offering Backstop Commitment Agreement, between Venator and the Backstop Parties, as may be further amended, modified, or supplement from time to time, in accordance with its terms, pursuant to which the Backstop Parties shall have agreed to backstop the Rights Offering.

136.    "*Rights Offering Backstop Commitment Premium*" means the backstop commitment fee of 10.0% of the Rights Offering Amount payable in New Ordinary Shares at the Discount Value.

137.    "*Rights Offering Documents*" means, collectively, the Rights Offering Backstop Commitment Agreement, the Rights Offering Procedures, and any and all other agreements, documents, and instruments delivered or entered into in connection with the Rights Offering.

138.    *"Rights Offering Participants"* means Holders of Term Loan Claims, Senior Secured Notes Claims, and the Senior Unsecured Notes Claims, as of the Rights Offering Record Date.

139.    "*Rights Offering Procedures*" means those certain rights offering procedures that are consistent in all material respects with the Rights Offering Backstop Commitment Agreement and applicable securities laws and otherwise in form and substance reasonably acceptable to the Debtors and the Required Consenting Creditors in all respects, as set forth in the Plan Supplement (if applicable).

140.    "*Rights Offering Record Date*" means the date reasonably acceptable to the Required Consenting Creditors and the Debtors to be set forth in the Rights Offering Documents.

141.    "*Rights Offering Shares*" means the New Ordinary Shares, if any, issued pursuant to the Rights Offering at the Discount Value.

142.    "*Rules*" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

143.    "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time.

144.    "*SEC*" means United States Securities and Exchange Commission.

145.    "*Secured Claim*" means a Claim:  (a) secured by a valid, perfected, and enforceable Lien on any Debtor's interest in property to the extent of the value of such interest as (i) set forth in the Plan; (ii) agreed to by the holder of such Claim and the Debtors; or (iii) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code; or (b) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code.

146.    "*Secured Tax Claim*" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

147.    "*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

148.    "*Security*" means any security, as defined in section 2(a)(1) of the Securities Act.

149.    "*Senior Secured Claims*" means, collectively, the Term Loan Claims and the Senior Secured Notes Claims.

150.    "*Senior Secured Equitization Distribution*" means (i) 90.0% of the New Ordinary Shares at Plan Equity Value, which shall be subject to dilution on account of (a) the MIP Shares, (b) the DIP Shares,

(c) the Rights Offering Shares, and (d) the Exit Backstop Shares, and (ii) the Subscription Rights to purchase up to 90.0% of the Rights Offering Shares.

151.    "*Senior Secured Notes*" means the first lien secured notes, due July 1, 2025, issued by Venator Finance S.à.r.l. and Venator Materials LLC pursuant to the Senior Secured Notes Indenture.

152.    "*Senior Secured Notes Claim*" means any Claim on account of the Senior Secured Notes.

153.    "*Senior Secured Notes Indenture*" means that certain indenture, dated as of May 22, 2020, between Venator Finance S.à.r.l., as co-issuer, Venator Materials LLC, as co-issuer, and Wilmington Trust, National Association, as trustee, including all amendments, modifications, and supplements thereto.

154.    "*Senior Unsecured Notes*" means the notes, due July 15, 2025, issued by Venator Finance S.à.r.l. and Venator Materials LLC pursuant to the Senior Unsecured Notes Indenture.

155.    "*Senior Unsecured Notes Claim*" means any Claim on account of the Senior Unsecured Notes.

156.    "*Senior Unsecured Notes Equitization Distribution*" means (i) 10.0% of the New Ordinary Shares at Plan Equity Value, which shall be subject to dilution on account of (a) the MIP Shares, (b) the DIP Shares, (c) the Rights Offering Shares, and (d) the Exit Backstop Shares, and (ii) the Subscription Rights to purchase up to 10.0% of the Rights Offering Shares.

157.    "*Senior Unsecured Notes Indenture*" means that certain indenture, dated as of July 14, 2017, between Venator Finance S.à.r.l., as co-issuer, Venator Materials LLC, as co-issuer, and Wilmington Trust, National Association, as trustee, including all amendments, modifications, and supplements thereto.

158.    "*Severance Plan*" means that certain Venator Materials PLC Amended and Restated Executive Severance Plan dated as of November 14, 2017.

159.    "*Solicitation Materials*" means, as applicable, any documents, forms, ballots, notices, and other materials provided in connection with the solicitation of votes on the Plan, as approved by the Bankruptcy Court pursuant to sections 1125 and 1126 of the Bankruptcy Code.

160.    "*Subscription Rights*" means the rights issued pursuant to the Rights Offering to purchase Rights Offering Shares, on the terms set forth in the Rights Offering Documents.

161.    "*Term Lender Group*" means that certain group of Holders of Term Loan Claims, Senior Secured Notes Claims, and Senior Unsecured Notes Claims represented by the Term Lender Group Advisors.

162.    "*Term Lender Group Advisors*" means White & Case LLP, as primary counsel, local counsel in each relevant jurisdiction, any special regulatory or other specialist counsel, Houlihan Lokey, as financial advisor, and any other non-legal advisors that the Term Lender Group engages in connection with the Restructuring Transactions.

163.    "*Term Loans*" means any loans outstanding under the Term Loan Facility.

164.    "*Term Loan Agent*" means Acquiom Agency Services LLC, in its capacity as co-administrative agent and collateral agent, and Seaport Loan Products LLC, in its capacity as co-administrative agent under the Term Loan Credit Agreement.

165.    "*Term Loan Claim*" means any Claim on account of the Term Loans.

166.    "*Term Loan Credit Agreement*" means that certain Term Loan Credit Agreement, dated as of August 8, 2017, among Venator Materials PLC, as Holdings, Venator Finance S.à.r.l., as borrower, Venator Materials LLC, as borrower, Acquiom Agency Services LLC, in its capacity as co-administrative agent and collateral agent, and Seaport Loan Products LLC, in its capacity as co-administrative agent.

167.    "*Term Loan Facility*" means that certain term loan facility under the loan agreement, dated August 8, 2017 between Venator Finance S.à.r.l., as borrower, Venator Materials LLC, as borrower, and the Term Loan Agent.

168.    "*Third Party Release*" means means the release set forth in Article VIII.D of this Plan.

169.    "*Trustee*" means any indenture trustee, collateral trustee, or other trustee or similar entity under the Senior Secured Notes and Senior Unsecured Notes.

170.    "*U.S. Trustee*" means the Office of the United States Trustee for the Southern District of Texas.

171.    "*Unexpired Lease*" means a lease to which one or more of the Debtors are a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

172.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

173.    "*Venator*" means Venator Materials PLC.

B.      *Rules of Interpretation.*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; *provided* that nothing in this clause (2) shall affect any parties' consent rights over any of the Definitive Documents or any amendments thereto (both as that term is defined herein and as it is defined in the Restructuring Support Agreement); (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with the Plan or Confirmation Order, as applicable; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document created or entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) unless otherwise specified, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (10) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan;

(11) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (12) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (13) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (14) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (15) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (16) unless otherwise specified, any action to be taken on the Plan Effective Date may be taken on or as soon as reasonably practicable thereafter.

C.      *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.      *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; *provided* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or the Reorganized Debtors, as applicable, if so required by such laws of the state of incorporation or formation of the relevant Debtor or the Reorganized Debtors.

E.      *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Reference to the Debtors or the Reorganized Debtors.*

Except as otherwise specifically provided in this Plan to the contrary, references in this Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.      *Controlling Document.*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

H.      *Consent Rights.*

Notwithstanding anything herein to the contrary, any and all consultation, information, notice, and consent rights set forth in the Restructuring Support Agreement (including the exhibits thereto), the DIP Orders, and the DIP Credit Agreement with respect to the form and substance of this Plan, all exhibits to the Plan, the Plan Supplement, and all other Definitive Documents, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A hereof) and fully enforceable as if stated in full herein.

**ARTICLE II.**
**ADMINISTRATIVE CLAIMS, PRIORITY CLAIMS, DIP CLAIMS, AND RESTRUCTURING EXPENSES**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, and DIP Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.      *Administrative Claims.*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors (with the consent of the Required Consenting Creditors, which consent shall not be unreasonably withheld) or the Reorganized Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (1) if an Administrative Claim is Allowed on or prior to the Plan Effective Date, on the Plan Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Plan Effective Date, no later than sixty (60) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

B.      *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive Cash equal to the full amount of its Claim or such other treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

C.     *DIP Claims.*

On the Plan Effective Date, each holder of a DIP New Money Claim shall receive, at the Debtors' election, (i) Cash in an amount equal to such DIP New Money Claim, or (ii) the right to convert such DIP New Money Claim into DIP Shares at the Discount Value.

On the Plan Effective Date, each holder of a DIP Roll-Up Claim shall receive Cash in an amount equal to such DIP Roll-Up Claim.  Any letters of credit that comprise DIP Roll-Up Claims shall, on or before the Plan Effective Date, either be returned undrawn and cancelled or cash collateralized in accordance with the terms of the Prepetition ABL Credit Agreement.

D.     *Professional Fee Claims.*

1.    Final Fee Applications and Payment of Professional Fee Claims.

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Plan Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Plan Effective Date.

2.    Professional Fee Escrow Account.

On the Plan Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount, which shall be funded by the Reorganized Debtors.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals.  Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors.  The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed.  When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

3.    Professional Fee Amount.

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date, and shall deliver such estimate to the Debtors no later than five (5) Business Days before the Plan Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims.  If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

4.    Post-Confirmation Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other

fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      *Payment of Restructuring Expenses.*

To the extent not otherwise paid, the Debtors or the Reorganized Debtors, as applicable, shall promptly pay in Cash in full all outstanding and invoiced Restructuring Expenses as follows: (i) on the Plan Effective Date, Restructuring Expenses incurred, or estimated to be incurred, during the period prior to the Plan Effective Date to the extent invoiced to the Debtors at least three (3) Business Days in advance and (ii) after the Plan Effective Date, any unpaid Restructuring Expenses within seven (7) Business Days of receiving an invoice; *provided* that, to the extent timely invoiced, Restructuring Expenses that are not paid by the Debtors or the Reorganized Debtors, as applicable, within the timeframes set forth in this Article II.E of the Plan shall not be deemed waived and shall be included in a subsequent invoice.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      *Classification of Claims and Interests.*

This Plan constitutes a separate Plan proposed by each Debtor. Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Plan Effective Date.

The classification of Claims against and Interests in the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | Senior Secured Claims | Impaired | Entitled to Vote |
| Class 4 | Senior Unsecured Notes Claims | Impaired | Entitled to Vote |
| Class 5 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 6 | Intercompany Claims | Impaired / Unimpaired | Not Entitled to Vote (Deemed to Reject or Presumed to Accept) |
| Class 7 | Intercompany Interests | Impaired / Unimpaired | Not Entitled to Vote (Deemed to Reject or Presumed to Accept) |

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 8 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 9 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.     *Treatment of Claims and Interests.*

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Reorganized Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Plan Effective Date or as soon as reasonably practicable thereafter.

1. <u>Class 1 – Other Secured Claims</u>

   (a)     *Classification*: Class 1 consists of all Other Secured Claims.

   (b)     *Treatment*: Each holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor, in consultation with the Required Consenting Creditors:

       (i)     payment in full in Cash of its Allowed Other Secured Claim;

       (ii)     the collateral securing its Allowed Other Secured Claim;

       (iii)     Reinstatement of its Allowed Other Secured Claim; or

       (iv)     such other treatment that renders its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

   (c)     *Voting*: Class 1 is Unimpaired under the Plan. Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such holders are not entitled to vote to accept or reject the Plan.

2. <u>Class 2 – Other Priority Claims</u>

   (a)     *Classification*: Class 2 consists of all Other Priority Claims.

   (b)     *Treatment*: Each holder of an Allowed Other Priority Claim shall receive payment in full in Cash.

   (c)     *Voting*: Class 2 is Unimpaired under the Plan. Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f)

of the Bankruptcy Code.  Therefore, such holders are not entitled to vote to accept or reject the Plan.

3.  <u>Class 3 – Senior Secured Claims</u>

    (a)   *Classification*:  Class 3 consists of all Senior Secured Claims against any Debtor.

    (b)   *Treatment*: Each Holder of an Allowed Senior Secured Claim shall receive, in full and final satisfaction of such Claim, such Holder's *Pro Rata* share of the Senior Secured Equitization Distribution.

    (c)   *Voting*:  Class 3 is Impaired under the Plan and Holders of Allowed Claims in Class 3 are entitled to vote to accept or reject the Plan.

4.  <u>Class 4 - Senior Unsecured Notes Claims</u>

    (a)   *Classification*:  Class 4 consists of all Senior Unsecured Notes Claims against any Debtor.

    (b)   *Treatment*:  Each Holder of an Allowed Senior Unsecured Claim shall receive, in full and final satisfaction of such Claim, such Holder's *Pro Rata* share of the Senior Unsecured Notes Equitization Distribution.

    (c)   *Voting*:  Class 4 is Impaired under the Plan and Holders of Allowed Claims in Class 4 are entitled to vote to accept or reject the Plan.

5.  <u>Class 5 – General Unsecured Claims</u>

    (a)   *Classification*:  Class 5 consists of all General Unsecured Claims.

    (b)   *Treatment*:  On the Plan Effective Date, each Holder of a General Unsecured Claim shall receive, at the Reorganized Debtors' and Required Consenting Creditors' option:

        (i)   payment in full in Cash;

        (ii)   Reinstatement of its General Unsecured Claim; or

        (iii)   such other treatment rendering such General Unsecured Claim unimpaired in accordance with section 1124 of the Bankruptcy Code.

    (c)   *Voting:*  Class 5 is Unimpaired under the Plan.  Holders of Allowed Claims in Class 5 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

6.  <u>Class 6 - Intercompany Claims</u>

    (a)   *Classification:*  Class 6 consists of all Intercompany Claims.

    (b)   *Treatment:*  Subject to any specific provisions contained in the Plan Supplement, Intercompany Claims shall be, at the option of the Reorganized Debtors with the

consent of the Required Consenting Creditors (not to be unreasonably withheld, conditioned, or delayed), reinstated, set off, settled, distributed, contributed, cancelled, or released without any distribution on account of such Claims, or such other treatment as reasonably determined by the Reorganized Debtors and the Required Consenting Creditors.

(c) *Voting:*  Holders of Class 6 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Class 6 Claims are not entitled to vote to accept or reject the Plan.

7.  Class 7 - Intercompany Interests

(a) *Classification:*  Class 7 consists of all Intercompany Interests.

(b) *Treatment:*  Subject to any specific provisions contained in the Plan Supplement, Intercompany Interests shall be, at the option of the Reorganized Debtors with the consent of the Required Consenting Creditors (not to be unreasonably withheld, conditioned, or delayed), reinstated, set off, settled, distributed, contributed, cancelled and released without any distribution on account of such Claims, or such other treatment as reasonably determined by the Reorganized Debtors and the Required Consenting Creditors.

(c) *Voting*:  Holders of Class 7 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Class 7 Claims are not entitled to vote to accept or reject the Plan.

8.  Class 8 - Section 510(b) Claims

(a) *Classification*:  Class 8 consists of all Section 510(b) Claims.

(b) *Treatment*:  On the Plan Effective Date, all Section 510(b) Claims will be cancelled, released, discharged, and extinguished and will be of no further force or effect, and Holders of Section 510(b) Claims will not receive any distribution on account of such Section 510(b) Claims.

(c) *Voting*:  Class 8 is Impaired under the Plan.  Holders of Allowed Claims in Class 8 are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

9.  Class 9 - Existing Equity Interests

(a) *Classification*:  Class 9 consists of all Existing Equity Interests.

(b) *Treatment*:  On the Plan Effective Date, all Existing Equity Interests shall be cancelled, released, extinguished, and discharged and will be of no further force or effect.  Each holder of an Interest shall receive no recovery or distribution on account of their Existing Equity Interests.

      (c)     *Voting*:  Class 9 is Impaired under the Plan.  Holders of Allowed Claims in Class 9 are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

C.     *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claims, including, all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

D.     *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.     *Voting Classes, Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

F.     *Intercompany Interests.*

To the extent Reinstated under the Plan, for the avoidance of doubt, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience, for the ultimate benefit of the Holders of New Ordinary Shares, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the Holders of Allowed Claims.

G.     *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

H.     *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date or such other date as fixed by the Bankruptcy Court.

I.      *Subordinated Claims*.

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, and subject to the Restructuring Support Agreement, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**ARTICLE IV.**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

A.      *General Settlement of Claims and Interests*.

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Plan Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates.  Subject to Article VI hereof, all distributions made to Holders of Allowed Claims in any Class are intended to be and shall be final.

B.      *Restructuring Transactions*.

Before, on, and after the Plan Effective Date, the Debtors or Reorganized Debtors, as applicable, shall consummate the Restructuring Transactions and may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan and the Restructuring Support Agreement, including as set forth in the Restructuring Steps Memorandum, that are consistent with and pursuant to the terms and conditions of the Plan, including: (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, the Plan Supplement, and the Restructuring Support Agreement; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the Plan Supplement, and the Restructuring Support Agreement and having other terms to which the applicable Entities may agree; (3) the execution, delivery, and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law, including any applicable New Corporate Governance Documents; (4) the execution and delivery of the Exit Financing Documents, entry into the Exit Facilities, and issuance of the Exit Backstop Shares, as applicable; (5) pursuant to the Rights Offering Documents, if applicable, the implementation of the Rights Offering, if applicable, and the issuance of any Rights Offering Shares in connection therewith; (6) the issuance and distribution of the New Ordinary Shares as set forth in the Plan; (7) the reservation of the Management Incentive Plan Pool; and (8) such other transactions that are required to effectuate the Restructuring Transactions, including any transactions set forth in the Restructuring Steps Memorandum; and (8) all other actions that the applicable Entities

determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

The Confirmation Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan and the Restructuring Transactions.

The Debtors and Reorganized Debtors will use commercially reasonable efforts to structure and implement the Restructuring Transactions in a tax-efficient and cost-effective manner, that is reasonably acceptable to the Required Consenting Creditors.

C.     *The Reorganized Debtors.*

On the Plan Effective Date, the New Board shall be established and each Reorganized Debtor shall adopt its New Corporate Governance Documents. The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan.

D.     *Sources of Consideration for Plan Distributions.*

The Debtors shall fund distributions under the Plan, as applicable, with: (1) the proceeds from the Exit Facilities; (2) Cash proceeds from the sale of Rights Offering Shares from the Rights Offering (if applicable); (3) the New Ordinary Shares; and (4) the Debtors' Cash on hand, as applicable. Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. The issuance, distribution, or authorization, as applicable, of certain Securities in connection with the Plan, including the New Ordinary Shares will be exempt from SEC registration to the fullest extent permitted by Law, as described more fully in Article IV.L below.

1.     Exit Facilities.

On the Plan Effective Date, the Reorganized Debtors shall enter into the Exit ABL Facility and may enter into the Exit Term Loan Facility if the Required Consenting Creditors and the Debtors agree that such Exit Term Loan Facility is necessary and advisable, each on the terms set forth in the applicable Exit Financing Documents. Confirmation of the Plan shall be deemed approval of the Exit Facilities and the Exit Financing Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the Reorganized Debtors to enter into and execute the Exit Financing Documents and such other documents as may be required to effectuate the treatment afforded by the Exit Facilities.

In addition the Required Consenting Creditors and the Debtors may decide to pursue either the Raised Exit Term Loan Facility or the Backstop Exit Term Loan Facility. If the Required Consenting Creditors and the Debtors agree that the Backstop Exit Term Loan Facility is necessary and advisable, such Backstop Exit Term Loan Facility shall be backstopped by the Backstop Parties in the Backstop Exit Term Loan Facility Amount on the terms set forth in the Exit Term Loan Facility Backstop Commitment

Agreement. In consideration for backstopping the Backstop Exit Term Loan Facility, each Backstop Party shall receive its *Pro Rata* share of the Exit Backstop Commitment Premium, payable in, at the election of the Required Consenting Creditors, either: (i) Exit Backstop Shares; or (ii) Cash; *provided* that (a) Holders of Senior Secured Claims who are Backstop Parties shall be entitled to provide 90.0% of the Exit Term Loan Facility Backstop on a *Pro Rata* basis, and (b) Holders of Senior Unsecured Notes Claims who are Backstop Parties shall be entitled to provide 10.0% of the Exit Term Loan Facility Backstop on a *Pro Rata* basis. The Exit Backstop Shares shall be subject to dilution on account of (i) the MIP Shares and (ii) the DIP Shares.

On the Plan Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Financing Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Financing Documents, (c) shall be deemed automatically perfected on the Plan Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Financing Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

2.  <u>Rights Offering</u>.

If the Debtors and the Required Consenting Creditors in good faith determine that additional funding is necessary or desirable, the Debtors shall distribute the Subscription Rights to the Rights Offering Participants on behalf of the Reorganized Debtors as set forth in the Plan and the Rights Offering Documents. The Rights Offering (if any) shall be conducted and consummated on the terms and conditions of, and in accordance with the Rights Offering Procedures (if any).

The Rights Offering (if any) shall be backstopped by the Backstop Parties on the terms set forth in the Rights Offering Backstop Commitment Agreement, which shall provide for, among other things, and in each case on a *Pro Rata* basis to each Backstop Party, the Rights Offering Backstop Commitment Premium and a direct allocation of 10.0% of the Subscription Rights; *provided* that (a) Holders of Senior Secured Claims who are Backstop Parties shall be entitled to provide 90.0% of the Backstop Commitment on a *Pro Rata* basis; and (b) Holders of Senior Unsecured Notes Claims who are Backstop Parties shall be entitled to provide 10.0% of the Backstop Commitment on a *Pro Rata* basis. In exchange for consideration consisting of the Rights Offering Backstop Commitment Premium and in accordance with the Rights Offering Backstop Commitment Agreement, the Backstop Parties have committed to fully backstop, severally and not jointly, the Rights Offering Shares. Each Backstop Party shall fund up to its commitment amount and receive its share of the Rights Offering Shares.

The Subscription Rights shall be offered in the following allocations, to: (a) Holders of Senior Secured Claims to purchase up to 90.0% of the Rights Offering Shares; and (b) Holders of Senior Unsecured Notes Claims to purchase up to 10.0% of the Rights Offering Shares. The Rights Offering Shares and the Rights Offering Backstop Commitment Premium shall be subject to dilution on account of (i) the MIP Shares and (ii) the DIP Shares.

The Subscription Rights will be offered, issued, and distributed under the Plan without registration under the Securities Act, or any state or local law requiring registration for offer and sale of a security, in reliance upon the exemption provided in section 1145(a) of the Bankruptcy Code to the maximum extent permitted by law, and to the extent such exemption is not available, then the Subscription Rights will be issued and distributed under the Plan pursuant to other applicable exemptions from registration under the Securities Act and any other applicable securities laws.  On the Plan Effective Date, the rights and obligations of the Debtors under the Rights Offering Backstop Commitment Agreement shall vest in the Reorganized Debtors, as applicable.  The proceeds of the Rights Offering (if any) shall be used by the Reorganized Debtors for general corporate purposes.

     3.   <u>Subscription Rights and New Ordinary Shares</u>.

Reorganized Venator shall be authorized to issue a certain number of shares of New Ordinary Shares to certain Holders of Claims pursuant to Article III.A and Article III.B.  Such New Ordinary Shares shall be issued to applicable Holders of Claims (including DIP Claims), Rights Offering Participants, and/or Backstop Parties pursuant to the Rights Offering (if any), the Rights Offering Backstop Commitment Agreement (if any), and the New Corporate Governance Documents.  Reorganized Venator shall issue all securities, instruments, certificates, and other documents required to be issued by it with respect to all such shares of New Ordinary Shares.  All such Subscription Rights and shares of New Ordinary Shares, and any other shares of New Ordinary Shares issued pursuant to the Plan, shall be duly authorized, validly issued, fully paid, and non-assessable.

Each distribution and issuance referred to in Article VI hereof shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, including the New Corporate Governance Documents, which terms and conditions shall bind each Entity receiving such distribution or issuance.  Any Entity's acceptance of New Ordinary Shares shall be deemed as its agreement to the New Corporate Governance Documents, as the same may be amended or modified from time to time following the Plan Effective Date in accordance with their terms.

Whether the New Ordinary Shares will be publicly listed upon the Plan Effective Date will be determined by the Required Consenting Creditors.

     4.   <u>Use of Cash</u>.

The Debtors or Reorganized Debtors, as applicable, shall use Cash on hand and proceeds of the Exit Facilities to fund distributions to certain Holders of Allowed Claims, consistent with the terms of the Plan.

E.    *Corporate Existence.*

Except as otherwise provided in the Plan or Plan Supplement, each Debtor shall continue to exist after the Plan Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which such Debtor is incorporated or formed and pursuant to the certificate of incorporation and by-laws (or other formation documents) in effect prior to the Plan Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal Law).

F.      *Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in the Confirmation Order, the Plan (including, for the avoidance of doubt, the Restructuring Steps Memorandum), or any agreement, instrument, or other document incorporated herein, or entered into in connection with our pursuant to, the Plan or Plan Supplement, on the Plan Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances.  On and after the Plan Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

G.      *Cancellation of Existing Agreements and Interests.*

On the Plan Effective Date, except with respect to the Exit Facilities or to the extent otherwise provided in the Confirmation Order or the Plan, as applicable, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be cancelled and the obligations of the Debtors and the Reorganized Debtors thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect; *provided* that, notwithstanding anything to the contrary contained herein, any agreement that governs the rights of the DIP Agent, the ABL Agent, the Term Loan Agent, or the Notes Trustee shall continue in effect solely for purposes of allowing the DIP Agent, the ABL Agent, the Term Loan Agent, and the Notes Trustee, as applicable, to (i) receive distributions under the Plan and to distribute them to the Holders of the Allowed DIP Claims, Allowed Term Loan Claims, Allowed Senior Secured Notes Claims, and Allowed Senior Unsecured Notes Claims, as applicable, in accordance with the terms of DIP Orders and the DIP Credit Agreement, Prepetition ABL Credit Agreement, the Term Loan Credit Agreement, or the Notes Indentures, as applicable, (ii) enforce its rights to payment of fees, expenses, and indemnification obligations as against any money or property distributable to Holders of Allowed DIP Claims, Allowed Term Loan Claims, Allowed Senior Secured Notes Claims, or Allowed Senior Unsecured Notes Claims, as applicable, in accordance with the terms of DIP Orders and the DIP Credit Agreement, the Prepetition ABL Credit Agreement, the Term Loan Credit Agreement, or Notes Indentures, as applicable, and (iii) appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court, including to enforce any obligation owed to either of the DIP Agent, the ABL Agent, the Term Loan Agent, the Notes Trustee, or Holders of the DIP Claims, the Term Loan Claims, the Senior Secured Notes Claims, or the Senior Unsecured Notes Claims under the Plan, as applicable.  Holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or relating to such instruments, Securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to this Plan. The ABL Agent's rights to reimbursement, indemnity and fees and expenses under the ABL Credit Agreement that by their terms survive a termination of the Prepetition ABL Credit Agreement shall survive the Plan Effective Date, notwithstanding the payment in full of the Prepetition ABL Obligations and the DIP Roll-Up Obligations and the terms of this Plan.

Any credit agreement or other instrument that governs the rights, claims, and remedies of the Holder of a Claim shall continue in full force and effect for purposes of allowing Holders of Allowed Claims to receive distributions under the Plan and allowing the Agents to exercise any charging lien against such distributions, as applicable.

*H.*     *Corporate Action.*

Upon the Plan Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including:  (1) adoption or assumption, as applicable, of the Employment Obligations; (2) selection of the directors, officers, or managers for the Reorganized Debtors on the terms provided in the Plan and Restructuring Support Agreement; (3) the issuance and distribution of the New Ordinary Shares; (4) implementation of the Restructuring Transactions, including the Rights Offering (if any); (5) entry into the Exit Financing Documents; (6) adoption of the New Corporate Governance Documents; (7) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (8) the reservation of the Management Incentive Plan Pool; and (9) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Plan Effective Date) and in accordance with the Restructuring Support Agreement.  All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtor, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security Holders, directors, officers, or managers of the Debtors or the Reorganized Debtors, as applicable.  On or (as applicable) prior to the Plan Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Ordinary Shares, the New Corporate Governance Documents, the Exit Facilities, and the Exit Financing Documents, any other Definitive Documents, and any and all other agreements, documents, securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by this Article IV.H shall be effective notwithstanding any requirements under non-bankruptcy law.

*I.*     *New Corporate Governance Documents.*

On or immediately prior to the Plan Effective Date, the New Corporate Governance Documents, if applicable, shall be automatically adopted by the applicable Reorganized Debtors.  To the extent required under the Plan or applicable non-bankruptcy Law, each of the Reorganized Debtors will file its New Corporate Governance Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state, province, or country of incorporation in accordance with the applicable Laws of the respective state, province, or country of incorporation to the extent such filing is required for each such document.  The New Corporate Governance Documents will prohibit the issuance of non-voting Equity Securities to the extent required under section 1123(a)(6) of the Bankruptcy Code.  For the avoidance of doubt, the New Corporate Governance Documents shall be included as exhibits to the Plan Supplement. After the Plan Effective Date, the Reorganized Debtors may amend and restate their respective New Corporate Governance Documents in accordance with the terms thereof, and the Reorganized Debtors may file such amended certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the Laws of the respective states, provinces, or countries of incorporation and the New Corporate Governance Documents.

*J.*     *Directors and Officers of the Reorganized Debtors.*

As of the Plan Effective Date, the term of the current members of the board of directors or other Governing Body of Venator shall expire, and the members for the initial term of the New Board shall be appointed; *provided*, that the independent directors serving on the special committee of the board of directors of the Debtors shall retain authority following the Plan Effective Date with respect to matters relating to Professional Fee Claim requests by Professionals acting at their authority and direction in

29

accordance with the terms of the Plan. The independent directors serving on the special committee of the board of directors of the Debtors shall not have any of their privileged and confidential documents, communications or information transferred (or deemed transferred) to the Reorganized Debtors or any other Person or Entity without the prior written consent of the independent directors. The initial New Board shall consist of seven (7) directors, including (a) the Chief Executive Officer of Reorganized Venator; (b) if the members of the Cross-Holder Group are still parties to the Restructuring Support Agreement, three (3) independent directors selected by the Cross-Holder Group; and (c) if the members of the Term Lender Group are still parties to the Restructuring Support Agreement, three (3) independent directors selected by the Term Lender Group. The identities of the initial members of the New Board will be included in the Plan Supplement, to the extent known at the time of filing. Each such member and officer of the Reorganized Debtors shall serve from and after the Plan Effective Date pursuant to the terms of the New Corporate Governance Documents and other constituent documents of the Reorganized Debtors.

K.      *Effectuating Documents; Further Transactions.*

On and after the Plan Effective Date, the Reorganized Debtors, and their respective officers and boards of directors and managers, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

L.      *Certain Securities Law Matters.*

The offering of any New Ordinary Shares prior to the Petition Date shall be exempt from the registration requirements of the Securities Act in reliance upon Section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder.

The offering, issuance, exchange and distribution of the New Ordinary Shares (excluding MIP Shares), as contemplated by Article III of the Plan, after the Petition Date shall be exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S., state, or local law requiring registration prior to the offering, exchange issuance, distribution, or sale of securities in accordance with, and pursuant to, section 1145 of the Bankruptcy Code, and to the extent such exemption is not available, then such New Ordinary Shares (including MIP Shares) will be offered, issued and distributed under the Plan pursuant to other applicable exemptions from registration under the Securities Act and any other applicable securities laws, including pursuant to Section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder. Such New Ordinary Shares, to the extent offered, issued and distributed pursuant to section 1145 of the Bankruptcy Code, (i) will not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (ii) will be freely tradeable and transferable without registration under the Securities Act in the United States by the recipients thereof that are not, and have not been within 90 days of such transfer, an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code, and compliance with applicable securities laws and any rules and regulations of the SEC or state or local securities laws, if any, applicable at the time of any future transfer of such securities or instruments.

Persons who receive the New Ordinary Shares pursuant to the exemption from registration set forth in Section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder will hold "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act. Resales of such restricted

securities would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Holders of such restricted securities would, however, under certain conditions, be permitted to resell New Ordinary Shares without registration if they are able to comply with the applicable provisions of Rule 144 or Rule 144A under the Securities Act or any other registration exemption under the Securities Act, or if such sales of restricted securities are registered under the Securities Act.

The Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order to any Entity (including DTC and any transfer agent for the New Ordinary Shares) with respect to the treatment of the New Ordinary Shares to be issued under the Plan under applicable securities laws. DTC and any transfer agent for the New Ordinary Shares shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Ordinary Shares to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. Notwithstanding anything to the contrary in the Plan, no Entity (including DTC and any transfer agent for the New Ordinary Shares) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Ordinary Shares to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

*M.*     *Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (1) the issuance, reinstatement, distribution, transfer, or exchange of any debt, Security, or other interest in the Debtors or the Reorganized Debtors; (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant of collateral as security for any or all of the Exit Facilities; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

*N.*     *Employment Obligations.*

Unless otherwise provided herein, and subject to Article V of the Plan, all employee wages, compensation, retiree benefits (as defined in 11 U.S.C. § 1114(a)), and benefit programs in place as of the Plan Effective Date with the Debtors, including for the avoidance of doubt, all executive compensation programs, executive employment agreements, and the Severance Plan, shall be assumed by the Reorganized Debtors and shall remain in place as of the Plan Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans as of the Plan Effective Date; *provided that*

it is agreed and understood that the consummation of the Restructuring Transactions and the Plan and any associated organization changes shall not constitute a "change in control" or "change of control" or other similar event under any such agreement, arrangement, program, plan, or policy.  For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, as of the Plan Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.  On the Plan Effective Date, the Reorganized Debtors shall (a) assume all employment agreements, indemnification agreements, or other agreements entered into with current employees; *provided* that it is agreed to and understood that the consummation of the Restructuring Transactions and the Plan and any associated organization changes shall not constitute a "change in control" or "change of control" or other similar event under any such agreement, arrangement, program, plan, or policy; or (b) enter into new agreements with such employees on terms and conditions acceptable to the Reorganized Debtors and such employee.  For the avoidance of doubt, the Third-Party Release does not release the Debtors from their obligations to retirees as set forth in the Plan.

O.     *Management Incentive Plan.*

Effective on the Plan Effective Date, the Reorganized Debtors shall implement the Management Incentive Plan.  The Management Incentive Plan shall provide for no less than 30.0% of the Management Incentive Plan Pool to be allocated within forty-five (45) days following the Plan Effective Date to the Management Incentive Plan Participants on terms to be agreed between the Management Incentive Plan Participants and the New Board; *provided* that such period shall be extended automatically by an additional forty-five (45) days if good faith discussions between the Management Incentive Plan Participants and the New Board regarding the terms of the Management Incentive Plan remain ongoing at the conclusion of the initial forty-five (45) day period.  The remaining 70.0% of the Management Incentive Plan Pool will be available to be allocated after the Plan Effective Date, in the form and on terms as determined by the New Board in consultation with the Management Incentive Plan Participants.  If either (a) the New Board does not institute the Management Incentive Plan in accordance with the terms of the Plan (including the time periods set forth therein) or (b) the allocation to any Management Incentive Plan Participant or any other term thereof is not satisfactory to such participant (as determined in such participant's sole discretion) prior to the expiration of the time periods set forth herein, in either case, such event shall constitute a "Termination for Good Reason" under the participant's employment agreement and under the Severance Plan.

P.     *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to this Article IV.P, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Plan Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII hereof.  For the avoidance of doubt, the Debtors and the Reorganized Debtors are hereby releasing in full (and are not preserving) any Claim or Cause of Action against the Consenting Creditors, the Backstop Parties, the DIP Lenders, the Holders of the DIP Roll-Up Claims, the ABL Agent, and their respective Affiliates and advisors (each in their capacity as such).

Subject to the limitations expressly provided herein, including the Releases set forth in Article VIII herein, the Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity (other than Consenting Creditors, Backstop Parties, the ABL Agent, the Holders of the DIP Roll-Up Claims, or the DIP Lenders, and their**

**respective Affiliates and advisors) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.**  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the corresponding Reorganized Debtor, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.  The Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action unless released pursuant to this Plan.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  For the avoidance of doubt, any Claims or Causes of Action against the Consenting Creditors, the Backstop Parties, the Holders of DIP Roll-Up Claims, the ABL Agent, or the DIP Lenders and their respective Affiliates and advisors (each in their capacity as such) shall not be retained Causes of Action.

Q.      *DTC Eligibility.*

The Debtors and the Reorganized Debtors, as applicable, shall use commercially reasonable efforts to promptly make the New Ordinary Shares eligible for deposit with DTC.

R.      *Closing the Chapter 11 Cases.*

Upon the occurrence of the Plan Effective Date, the Reorganized Debtors shall be permitted to close all of the Chapter 11 Cases except for one of the Chapter 11 Cases, as determined by the Reorganized Debtors, and all pending or contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in such Chapter 11 Case.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption of Executory Contracts and Unexpired Leases.*

On the Plan Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Plan Effective Date under sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract and Unexpired Lease:  (1) was assumed, assumed and assigned, or rejected previously by the Debtors; (2) previously expired or terminated pursuant to its own terms; (3) is the subject of a motion to reject Filed on or before the Plan Effective Date; or (4) is identified

on the Rejected Executory Contract and Unexpired Lease List. The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute a court order approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan or the Rejected Executory Contract and Unexpired Lease List pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Any motions to assume Executory Contracts or Unexpired Leases pending on the Plan Effective Date shall be subject to approval by the Bankruptcy Court on or after the Plan Effective Date by a Final Order. Each Executory Contract and Unexpired Lease assumed pursuant to this Article V.A or pursuant to any order of the Bankruptcy Court, which has not been assigned to a third party before the Confirmation Date, shall revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as such terms are modified by the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption or rejection under applicable federal Law. Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, with the consent of the Required Consenting Creditors (not to be unreasonably withheld or delayed), reserve the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease List at any time through and including thirty (30) days after the Plan Effective Date.

To the maximum extent permitted by applicable Law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" or similar provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

B.     *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Claims and Noticing Agent and served on the Reorganized Debtors no later than thirty (30) days after the effective date of such rejection.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Claims and Noticing Agent within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Reorganized Debtors, the Estates, or their property, without the need for any objection by the Debtors or Reorganized Debtors, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in Article VIII.F of the Plan, notwithstanding anything in a Proof of Claim to the contrary.**

All Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be treated as a General Unsecured Claim pursuant to Article III.B of the Plan and may be objected to in accordance with the provisions of Article VII of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

C.     *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

The Debtors or the Reorganized Debtors, as applicable, shall pay Cures, if any, on the Plan Effective Date or as soon as reasonably practicable thereafter. Unless otherwise agreed upon in writing by

the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be Filed with the Bankruptcy Court on or before thirty (30) days after the Plan Effective Date. Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure; *provided* that nothing herein shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to File such request for payment of such Cure. The Reorganized Debtors, in consultation with Required Consenting Creditors, also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before thirty (30) days after the Plan Effective Date. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing, or such other setting as requested by the Debtors or Reorganized Debtors, for which such objection is timely Filed. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is any dispute regarding any Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure pursuant to this Article V shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the Plan Effective Date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to this Article V, shall be deemed disallowed and expunged as of the Plan Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court**.

D.     *Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. Unless otherwise provided in the Plan, on the Plan Effective Date, (1) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (2) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors.

The Reorganized Debtors shall not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies in effect prior to the Plan Effective Date (including, without limitation, any tail policy), and any directors and officers of the Debtors who served in such capacity at any time before or after the Plan Effective Date shall be entitled to the full benefits of any such policy for the full term of such

policy regardless of whether such directors and/or officers remain in such positions after the Plan Effective Date. Notwithstanding anything herein to the contrary, the Debtors and the Reorganized Debtors shall retain the ability to supplement such directors' and officers' insurance policies as the Debtors deem necessary, including by purchasing any tail coverage (including, without limitation, a tail policy).

E.    *Indemnification Policies.*

Consistent with applicable Law, all Indemnification Provisions in place as of the Plan Effective Date shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Plan and the Restructuring Transactions on terms no less favorable to such current and former officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the Indemnification Provisions in place prior to the Plan Effective Date.

F.    *Reservation of Rights.*

Nothing contained in the Plan or the Plan Supplement, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Reorganized Debtors have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have forth-five (45) days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease under the Plan.

G.    *Nonoccurrence of Plan Effective Date.*

In the event that the Plan Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

H.    *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors liable thereunder in the ordinary course of their business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.    *Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in the Plan, on the Plan Effective Date (or, if a Claim is not an Allowed Claim on the Plan Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII hereof. Except as otherwise provided in the Plan, Holders of Claims

shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Plan Effective Date.

B.      *Disbursing Agent.*

All distributions under the Plan shall be made by the Disbursing Agent on the Plan Effective Date. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

C.      *Rights and Powers of Disbursing Agent.*

   1.   Powers of the Disbursing Agent.

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

   2.   Expenses Incurred On or After the Plan Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent (including the Agents/Trustees) on or after the Plan Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

D.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

   1.   Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.  If a Claim, other than one based on a publicly traded Security, is transferred twenty (20) or fewer days before the Distribution Record Date, the Disbursing Agent shall make distributions to the transferee only to the extent practicable and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

2.   Delivery of Distributions in General.

Except as otherwise provided herein, the Disbursing Agent shall make distributions to Holders of Allowed Claims and Allowed Interests (as applicable) as of the Distribution Record Date at the address for each such Holder as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors.

3.   Minimum Distributions.

No fractional shares of New Ordinary Shares shall be distributed and no Cash shall be distributed in lieu of any fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest (as applicable) would otherwise result in the issuance of a number of shares of New Ordinary Shares that is not a whole number, the actual distribution of shares of New Ordinary Shares shall be rounded as follows:  (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefore.  The total number of authorized shares of New Ordinary Shares to be distributed under the Plan shall be adjusted as necessary to account for the foregoing rounding.

4.   Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any Holder of Allowed Claims or Allowed Interests (as applicable) is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one (1) year from the Plan Plan Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder of Claims to such property or interest in property shall be discharged and forever barred.

5.   Surrender of Canceled Instruments or Securities.

On the Plan Effective Date or as soon as reasonably practicable thereafter, each holder of a certificate or instrument evidencing a Claim or an Interest shall be deemed to have surrendered such certificate or instrument to the Disbursing Agent.  Such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the holder of a Claim or Interest, which shall continue in effect for purposes of allowing holders to receive distributions under the Plan, charging liens, priority of payment, and indemnification rights.  Notwithstanding anything to the contrary herein, this paragraph shall not apply to certificates or instruments evidencing Claims or Interests that are Unimpaired under the Plan.

E.   *Manner of Payment.*

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

F.      *Section 1145 Exemption.*

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, exchange and distribution of the New Ordinary Shares (excluding the MIP Shares), as contemplated by Article III.B hereof, shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable Law requiring registration prior to the offering, issuance, exchange, distribution, or sale of Securities, to the maximum extent possible.  The offering of such New Ordinary Shares prior to the Petition Date shall be exempt from such registration requirements pursuant to Section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder.  In addition, to the extent New Ordinary Shares are offered, issued, exchanged or distributed pursuant to section 1145 of the Bankruptcy Code, such New Ordinary Shares (excluding the MIP Shares) will be freely tradable in the U.S. by the recipients thereof, subject to the provisions of (i) section 1145 (b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act; (ii) compliance with applicable securities Laws and any rules and regulations of the SEC, if any, applicable at the time of any future transfer of such Securities or instruments; and (iii) any restrictions in the New Corporate Governance Documents.

G.      *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, any applicable withholding or reporting agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, any applicable withholding or reporting agent shall be authorized to take all actions necessary to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

H.      *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

I.      *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Plan Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal (National Edition)*, on the Plan Effective Date.

J.      *Setoffs and Recoupment.*

Except as expressly provided in this Plan, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Reorganized Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment (other than for any Allowed Claim held by the Consenting Creditors, Backstop Parties, the ABL Agent, the Holders of the DIP Roll-Up Claims, or DIP Lenders) is either (1) agreed in amount among the relevant Reorganized Debtor(s)

and Holder of Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable Holder.  In no event shall any Holder of Claims against, or Interests in, the Debtors be entitled to recoup any such Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XII.G of the Plan on or before the Plan Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

K.    *Claims Paid or Payable by Third Parties.*

1.    Claims Paid by Third Parties.

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is fully repaid.

2.    Claims Payable by Third Parties.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.    Applicability of Insurance Policies.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Notwithstanding anything to the contrary contained herein (including Article III of the Plan), nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers, under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A.      *Disputed Claims Process.*

Notwithstanding section 502(a) of the Bankruptcy Code, and in light of the Unimpaired status of all Allowed General Unsecured Claims under the Plan, except as required by the Plan, Holders of Claims need not file Proofs of Claim, and the Reorganized Debtors and the holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Chapter 11 Cases had not been commenced except that (unless expressly waived pursuant to the Plan) the Allowed amount of such Claims shall be subject to the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable.  All Proofs of Claim filed in these Chapter 11 Cases shall be considered objected to and Disputed without further action by the Debtors.  Upon the Plan Effective Date, all Proofs of Claim filed against the Debtors, regardless of the time of filing, and including Proofs of Claim filed after the Plan Effective Date, shall be deemed withdrawn and expunged, other than as provided below.  Notwithstanding anything in this Plan to the contrary, disputes regarding the amount of any Cure pursuant to section 365 of the Bankruptcy Code and Claims that the Debtors seek to have determined by the Bankruptcy Court, shall in all cases be determined by the Bankruptcy Court.

For the avoidance of doubt, there is no requirement to File a Proof of Claim or Proof of Interest (or move the Bankruptcy Court for allowance) to be an Allowed Claim or Allowed Interest, as applicable, under the Plan.  Notwithstanding the foregoing, Entities must file Cure objections as set forth in Article VII hereof to the extent such Entity disputes the amount of the Cure paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty.  **Except as otherwise provided herein, all Proofs of Claim filed after the Plan Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

B.      *Allowance of Claims.*

After the Plan Effective Date and subject to the terms of this Plan, each of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Plan Effective Date.  The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

C.      *Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, after the Plan Effective Date, the Reorganized Debtors, in consultation with the Required Consenting Creditors, shall have the sole authority:  (1) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim or Interest without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, from and after the Plan Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Plan Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to the Plan.

Any objections to Claims and Interests other than General Unsecured Claims shall be served and Filed on or before the 120th day after the Plan Effective Date or by such later date as ordered by the Bankruptcy Court. All Claims and Interests other than General Unsecured Claims not objected to by the end of such 120-day period shall be deemed Allowed unless such period is extended upon approval of the Bankruptcy Court.

Notwithstanding the foregoing, the Debtors and Reorganized Debtors shall be entitled to dispute and/or otherwise object to any General Unsecured Claim in accordance with applicable nonbankruptcy law. If the Debtors or Reorganized Debtors dispute any General Unsecured Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced. In any action or proceeding to determine the existence, validity, or amount of any General Unsecured Claim, any and all claims or defenses that could have been asserted by the applicable Debtor(s) or the Entity holding such General Unsecured Claim are preserved as if the Chapter 11 Cases had not been commenced.

D.      *Estimation of Claims and Interests.*

Before or after the Plan Effective Date, the Debtors or the Reorganized Debtors, as applicable, (and in consultation with the Required Consenting Creditors), may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party in interest previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

E.      *Adjustment to Claims or Interests without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

F.      *Disallowance of Claims or Interests.*

All Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if: (1) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (2) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

G.      *No Distributions Pending Allowance.*

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest; *provided* that if only the Allowed amount of an otherwise valid Claim or Interest is Disputed, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

H.      *Distributions After Allowance.*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the holder of such Allowed Claim or Interest in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Interest becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim or Interest the distribution (if any) to which such holder is entitled under the Plan as of the Plan Effective Date, without any interest to be paid on account of such Claim or Interest.

I.      *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims against the Debtors, and no Holder of a prepetition Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Plan Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Plan Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Plan Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Interests, including demands, liabilities, and Causes of Action that arose before the Plan Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Plan Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Plan Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of

the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Plan Effective Date.

**B.    *Release of Liens.***

**Except as otherwise provided in the Exit Financing Documents, the Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Plan Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Plan Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with Article III.B.1 hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

**C.    *Releases by the Debtors.***

**Notwithstanding anything contained in the Plan to the contrary, as of the Plan Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions and services of the Released Parties in facilitating the implementation of the restructuring contemplated by the Plan, the adequacy of which is hereby confirmed, except (i) for the right to enforce the Plan or any right or obligation arising under, without limitation, the Definitive Documents or other documents entered into in furtherance of the Restructuring and Restructuring Transactions that remain in effect or become effective after the Plan Effective Date or (ii) as otherwise provided in the Plan or in the Confirmation Order, on and after the Plan Effective Date, the Released Parties are deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Reorganized Debtors, and their Estates, and their Related Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates, or their Related Parties, as applicable, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtors, the Reorganized Debtors, or their Estates, or their Related Parties, as applicable, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, a Reorganized Debtor, their Estates, or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the Debtors' capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between or among**

any Debtor, Reorganized Debtor, Related Party and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors by Released Parties other than the Consenting Creditors), intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the DIP New Money Facility, the DIP Roll-Up Facility, the DIP Documents, the Exit Financing Arrangements, the Exit Financing Documents, the Rights Offering Documents (if any), the Backstop Commitment Agreements (if any), the Prepetition ABL Credit Agreement, the Term Loan Credit Agreement, the Notes Indentures, the Disclosure Statement, the Plan (including, for avoidance of doubt, the Plan Supplement), before or during the Chapter 11 Cases, any other Definitive Document, or other documents entered into in furtherance of the Restructuring and Restructuring Transactions, or any Restructuring Transactions, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the Restructuring Support Agreement, the DIP New Money Facility, the DIP Roll-Up Facility, the DIP Documents, the Exit Financing Arrangements, the Exit Financing Documents, the Rights Offering Documents (if any), the Backstop Commitment Agreements (if any), the Prepetition ABL Credit Agreement, the Term Loan Credit Agreement, the Notes Indentures, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), any other Definitive Document, or other documents entered into in furtherance of the Restructuring and Restructuring Transactions, or any Restructuring Transactions, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Restructuring Transactions, including the issuance or distribution of Securities pursuant to the Restructuring Transactions, or the distribution of property pursuant to the Restructuring Transactions, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before, in respect of the foregoing clause, the Plan Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any Causes of Action identified in the Schedule of Retained Causes of Action; *provided*, however, that any Causes of Action against the Consenting Creditors, their Affiliates, the ABL Agent, the Holders of the DIP Roll-Up Claims, or their respective advisors shall not be retained Causes of Action or be identified in the Schedule of Retained Causes of Action, and (ii) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or Agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Financing Arrangements, the Exit Financing Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (a) in exchange for the good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the

Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

**D.      *Releases by Third Parties.***

Notwithstanding anything contained in the Plan to the contrary, as of the Plan Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions and services of the Released Parties in facilitating the implementation of the restructuring contemplated by the Plan, the adequacy of which is hereby confirmed, pursuant to section 1123(b) of the Bankruptcy Code, in each case except for Claims arising under, or preserved by, the Plan, including (i) the right to enforce the Plan or any right or obligation arising under the Definitive Documents or other documents entered into in furtherance of the Restructuring and Restructuring Transactions that remain in effect or become effective after the Plan Effective Date or (ii) as otherwise provided in the Plan or in the Confirmation Order, to the fullest extent permitted under applicable law, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each and all of the Releasing Parties, from any and all Claims and Causes of Action, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the foregoing Entities, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates, or any Related Entity, as applicable, that such Entity would have been legally entitled to assert (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, a Reorganized Debtor, or their Estates or other Entity, or any Related Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between or among any Debtor and any Released Party, or any Related Entity, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights or remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors by Released Parties other than the Consenting Creditors), intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement, the DIP New Money Facility, the DIP Roll-Up Facility, the DIP Documents, the Exit Financing Arrangements, the Exit Financing Documents, the Rights Offering Documents (if any), the Backstop Commitment Agreements (if any), the Prepetition ABL Credit Agreement, the Term Loan Credit Agreement, the Notes Indentures, the Disclosure Statement, the Plan (including, for avoidance of doubt, the Plan Supplement), before and during the Chapter 11 Cases, any other Definitive Document, or other documents entered into in furtherance of the Restructuring and Restructuring Transactions or any Restructuring Transactions, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the Restructuring Support Agreement, the DIP New Money Facility, the DIP Roll-Up Facility, the DIP Documents, the Exit Financing Arrangements, the Exit

Financing Documents, the Rights Offering Documents (if any), the Backstop Commitment Agreements (if any), the Prepetition ABL Credit Agreement, the Term Loan Credit Agreement, the Notes Indentures, the Disclosure Statement, the Plan (including, for avoidance of doubt, the Plan Supplement), before or during the Chapter 11 Cases, any other Definitive Document, or other documents entered into in furtherance of the Restructuring and Restructuring Transactions or any Restructuring Transactions, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable law, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Restructuring Transactions and/or Plan, or the distribution of property pursuant to the Restructuring Transactions and/or the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Plan Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Financing Arrangements, the Exit Financing Documents, or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing the Plan; (d) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

### E.    *Exculpation.*

Effective as of the Plan Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action or any claim arising from the Petition Date through the Plan Effective Date related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Restructuring Support Agreement, the DIP New Money Facility, the DIP Roll-Up Facility, the DIP Documents, the Exit Facilities, the Exit Financing Documents, the Rights Offering Documents (if any), the Backstop Commitment Agreements (if any), the Prepetition ABL Credit Agreement, the Term Loan Credit Agreement, the Notes Indentures, the Disclosure Statement, the Plan (including, for avoidance of doubt, the Plan Supplement), any other Definitive Document, or any Restructuring Transaction, contract, instrument, release or other agreement or document (relating to any of the foregoing, created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Exit Facilities, the Plan, or the Plan Supplement before or during the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (excluding, for the avoidance of doubt, providing any

legal opinion effective as of the Effective Date requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan), except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Debtors have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.  Notwithstanding the foregoing, the exculpation shall not release any obligation or liability of any Entity for any post-Effective Date obligation under the Plan or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. No entity or person may commence or pursue a Claim or Cause of Action of any kind against any of the Debtors that arose or arises from, in whole or in part, a Claim or Cause of Action subject to the terms of this paragraph, without this Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim for actual fraud, gross negligence, or willful misconduct against any such Debtor and such party is not exculpated pursuant to this provision; and (ii) specifically authorizing such Entity or Person to bring such Claim or Cause of Action against such Debtor.

The Debtors have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above does not release or exculpate any Claim relating to post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Financing Arrangements, the Exit Financing Documents, or any Claim or obligation arising under the Plan.

Solely with respect to the exculpation provisions, notwithstanding anything to the contrary herein the Plan, the 1125(e) Exculpation Parties shall not incur liability for any Cause of Action or Claim related to any act or omission in connection with, relating to, or arising out of, in whole or in part, (a) the solicitation of acceptance or rejection of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code or (b) the participation, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security, offered or sold under the Plan.  No entity or person may commence or pursue a Claim or Cause of Action of any kind against any of the 1125(e) Exculpation Parties that arose or arises from, in whole or in part, a Claim or Cause of Action subject to the terms of this paragraph, without this Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim for actual fraud, gross negligence, or willful misconduct against any such 1125(e) Exculpation Party and such party is not exculpated pursuant to this provision; and (ii) specifically authorizing such Entity or Person to bring such Claim or Cause of Action against such 1125(e) Exculpation Party.  The Bankruptcy Court will have sole and exclusive jurisdiction to adjudicate the underlying colorable Claim or Causes of Action.

**F.      Injunction.**

Except as otherwise expressly provided in this Plan or the Confirmation Order or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Plan Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Plan Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

No Person or Entity may commence or pursue a Claim or Cause of Action, as applicable, of any kind against the Debtors, the Reorganized Debtors, or the Released Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action, as applicable, subject to the terms of the Plan, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a claim of willful misconduct, fraud or gross negligence against a Released Party or Exculpated Party and (ii) specifically authorizing such Entity or Person to bring such Claim or Cause of Action against any such Debtor, Reorganized Debtor, or Exculpated Party, Released Party, as applicable.

The Bankruptcy Court shall have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action is colorable and, only to the extent legally permissible and shall have jurisdiction to adjudicate the underlying colorable Claim or Cause of Action.

**G.      Protections Against Discriminatory Treatment.**

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

H.      *Document Retention.*

On and after the Plan Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

I.      *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

**ARTICLE IX.**
**CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN**

A.      *Conditions Precedent to the Plan Effective Date.*

It shall be a condition to the Plan Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

1.  the Restructuring Support Agreement shall not have been terminated by all parties thereto and shall remain in full force and effect;

2.  the Final DIP Order shall be in full force and effect and there shall be no defaults under the DIP Documents continuing unless waived by the requisite DIP Lenders in accordance with the terms of the DIP Documents;

3.  the Restructuring Transactions have been implemented in accordance with the Restructuring Steps Memorandum in all material respects;

4.  an order approving the Disclosure Statement and an order confirming the Plan (which, for the avoidance of doubt, may be the same order) shall have been entered and such orders shall not have been stayed, modified, or vacated on appeal;

5.  the Backstop Commitment Agreements (if any) shall not have been terminated and shall remain in full force and effect;

6.  the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed in a manner consistent in all material respects with the Plan and subject to the consent rights in the Restructuring Support Agreement or other Definitive Document;

7.  the Plan, Confirmation Order, and all schedules, documents, supplements, and exhibits to the Plan, and any other Definitive Documents shall have become effective, subject to the consent and approval rights set forth in the Restructuring Support Agreement;

8.   the New Ordinary Shares shall have been issued (with all conditions precedent thereto having been satisfied or waived);

9.   all Professional Fee Amounts that require the approval of the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Plan Effective Date shall have been funded into the Professional Fee Escrow Account pending the approval of such fees and expenses by the Bankruptcy Court;

10.  all Restructuring Expenses shall have been paid in accordance with the Plan; and

11.  any and all requisite governmental, regulatory, and third-party approvals and consents shall have been obtained.

B.   *Waiver of Conditions.*

The conditions to the Plan Effective Date set forth in this Article IX may be waived in whole or in part at any time by the Debtors only with the prior written consent of the Required Consenting Creditors (email shall suffice), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

C.   *Substantial Consummation*

"Substantial consummation" of the Plan, as defined by section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Plan Effective Date.

D.   *Effect of Failure of Conditions.*

If Consummation does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims by the Debtors, Claims, or Interests; (2) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity, respectively; *provided* that all provisions of the Restructuring Support Agreement that survive termination thereof shall remain in effect in accordance with the terms thereof.

**ARTICLE X.**
**MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**

A.   *Modification and Amendments.*

Except as otherwise specifically provided in the Plan and to the extent permitted by the Restructuring Support Agreement and applicable law, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to those restrictions on modifications set forth in the Plan and the Restructuring Support Agreement, and the requirements of section 1127 of the Bankruptcy Code, Rule 3019 of the Federal Rules of Bankruptcy Procedure, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or, to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or

reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

B.      *Effect of Confirmation on Modifications.*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan.*

To the extent permitted by the Restructuring Support Agreement (including the consent, approval, and consultation rights set forth therein), the Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Plan Effective Date, on and after the Plan Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Plan Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Plan Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7.      enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

8.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan, including any action to adversely impact, reduce or diminish the Debtors' or Reorganized Debtor's net operating losses or other tax assets or attributes, or any action (including in the United States or any foreign jurisdiction) that is intended or is reasonably likely to directly or indirectly prevent, impede, hinder, adversely affect, and/or delay any of the Restructuring Transactions or any actions or efforts of the Debtors and Reorganized Debtors and/or their ability to consummate the Plan;

11.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, exculpations, and other provisions;

12.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.K hereof;

13.      enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.      determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan, the Plan Supplement, or the Disclosure Statement;

15.      enter an order concluding or closing the Chapter 11 Cases;

16.      adjudicate any and all disputes arising from or relating to distributions under the Plan;

17.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.     determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.     hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions and releases granted in the Plan, including under Article VIII hereof, regardless of whether such termination occurred prior to or after the Plan Effective Date;

22.     hear and determine all disputes involving the obligations or terms of the Rights Offering and the Backstop Commitment Agreements;

23.     enforce all orders previously entered by the Bankruptcy Court; and

24.     hear any other matter not inconsistent with the Bankruptcy Code.

As of the Plan Effective Date, notwithstanding anything in this Article XI to the contrary, the Exit Financing Documents shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain any jurisdiction with respect thereto.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

*A.     Immediate Binding Effect.*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Plan Effective Date, the terms of the Plan (including, for the avoidance of doubt, the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

*B.     Additional Documents.*

On or before the Plan Effective Date, and consistent in all respects with the terms of the Restructuring Support Agreement, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Reorganized Debtors (or the Disbursing Agent on behalf of each of the Reorganized Debtors) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

D.      *Statutory Committee and Cessation of Fee and Expense Payment.*

On the Plan Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.  The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Plan Effective Date.

All monthly reports shall be filed, and all fees due and payable pursuant to section 1930(a) of Title 28 of the United States Code shall be paid by the Debtors or the Reorganized Debtors (or the Disbursing Agent on behalf of each of the Reorganized Debtors) on the Plan Effective Date, and following the Plan Effective Date, the Reorganized Debtors (or the Disbursing Agent on behalf of each of the Reorganized Debtors) shall pay such fees as they are assessed and come due for each quarter (including any fraction thereof), and shall file quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each Debtor shall remain obligated to pay such quarterly fees to the U.S. Trustee and to file quarterly reports until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

E.      *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Plan Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Plan Effective Date.

F.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.      *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

1.  Debtors:

        Venator Materials PLC
        Titanium House

Hanzard Drive
Wynyard Park
Stockton-On-Tees
United Kingdom
TS22 5FD
Attention: Russ Stolle, Executive Vice President, General Counsel and
Chief Compliance Officer
E-mail address: russ_stolle@venatorcorp.com
with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:  Steven N. Serajeddini, P.C.
E-mail address:  steven.serajeddini@kirkland.com

and

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Attention:  Jeffrey Michalik
E-mail address: jeff.michalik@kirkland.com

and

Jackson Walker LLP
1401 McKinney, Suite 1900
Houston, Texas 77010
Attention:  Matthew Cavenaugh, Jennifer Wertz, and Victoria Argeropolous, Beau Butler
E-mail addresses: mcavenaugh@jw.com; jwertz@jw.com; vargeroplos@jw.com;
bbutler@jw.com

2.   Cross-Holder Group:

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
Attention: Scott J. Greenberg and Steven Domanowski
E-mail address: sgreenberg@gibsondunn.com; sdomanowski@gibsondunn.com

and

Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue
Washington, DC 20036
Attention: AnnElyse Scarlett Gains
E-mail address: agains@gibsondunn.com

3.   <u>Term Lender Group</u>:

White & Case LLP
1221 Avenue of the Americas
New York, NY 10020
Attention: Harrison Denman and Scott Greissman
E-mail address: harrison.denman@whitecase.com; sgreissman@whitecase.com

After the Plan Effective Date, the Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Plan Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

H.   *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Plan Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I.   *Entire Agreement.*

Except as otherwise indicated, and without limiting the effectiveness of the Restructuring Support Agreement, the Plan (including, for the avoidance of doubt, the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J.   *Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at http://dm.epiq11.com/Venator or the Bankruptcy Court's website at www.txs.uscourts.gov/bankruptcy.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

K.   *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, subject to the terms of the Restructuring Support Agreement, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or

interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent, *provided* that any such deletion or modification must be consistent with the Restructuring Support Agreement and the consent rights contained in each of them; and (3) nonseverable and mutually dependent.

L.      *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

M.      *Closing of Chapter 11 Cases.*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

N.      *Waiver or Estoppel.*

Each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

Dated:  May 14, 2023                         VENATOR MATERIALS PLC
                                             on behalf of itself and all its Debtor affiliates


                                             By: */s/ Kurt Ogden*
                                             _____
                                                  Name:  Kurt Ogden
                                                  Title: Chief Financial Officer

**EXHIBIT C**

**DIP Term Sheet**

*Execution Version*

**DIP TERM SHEET**

**VENATOR FINANCE S.À R.L. AND VENATOR MATERIALS LLC**

This summary of terms and conditions (this "***DIP Term Sheet***") sets forth the principal terms of the senior secured superpriority, priming debtor-in-possession credit facility (the "***DIP Facility***," the credit agreement evidencing the DIP Facility, the "***DIP Credit Agreement***"[1] and any other DIP Documents (as defined herein), each of which shall be in form and substance acceptable to the Debtors, the DIP Agent and the DIP Lenders (each as defined herein)) that the DIP Lenders are contemplating providing to Venator Finance S.à r.l. and Venator Materials LLC (the "***Borrowers***") and certain of Borrowers' affiliates and subsidiaries that will be debtors and debtors in possession (collectively, the "***Debtors***") in connection with the chapter 11 cases (the "***Chapter 11 Cases***") to be filed by the Debtors under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended (the "***Bankruptcy Code***").

This DIP Term Sheet does not attempt to describe all of the terms, conditions, and requirements that would pertain to the financing described herein, but rather is intended to be a summary outline of certain basic items, which shall be set forth in final documentation, which documentation shall be acceptable in all respects to the DIP Agent and the DIP Lenders in their sole discretion.  This DIP Term Sheet should not be construed as a commitment to lend or to arrange for any credit facility and is for discussion purposes only.

| | |
|---|---|
| **Borrowers** | Venator Finance S.à r.l. and Venator Materials LLC |
| **Guarantors** | The obligations of the Borrowers shall be unconditionally guaranteed, on a joint and several basis, by each Debtor (each, a "***Guarantor***" and, collectively, the "***Guarantors***" and the Guarantors, together with the Borrowers, the "***DIP Parties***"), subject to limitations consistent with those contained in the Term Loan Credit Agreement and related prepetition documents on upstream guarantees by non-US Guarantors as may be required by local law. |
| **DIP Facility** | The DIP Facility commitments total $275 million (the loans under the DIP Facility, the "***DIP Loans***," and the commitments thereunder, the "***DIP Commitments***" including all accrued interest and fees, the "***DIP Obligations***"), as follows:<br><br>(a) $100 million upon the entry of an interim order by the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***") approving the DIP Facility (the "***Interim DIP Order***"); and<br><br>(b) $175 million within one (1) business day upon the entry of a final order by the Bankruptcy Court approving the DIP Facility (the |

---

[1]   Unless and until the DIP Credit Agreement is executed by the applicable parties, references herein to the DIP Credit Agreement shall refer to this DIP Term Sheet.

| | |
|---|---|
| | "***Final DIP Order***" and, together with the Interim DIP Order, the "***DIP Orders***"). |
| | The DIP Credit Agreement shall be executed by the applicable parties prior to the Bankruptcy Court's entry of the Interim DIP Order. |
| **Interest Rate** | Subject to the Cash/PIK Election, the DIP Loans will bear interest at a rate equal to SOFR plus 10.00% per annum; *provided*, that in the event the Majority Lenders elect to receive an interest payment in kind pursuant to the Cash/PIK Election, the Debtors shall pay in cash SOFR plus 1.50% per annum (the "***Minimum Cash Pay Requirement***") <u>plus</u> additional interest shall accrue in kind at a rate equal to 8.50% per annum. |
| **Fees and Premiums** | **Backstop Fee**: The Borrowers shall pay to the DIP Agent, for the ratable account of each Backstop Party, a fee in an amount equal to 10.00% of the DIP Commitments, which fee shall be payable in kind. |
| | **Commitment Fee**: The Borrowers shall pay to the DIP Agent, for the ratable account of each DIP Lender, a fee, payable in DIP Loans, in an amount equal to 2.00% of the DIP Commitments. |
| | **Exit Fee**: |
| | • If the DIP Obligations are satisfied in full in cash, a fee of 2.50% of the aggregate principal amount of the DIP Loans (including any amounts paid in kind) and remaining outstanding DIP Commitments shall be fully earned on the date of the effectiveness of the DIP Facility (the "***Closing Date***") and shall be payable in cash to the DIP Lenders on a *pro rata* basis on the earlier of (i) the Maturity Date and (ii) the date on which the DIP Obligations are paid in full in cash. |
| | • If the DIP Obligations are satisfied other than in full in cash, a fee of 5.00% of the aggregate principal amount of the DIP Loans (including any amounts paid in kind) and remaining outstanding DIP Commitments shall be fully earned on the Closing Date and shall be payable in cash to the DIP Lenders on a pro rata basis as a condition to the Plan Effective Date. |
| | **Extension Fee**: Subject to the Cash/PIK Election, as a condition precedent to any Extension, the Borrowers shall pay to the DIP Agent for the benefit of the DIP Lenders an extension fee of 1.25% in cash or 2.50% in kind (the "***Extension Fee***") on the then aggregate outstanding principal amount of the DIP Loans (including any amounts paid in kind) and remaining outstanding DIP Commitments, payable to each DIP Lender based on each DIP Lender's proportion of its share of the then aggregate |

|  | outstanding principal amount of such DIP Loans and remaining outstanding DIP Commitments. |
|---|---|
| **DIP Agent** | Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent for the DIP Lenders. |
| **DIP Lenders** | Following entry of the Interim DIP Order and upon entry of the Final DIP Order, participation in the DIP Facility shall be offered ratably to all Term Loan Lenders, Secured Noteholders, and Senior Unsecured Noteholders (in each case in its capacity under the DIP Facility, including its registered assigns, the "***DIP Lender***," and together the "***DIP Lenders***") with 90.0% of the DIP Commitments offered to Term Loan Lenders and Secured Noteholders on a *pro rata* basis and 10.0% of the DIP Commitments offered to the Senior Unsecured Noteholders on a *pro rata* basis.<br><br>DIP Lenders and Backstop Parties, as applicable, shall be entitled to designate participation in the DIP Commitments to one or more affiliates or funds or accounts managed, advised or sub-advised by such DIP Lenders or Backstop Parties, as applicable. |
| **Backstop Parties[2]** | Members of the (i) Term Lender Group who sign the Restructuring Support Agreement and (ii) Cross-Holder Group who sign the Restructuring Support Agreement; provided that (a) holders of Senior Secured Claims who are Backstop Parties shall be entitled to provide 90.0% of the backstop for the DIP Commitments on a *pro rata* basis; and (b) holders of Senior Unsecured Notes Claims who are Backstop Parties shall be entitled to provide 10.0% of the backstop for the DIP Commitments on a *pro rata* basis. |
| **DIP Loan Maturity Date** | Other customary chapter 11 maturity triggers, including, the earliest to occur of (i) the date (the "***Stated Maturity Date***") falling four months after the commencement of the Chapter 11 Cases, subject to three one-month extensions (each, an "***Extension***") at the sole discretion of the Majority Lenders, (ii) the Plan Effective Date, (iii) the date of prepayment in cash in full by the Debtors of all DIP Obligations and termination of all of the DIP Commitments in accordance with the terms of the DIP Facility, (iv) the date of termination of the DIP Commitments and acceleration of any outstanding extensions of credit following the occurrence and during the continuance of an Event of Default under the DIP Facility (subject to any applicable cure or noticing periods set forth in the DIP Orders), and (v) the date upon which the Debtors sell all or substantially all of their assets (such earliest date, the "***Maturity Date***") |

---

[2]   Terms used herein but not otherwise defined shall have the meaning set forth in the Restructuring Support Agreement.

| | |
|---|---|
| **Roll-Up Obligations Payment Date** | The Roll-Up Obligations shall be payable on the Stated Maturity Date of the DIP Facility as in effect on the closing date, subject to three one-month extensions by the ABL Agent acting at the direction of the requisite ABL Lenders (the consent to such extensions not to be unreasonably withheld). |
| **Non-Debtor Assets** | In furtherance of providing the DIP Lenders with perfected and enforceable first ranking liens and claims on the Previously Unencumbered Property, the Debtors agree that they shall use commercially reasonable efforts (subject to applicable local law limitations), in advance of entry of the Final DIP Order, to identify any Previously Unencumbered Property of the Debtors and, if practicable, cause non-Debtor subsidiaries to pledge any applicable assets to secure the DIP Commitments, or such other actions as may be reasonably requested by the Majority Lenders. |
| **Collateral** | Subject to the carve out (as attached here as **Annex A**, the "***Carve Out***") the DIP Facility shall be secured by automatically perfected liens on and security interests in (collectively, the "***DIP Liens***"): |
| | (a) all Term Loan Priority Collateral (as defined in the ABL Intercreditor Agreement), on a superpriority priming basis and with a first priority ranking basis senior to any other lien or claim; |
| | (b) all ABL Priority Collateral (as defined in the ABL Intercreditor Agreement), on a junior basis to the liens of the ABL Lenders securing the Roll-Up Obligations but senior to all other liens; |
| | (c) all property of the DIP Parties other than Term Loan Priority Collateral or ABL Priority Collateral that is subject to valid, perfected, and non-avoidable liens in existence immediately prior to the Petition Date or valid and non-avoidable liens perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code ("***Other Permitted Prior Liens***") on a junior basis to such Other Permitted Prior Liens but senior to all other liens; |
| | (d) all property of the DIP Parties, consistent with the terms hereof and the DIP Orders, whether existing on the Petition Date or thereafter acquired that is not subject to valid, perfected, and non-avoidable liens or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code (the "***Previously Unencumbered Property***"), on a first priority ranking basis senior to any other lien or claim; |
| | (e) the proceeds of any actions brought under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral (as defined below) to the extent the DIP Liens on such |

DIP Collateral are first priority ("**Transfer Actions**") but in no event shall the DIP Liens extend to Transfer Actions;

(f) subject to and upon entry of the Final DIP Order, the proceeds of any claims or causes of action arising under or pursuant to chapter 5 of the Bankruptcy Code, section 724(a) of the Bankruptcy Code or any other similar provisions of applicable state, federal or foreign law (including any other avoidance actions under the Bankruptcy Code) ("**Avoidance Actions**") but in no event shall the DIP Liens extend to Avoidance Actions; and

(g) subject to and upon entry of the Final DIP Order, the proceeds of any exercise of the Debtors' rights under section 506(c) and 550 of the Bankruptcy Code ("**Recovery Actions**") but in no event shall the DIP Liens extend to the Recovery Actions.

(collectively, the "**DIP Collateral**").

The DIP Facility shall also benefit from superpriority administrative expense claims against all Debtors that are senior to all other administrative expenses or other claims against the Debtors, but which shall be junior to the Carve Out, and in respect of assets that constitute ABL Priority Collateral, junior to the ABL Roll-Up Liens and the administrative expense claims granted in respect of the ABL Roll-Up Obligations.

The DIP Liens on the Previously Unencumbered Property shall only be subject and subordinate to the Carve Out.

The DIP Liens described herein shall, to the fullest extent permitted by applicable law, be effective and perfected upon entry of the Interim DIP Order (as defined below) and/or Final DIP Order, as applicable, and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements, and the Debtors shall not be required to take any action to create or perfect the liens in the DIP Collateral, except as otherwise agreed between the Debtors and the Majority Lenders.  The Interim DIP Order and Final DIP Order will contain customary intercreditor agreement provisions, including, without limitation, turn-over and enforcement rights consistent with the lien priority provided herein.

Upon the request of the DIP Agent (at the direction of the Majority Lenders), each applicable Debtor shall use commercially reasonable efforts to execute, acknowledge, and deliver, or shall cause to be executed, acknowledged, and delivered, all such further agreements, instruments, certificates or documents, that the DIP Agent (at the direction of the Majority Lenders) shall reasonably request in order to

|  | ensure and perfect, as applicable, the priorities, rights, security interests and remedies of the DIP Collateral for the benefit of the DIP Agent and the DIP Lenders with respect to the DIP Collateral, including any filings or other action with respect to the perfection of security interests in any jurisdiction outside of the United States. Further, the DIP Agent (at the direction of the Majority Lenders) may require the Debtors to enter into non-U.S. security documentation with respect to collateral owned by non-U.S. Debtors or located in non-U.S. jurisdictions and each Debtor and its respective officers or agents are authorized to execute, file and record any documents or instruments as the DIP Agent (at the direction of the Majority Lenders) shall request, and all such documents and instruments shall be deemed to have been filed or recorded at the time and on the date of entry of the Interim DIP Order.<br><br>To the extent that any Prepetition Agent is a secured party under any account control agreement, listed as an additional insured, loss payee under any of the Debtors' insurance policies, or is the secured party under any loan document, financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction to validate, attach, perfect, or prioritize liens (any such instrument or document, a "***Security Document***"), the DIP Agent shall also be deemed to be the secured party under each such Security Document, and shall have all the rights and powers attendant to that position (including, without limitation, rights of enforcement), and shall act in that capacity and distribute any proceeds recovered or received subject to the Carve Out and in accordance with the terms of the Interim DIP Order and/or the Final DIP Order, as applicable, and the other DIP Documents.  Each Prepetition Agent shall serve as a gratuitous bailee for the DIP Agent solely for the purposes of perfecting its security interests in and liens on all DIP Collateral that is of a type such that perfection of a security interest therein (but for the entry of the Interim DIP Order) may be accomplished only by possession or control by a secured party to the extent such Prepetition Agent possesses or controls any such DIP Collateral. |
|---|---|
| **Use of Proceeds** | Substantially in accordance with the DIP Budget (subject to Permitted Deviations and which shall not operate as a cap in respect of professional fees), the proceeds of the DIP Facility and/or Cash Collateral shall be available, subject to and upon entry of the Interim DIP Order and Final DIP Order, as applicable, (i) for the Debtors' working capital needs, including to fund the costs of the administration of the chapter 11 cases and to pay adequate protection payments as authorized by the Bankruptcy Court in the Interim DIP Order and the Final DIP Order, in each case in a manner consistent with the DIP Budget, (ii) to pay professional fees and expenses, and (iii) to pay obligations arising from or related to the Carve Out. |

<table>
<tr><td></td><td>

No portion of the Cash Collateral (as such term is defined in section 363(a) of the Bankruptcy Code), the proceeds of the DIP Facility, the Collateral (as defined below), or the Carve Out (as defined below) may be used:

    (a)    for any purpose that is prohibited under the Bankruptcy Code or the DIP Orders;

    (b)    unless expressly provided in the DIP Budget, to make any payment or distribution, directly or indirectly, to any insider of the Debtors that is outside of the ordinary course;

    (c)    to make any payment, advance, intercompany advance, or any other remittance or transfer whatsoever (including any intercompany loans and investments (including to and in foreign subsidiaries)) that is not in accordance with the DIP Budget (subject to Permitted Deviations); and

    (d)    to finance or reimburse for expenses incurred or to be incurred, in both instances, directly or directly and in any way: (i) any adversary action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the interests of any or all of the DIP Agent, the DIP Lenders, the Prepetition Agents/Trustees, the Prepetition Secured Parties, or their respective rights and remedies under the DIP Credit Agreement and any other agreements, instruments, pledge agreements, intercreditor agreements, guarantees, fee letters, control agreements, and other ancillary documents related thereto (including any security agreements, intellectual property security agreements, or notes) (as amended, restated, supplemented, waived, and/or modified from time to time, collectively with the DIP Credit Agreement and the DIP Orders, the "***DIP Documents***"), the Interim DIP Order, or the Final DIP Order or (ii) any other action, which with the giving of notice or passing of time, would result in an Event of Default (as defined in the DIP Credit Agreement) under the DIP Documents.

</td></tr>
<tr><td>**Covenants**</td><td>Those contained in the Term Loan Credit Agreement (but subject to customary modifications required to reflect the proposed DIP Facility and the Chapter 11 Cases).</td></tr>
<tr><td>**Roll-Up Facility Borrowing Base**</td><td>The Debtors shall provide the ABL Agent with a Borrowing Base Certificate (as defined in the ABL Credit Agreement) monthly in accordance with the terms of the ABL Credit Agreement, and consistent in form with the most recent monthly Borrowing Base Certificate delivered to the ABL Agent.</td></tr>
</table>

| | |
|---|---|
| | Notwithstanding any provision of the ABL Credit Agreement, the ABL Agent shall not institute any new discretionary Reserves (as defined in the ABL Credit Agreement) against the Borrowing Base (as defined in the ABL Credit Agreement) that are not in place on the Petition Date other than a Carve Out Reserve (as defined below).<br><br>Notwithstanding anything in the ABL Credit Agreement to the contrary, the ABL Agent may not give effect to the results of any new appraisals or field examinations in respect of the collateral (including by updating the Net Orderly Liquidation Values (as defined in the ABL Credit Agreement) attributed to any inventory collateral) prior to the Borrowing Base Certificate to be delivered in July, 2023. Starting with the Borrowing Base Certificate delivered in July, 2023 and onwards, the ABL Agent may make adjustments in respect of field examinations and appraisals in accordance with the terms of the ABL Credit Agreement.<br><br>On the Petition Date, the ABL Agent may institute a Reserve in the amount of the Carve Out (the "***Carve Out Reserve***"). |
| **Roll-Up Borrowing Base Reserve** | The Debtors shall not permit the Borrowing Base to be less than the sum of (i) the ABL Roll-Up Obligations (but for the purposes of this calculation only, excluding the Ancillary Facility (as defined in the ABL Credit Agreement) and the Specified Hedge Obligations (as defined in the ABL Credit Agreement), plus (ii) $40 million during the Chapter 11 Cases (an "***Availability Event***"). Upon the occurrence of an Availability Event, the Debtors shall promptly, and in no event later than two (2) business days following delivery of the Borrowing Base Certificate that gives rise to the Availability Event, deposit cash into an account controlled by the ABL Agent (a "***Borrowing Base Collateral Account***") in an amount sufficient, such that when such cash is added to the Borrowing Base, no Availability Event would be in effect. Any cash in the Borrowing Base Collateral Account shall constitute ABL Priority Collateral.<br><br>All cash deposited into the Borrowing Base Collateral Account shall be added on a dollar for dollar basis to the Borrowing Base. If after delivery of any Borrowing Base Certificate, the Borrowing Base is greater than the sum of the ABL Roll-Up Obligations plus $40 million, the Debtors may request and receive withdrawal of cash from the Borrowing Base Collateral Account in the amount of such excess. |
| **Automatic Stay Acknowledgement** | Each DIP Lender hereby expressly acknowledges that it is bound by the automatic stay under 11 U.S.C. § 362 and will therefore not, unless otherwise permitted under the DIP Documents or the Restructuring Support Agreement or any other order of the Bankruptcy Court, claim payment of any other outstanding prepetition claims against Venator Holdings Germany GmbH, Venator Germany GmbH, Venator Uerdingen |

8

| | |
|---|---|
| | GmbH, and Venator Wasserchemie Holding GmbH during the relevant chapter 11 proceedings over such Borrower or Guarantor (as applicable) in violation of such automatic stay. |
| **Finnish Companies Act Acknowledgement** | The liabilities and obligations of Venator P&A Finland Oy under any DIP Document, DIP Order, or any other document to which it is a party shall be limited to the extent it would constitute (i) unlawful financial assistance within the meaning of Chapter 13 Section 10 of the Finnish Companies Act, or (ii) unlawful distribution of assets within the meaning of Chapter 13 Section 1 of the Finnish Companies Act (or their equivalents from time to time). |
| **Mandatory Prepayments and Asset Sale Covenant** | In addition to mandatory prepayment requirements usual and customary for transactions of this type from proceeds of asset sales, insurance (subject to reinvestment rights), and condemnation, and proceeds of certain indebtedness, an asset sale negative covenant usual and customary for transactions of this type including a prohibition on out of the ordinary course sales of assets and the sale of the Debtors' interest in the Lake Charles JV. |
| **Approved DIP Budget** | The Debtors shall, immediately upon receipt of the proceeds of the DIP Facility, deposit such amounts into a segregated bank account that may only be drawn in accordance with the DIP Budget (as defined below) with all funds held in the account deemed to be DIP Collateral, and such account shall be maintained by the DIP Agent.  The release of funds from such account shall be subject to the DIP Budget and the mechanics for the release set forth in the DIP Credit Agreement.  The Debtors shall use commercially reasonable efforts to place a control agreement over such account.

The "***DIP Budget***" means the rolling 13-week operating cash flow forecast/budget of the Debtors, to be approved by the Majority Lenders.  Any updated DIP Budget shall be subject to approval in form and substance by the Majority Lenders and otherwise subject to updates by the Debtors every fourth Friday following the week in which filing occurred (such updates to be approved by the Majority Lenders; it being agreed and understood that a form substantially consistent with the form attached as **Annex B** is acceptable to the Majority Lenders).  The DIP Budget shall include a line-item for weekly professional fee forecasts for each professional in the budget.  In the event a DIP Budget is not approved or if the Debtors and the Majority Lenders otherwise affirmatively agree, the prior DIP Budget shall continue to govern.

A "***Testing Period***" means each rolling cumulative four-week period beginning with the first full week after the Petition Date. |

A "**_Variance Test_**" means for the relevant Testing Period, the negative difference (if any) expressed as a percentage, of (x) projected cumulative receipts or disbursements for such period as reflected in the then-approved DIP Budget in the aggregate to (y) actual receipts or disbursements for such period in the aggregate; provided that such calculation shall in all cases exclude any payment of professional fees; _provided_ that receipts shall be excluded from each Variance Test that is prior to the date that is 60 days after the Petition Date.

"**_Permitted Deviation_**" means, (a) with respect to each Variance Test based on receipts, an aggregate unfavorable variance equal to or less than 25.0% (the "**_Receipts Permitted Deviation_**"), and (b) with respect to each Variance Test based on disbursements, an aggregate unfavorable variance equal to or less than 15.0%.  All spending must be consistent with the disbursements in the DIP Budget (subject to Permitted Deviations).

It shall be a condition precedent to the effectiveness of the DIP Facility that the Debtors shall have delivered a DIP Budget in form and substance acceptable to the Majority Lenders (including with respect to any updated DIP Budget; it being agreed and understood that a form substantially consistent with the form attached as **Annex B** is acceptable to the Majority Lenders).  Compliance with the initial DIP Budget and each subsequent DIP Budget shall be tested via Variance Test, subject to Permitted Deviations, to be conducted on the Weekly Reporting Date following the applicable Testing Period; _provided_ that, upon a Variance Test showing noncompliance with the Receipts Permitted Deviation, the Debtors' shall not be permitted further drawings of funds from the DIP Account (subject to the Carve Out) but such noncompliance with the Receipts Permitted Deviation shall not constitute an Event of Default in the DIP Documents or a Consenting Creditor Termination Event in the Restructuring Support Agreement.

| **Reporting** | So long as any obligations remain outstanding under this DIP Term Sheet or the DIP Orders, the Debtors shall timely provide the DIP Lenders, the ABL Agent, and their respective advisors with the following (in each case, as may be extended by the advisors to the DIP Lenders and the ABL Agent (which may be by email)): |

- _Weekly Reporting_:  Weekly reporting from the Debtors or their advisors on professional fees and variance reports with regard to the DIP Budget (provided that, for the avoidance of doubt, (i) such report shall include a comparison of actual receipts for such period in the aggregate against projected receipts for such period in the aggregate and disbursements for such period in the aggregate against projected disbursements for such period in the aggregate and (ii) Variance Tests shall only be performed at the end of the

applicable Testing Period, which such weekly updates and variance reports in respect of a particular week shall be delivered no later than Friday of the immediately following week (such date, the "***Weekly Reporting Date***").

- *Management Conference Calls*.  Weekly, or at the reasonable request of the Majority Lenders or their advisors, the Debtors and their advisors shall participate in a teleconference call with the DIP Lenders and their advisors to be held at such times as may be reasonably agreed by the parties.  The Debtors and the advisors shall provide a status update on the following topics, with additional topics as requested by the DIP Lenders or their advisors (with questions provided in advance of such call if practical):  (i) general business update; (ii) budget variance reporting; and (iii) status of the Chapter 11 Cases and foreign operations.

- *Monthly Financial Statements*.  As soon as available, and in any event within 30 days after the end of each of month, the consolidated balance sheet of the Borrowers and their subsidiaries as at the end of such month and the related consolidated statements of income, stockholders' equity and cash flows of the Borrowers and its subsidiaries for such month and for the period from the beginning of the then current fiscal year to the end of such month, and setting forth in each case in comparative form the corresponding figures for the corresponding periods in a manner consistent with the Debtors' existing reporting obligations of the business plan, all in reasonable detail, together with a Financial Officer Certification.

- *Monthly Borrowing Base Reporting*.  The Debtors shall provide monthly borrowing base certificates in form and substance consistent with the terms of the ABL Credit Agreement, which shall also be provided to the DIP Lenders; *provided* that, for the avoidance of doubt, the monthly borrowing base certificate shall be due monthly.

- *Sales Volume Reporting*:  Weekly reporting of weekly sale volumes versus the Debtors' internal monthly sales forecast, which shall be delivered no later than Friday of the immediately following week.

- *Monthly Performance*:  As soon as available, and in any event within 30 days after the end of each of month, flash reports depicting monthly financial performance, including sales volumes, average realized pricing, revenues, EBITDA, Capex, operational restructuring expenses, cash flow, and other

| | |
|---|---|
| | categories to be reasonably agreed between the Majority Lenders and the Debtors. |
| **Representations and Warranties** | Those contained in the Term Loan Credit Agreement (but subject to customary modifications required to reflect the proposed DIP Facility and the Chapter 11 Cases). |
| **Events of Default / Cash Collateral Termination** | Those contained in the Term Loan Credit Agreement (but subject to customary modifications required to reflect the proposed DIP Facility and the Chapter 11 Cases), including usual and customary events of default ("**_Events of Default_**"), and including but not limited to, the following Events of Default, unless consented to by the Majority Lenders:<br><br>• any Debtor or non-Debtor subsidiary fails to preserve, renew, and keep in full force and effect their legal existence;<br><br>• any Debtor is:  (i) enjoined from conducting any material portion of its business; or (ii) has any material damage to or loss of material assets of its business operations;<br><br>• any Debtor or non-Debtor subsidiary files (or fails to oppose) any motion seeking an order authorizing the sale of all or substantially all of the assets of the Debtors or any non-Debtor subsidiary without the prior written consent of the Majority Lenders; and<br><br>• other than in connection with the Chapter 11 Cases, the Debtors or any non-Debtor subsidiaries (a) commence any case, proceeding or other action (i) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (ii) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or (b) make a general assignment for the benefit of its creditors.<br><br>Events of Default shall be subject to notice and cure periods as and to the extent set forth in the DIP Credit Agreement.  In the case of the enforcement of liens and other remedies with respect to the DIP Collateral, the DIP Agent (at the direction of the Majority Lenders) shall first file a motion with the Bankruptcy Court seeking relief from the automatic stay to exercise such remedies, and an emergency hearing before the Bankruptcy Court for authorization of such relief, on at least five (5) business days' written notice of an Event of Default.  Upon the occurrence and during the continuation of an Event of Default, the Debtors shall be permitted to use Cash Collateral (x) with respect to any amounts already drawn, in the ordinary course of business, subject to the |

| | |
|---|---|
| | DIP Budget in accordance with the DIP Documents, and (y) for the funding of the Carve Out. |
| | The DIP Credit Agreement shall provide for customary remedies for an Event of Default that remains uncured including, but not limited to, the accrual of default interest at 2.00%, and the DIP Documents shall provide, subject to the Carve Out, that the Debtors shall not be permitted to make any draws under the DIP Facility during the continuance of a default or an Event of Default. |
| **ALB Roll-Up Facility Events of Default** | The ABL Roll-Up Facility shall have the same events of default as provided under the DIP Facility, with modifications only as necessary to ensure that such events apply to the ABL Priority Collateral or ABL Roll-Up Facility, including: |
| | • The creation of any liens on ABL Priority Collateral that are *pari passu* or senior to the liens in favor of the ABL Roll-Up Facility (except as otherwise expressly permitted under the DIP Orders, including the Carve Out); |
| | • The filing of any motion, plan, disclosure statement, or any other pleading or document by the Debtors, or the Debtors support or do not object to a motion, plan, disclosure statement or any other pleading or documents, that provides for treatment of the Roll-up Obligations under a plan of reorganization in any manner other than payment in full in cash on or before the Plan Effective Date; |
| | • The confirmation of a plan of reorganization that provides for treatment of the Roll-Up Obligations other than payment in full in cash on or before the effective date; and |
| | • The failure by the Debtors to deposit funds into the Borrowing Base Collateral Account when required under the terms of the DIP Orders. |
| **ABL Roll-Up Obligations** | The obligations arising under the ABL Facility (the "***ABL Obligations***") (which, for the avoidance of doubt, shall include all obligations under clauses (1), (2), (3), and (4) of the definition of "Obligations" under the ABL Credit Agreement from time to time outstanding under the Loan Documents, including all reimbursement obligations now or hereafter owing under issued and outstanding Letters of Credit (as defined in the ABL Credit Agreement), obligations under Hedge Agreements (as defined in the ABL Credit Agreement) and any amounts owing to any lenders or agents under the ABL Credit Agreement in respect of cash management services) shall be rolled up and deemed post-petition, debtor in possession financing obligations (the "***ABL Roll-Up Obligations***") upon entry of the Interim DIP Order (the "***ABL Roll-Up Facility***"). |

The ABL Roll-Up Obligations shall be entitled to joint and several superpriority claims under section 507 of the bankruptcy code against the Debtors and shall have first priority, senior and automatically secured priming liens from each Debtor under section 364(d) of the bankruptcy code on the ABL Priority Collateral whether now existing or hereinafter arising (as defined in the ABL Intercreditor Agreement) and junior liens on all Term Loan Priority Collateral of the Debtors whether now existing or hereinafter arising  (collectively, the "***ABL Roll-Up Liens***"). Subject to the Carve Out, there shall be no liens or claims (whether prepetition or post-petition) granted to any other party that are pari passu or senior to any ABL Obligations, adequate protection claims granted with respect thereto or ABL Roll-Up Obligations on the ABL Priority Collateral.

The ABL Roll-Up Obligations shall be paid current interest during the course of any chapter 11 proceeding at the default rate in accordance with the applicable rates set forth under the ABL Credit Agreement or any Hedge Agreement, as applicable.

Without limiting borrowing base protections and reporting customarily granted in cases similar to this, the ABL Roll-Up Obligations shall be entitled to rights and remedies no less favorable than granted to the DIP Lenders.

The ABL Roll-Up Facility and the associated DIP Orders shall include borrowing base protections and other terms customary for cases of this nature.

The Definitive Documents (including the Plan) shall provide for the un-impairment of the ABL Roll-Up Obligations and shall provide for payment in full in cash of the ABL Roll-Up Obligations on or before the Plan Effective Date.  Any deviation or modification or proposed deviation or modification from the foregoing treatment shall constitute an event of default under the ABL Roll-Up Facility subject to the applicable cure period.

The Debtor shall pay the following invoiced fees, costs and expenses of the ABL Agent (including one primary and one local counsel) and the ABL Lenders (including the fees and expenses of Simpson Thacher & Bartlett LLP, AlixPartners, LLP, and one local counsel) that accrue prior or during the Chapter 11 Cases.

For the avoidance of doubt, as used herein, DIP Commitments, DIP Obligations, DIP Loans, DIP Facility, and DIP Lenders expressly excludes the ABL DIP Facility and ABL Roll-Up Obligations.  The

| | |
|---|---|
| | ABL Lenders are not and shall not be deemed to be DIP Lenders or Backstop Parties. |
| **Adequate Protection for the Term Loan Lenders**[3] | Pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, as protection in respect of the imposition of the automatic stay and the Debtors' use of the Term Loan Collateral (as defined below) during the pendency of the Debtors' bankruptcy cases, the Debtors and the Term Loan Lenders agree, subject to approval of the Bankruptcy Court and unless waived by the Term Loan Lenders, to all of the following forms of adequate protection (the "***Term Loan Adequate Protection***"): |

a) validly binding, enforceable, unavoidable and perfected additional and replacement liens on and security interests in (in each case to the extent necessary to adequately protect the Term Loan Lenders from any diminution in the value of their interests in the collateral (including as a result of the use, sale, or lease by the Debtors of such collateral, the imposition of the automatic stay under section 362(a) of the Bankruptcy Code, priming, and the Carve Out, "***Diminution in Value***") securing all obligations arising under the Term Loan Credit Agreement (the "***Term Loan Obligations***," and such collateral, the "***Term Loan Collateral***")) (i) subject to the Final DIP Order, liens on any proceeds of property recovered due to Avoidance Actions, in each case subject and subordinate to the Carve Out and junior in all respects to the DIP Liens and (ii) all of the Debtors' other assets, subject and subordinate to the Carve Out and junior in all respects to the DIP Liens and existing valid, perfected, unavoidable and superior liens on such assets (collectively, the "***Term Loan Adequate Protection Liens***");

b) allowed superpriority administrative expense claims as contemplated by section 507(b) of the Bankruptcy Code solely for any Diminution in Value of the Term Loan Lenders' interests in the Term Loan Collateral, consistent with that certain Pari Passu Intercreditor Agreement and the ABL Intercreditor Agreement, which claims shall have priority over all priority claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 506(c), 507(a), 507(b), 546(c), 726(b), and 1114 of the Bankruptcy Code or otherwise (the "***Term Loan Adequate Protection Claims***"); *provided* that such claims shall be subject and subordinate to the Carve Out and junior in all respects to the DIP Obligations and, on

---

[113] Relative priorities of DIP Liens, ABL Roll-Up Liens, and Adequate Protection Liens are illustrated on the chart attached hereto as **Annex C**.

| | the ABL Priority Collateral, junior to the ABL Roll-Up Liens and the administrative expense claims granted in respect thereof; and |
| --- | --- |
| | c) a prohibition on the Debtors' creation of, incurrence of, or suffering any other claim that is *pari passu* with or senior to the claims held by the Term Loan Lenders on the Term Loan Priority Collateral (other than the Carve Out, the DIP Liens, and those secured by valid and perfected senior pre-petition liens). |
| **Adequate Protection for the Prepetition Secured Noteholders** | Pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, as protection in respect of the imposition of the automatic stay and the Debtors' use of the Secured Notes Collateral (as defined below) during the pendency of the Debtors' bankruptcy cases, the Debtors and the Secured Noteholders agree, subject to approval of the Bankruptcy Court, to all of the following forms of adequate protection (the "***Secured Notes Adequate Protection***" and, together with the Term Loan Adequate Protection, the "***Adequate Protection***"):

a) validly binding, enforceable, unavoidable and perfected additional and replacement liens on and security interests in (in each case to the extent necessary to adequately protect the Secured Noteholders from any Diminution in Value of their interests in the collateral securing all obligations arising under the Secured Notes Indenture (the "***Secured Notes Obligations***," and collectively with the Term Loan Obligations, the "***Prepetition Obligations***" and such collateral, the "***Secured Notes Collateral***," and collectively with the Term Loan Collateral, the "***Prepetition Collateral***")) (i) subject to the Final DIP Order, liens on any proceeds of property recovered due to Avoidance Actions, in each case subject and subordinate to the Carve Out and junior in all respects to the DIP Liens (ii) all of the Debtors' other assets, subject and subordinate to the Carve Out and junior in all respects to the DIP Liens and existing valid, perfected, unavoidable and superior liens on such assets (collectively, the "***Secured Notes Adequate Protection Liens***," and together with the Term Loan Adequate Protection Liens, the "***Adequate Protection Liens***"); and

b) allowed superpriority administrative expense claims as contemplated by section 507(b) of the Bankruptcy Code solely for any Diminution in Value of the Secured Noteholders' interests in the Secured Notes Collateral, consistent with the Pari Passu Intercreditor Agreement, which claims shall have priority over all priority claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 506(c), 507(a), 507(b), 546(c), 726(b), and |

| | 1114 of the Bankruptcy Code or otherwise (the "**Secured Notes Adequate Protection Claims**," and together with the Term Loan Adequate Protection Claims, the "**507(b) Claims**"); *provided* that such claims shall be subject and subordinate to the Carve Out and junior in all respects to the DIP Obligations, and, on the ABL Priority Collateral, junior to the ABL Roll-Up Liens and the administrative expense claims granted in respect thereof. |
|---|---|
| **Marshaling Doctrine, 506(c) Waiver** | Subject to and effective upon (a) entry of the Final DIP Order, with respect to the Prepetition Collateral and (b) entry of the Interim DIP Order, with respect to the DIP Collateral and the collateral securing the ABL Roll-Up Liens, in each case except to the extent of the Carve Out, authorization for the Debtors to waive (a) any right to surcharge any collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise, (b) the equitable doctrine of marshaling and other similar doctrines, and (c) the "equities of the case" exception under section 552(b) of the Bankruptcy Code; *provided* that the foregoing shall be without prejudice to the terms of the Final DIP Order with respect to the period from and after entry of the Final DIP Order. |
| **DIP Interest, Fees, Costs, Indemnities, and Expenses** | The DIP Orders to provide for customary payments in relation to the DIP Facility including fees, costs, indemnities, expenses of the DIP Agent, the DIP Lenders, and their advisors and consultants without any obligation for such parties to seek Bankruptcy Court approval or otherwise comply with any applicable U.S. Trustee Guidelines. |
| **Stipulations and Releases** | Subject to entry of the Interim DIP Order, but subject to a customary "challenge" period, the DIP Parties will provide customary stipulations and releases for any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, or obligations related to or arising out of the Prepetition Obligations, the Prepetition Collateral, and documentation related thereto. |
| **Ratings** | The Debtors and the DIP Lenders shall use commercially reasonable efforts to obtain ratings of DIP Facility from Moody's, Standard & Poor's and/or Fitch within 90 days after the Petition Date. |
| **CLO Adjustments** | The Debtors shall work in good faith with the DIP Lenders to address any structural requirements of any CLO funds and fund advisors under their constituent documents or investment criteria in regard to exchanging any DIP New Money Claims (as defined in the Plan) for DIP Shares (as defined in the Plan) at the Discount Value (as defined in the Plan) while providing substantially similar economics set forth herein and in the Restructuring Support Agreement. |
| **Advisors to the DIP Lenders** | <u>**Advisors to the Term Lender Group**</u>:  White & Case LLP; Houlihan Lokey and other local and foreign counsels. |

|  | **Advisors to the Cross-Holder Group**:   Gibson Dunn & Crutcher; Lazard Frères & Co. LLC and other local and foreign counsels. |
|---|---|
| **Governing Law** | New York but excluding any principles of conflicts of law or other rule of law that would cause the application of the law of any jurisdiction other than the State of New York (and, to the extent applicable, the Bankruptcy Code); provided that certain collateral documents shall be governed by applicable local law. |
| **Assignments and Participations** | Assignments under the DIP Facility are subject to the consent of the Borrowers and the DIP Agent (which consent shall not be unreasonably withheld or delayed), unless such assignment is (i) to a DIP Lender, (ii) to an affiliate of the transferor or (iii) solely with regards to the Borrower's consent right, during the continuance of an Event of Default. No participation shall include voting rights, other than for matters requiring consent of 100% of the DIP Lenders or each adversely affected DIP Lender.<br><br>Notwithstanding the foregoing, assignments or participations with respect to bona fide competitors of the Borrower and any affiliates of such bona fide competitors identified by the Borrower in writing (excluding any affiliate that is a bona fide debt fund) shall require the consent of the Borrower (in its sole discretion). In addition, other customary borrower protections in respect of assignments to certain categories of transferees, including natural persons, among others, shall apply. |
| **Intercreditor Agreements** | The ABL Intercreditor Agreement and the Pari Passu Intercreditor Agreement shall remain in full force and effect throughout the Chapter 11 Cases. |
| **Definitions** | |
| **ABL Facility** | That certain credit agreement, dated as of October 15, 2021 (as amended, amended and restated, modified, or otherwise supplemented from time to time, the "***ABL Credit Agreement***"), by and among Venator Materials PLC, as Holdings, certain subsidiaries as Borrower named therein, JPMorgan Chase Bank, N.A., as administrative and collateral agent (the "***ABL Agent***"), the guarantors named therein, and the lenders named therein (the "***ABL Lenders***"). |
| **ABL Intercreditor Agreement** | That certain ABL Intercreditor Agreement, dated as of August 8, 2017 (as amended, amended and restated, modified, or otherwise supplemented from time to time, the "***ABL Intercreditor Agreement***"), by and among JPMorgan Chase Bank, N.A. as common collateral agent, JPMorgan Chase Bank, N.A. as administrative and collateral agent for the ABL Lenders, and Acquiom Agency Services LLC and Seaport Loan Products |

| | LLC, as co-administrative agents, and Acquiom Agency Services LLC, as collateral agent for the Term Loan Lenders. |
|---|---|
| **ABL Required Lenders** | Has the meaning given to the defined term "Required Lenders" in the ABL Credit Agreement. |
| **Cash/PIK Election** | Means, subject to the Minimum Cash Pay Requirement, the election of the Majority Lenders (to be made before the applicable payment) to receive each interest payment and/or the Extension Fee in cash or in kind. |
| **Cross-Holder Group** | Means that certain group of holders of Term Loan Claims, Senior Secured Notes Claims, and Senior Unsecured Notes Claims represented by Gibson Dunn & Crutcher and Lazard Frères & Co. LLC. |
| **Lake Charles JV** | Means Louisiana Pigment Company, L.P. |
| **Majority Lenders** | The Required Consenting Creditors (as defined in the Restructuring Support Agreement). |
| **Pari Passu Intercreditor Agreement** | That certain *Pari Passu* Intercreditor Agreement, dated as of May 22, 2020 (as amended, amended and restated, modified, or otherwise supplemented from time to time, the "***Pari Passu Intercreditor Agreement***"), by and among Acquiom Agency Services LLC, as term loan collateral agent for the Credit Agreement Secured Parties, Wilmington Trust, National Association, as first lien notes collateral agent for the First Lien Notes Secured Parties, and each additional agent from time to time party hereto |
| **Plan Effective Date** | Means the date upon which the conditions precedent to the effectiveness of a plan of reorganization implementing the terms and conditions set forth in the Plan (as defined in the Restructuring Support Agreement) shall have been satisfied or validly waived. |
| **Prepetition Secured Parties** | The Term Loan Lenders and the Secured Noteholders. |
| **Secured Notes** | The 9.50% secured notes due 2025 (the "***Secured Notes***," and the holders thereof, the "***Secured Noteholders***") issued pursuant to that certain indenture, dated as of May 22, 2020 (as amended, amended and restated, modified, or otherwise supplemented from time to time, the "***Secured Notes Indenture***") by and among Venator Finance S.á r.l. and Venator Finance LLC, as issuers, each of the guarantors named therein, and Wilmington Trust, National Association, as trustee and notes collateral agent (the "***Secured Notes Trustee***" and, together with the Secured Noteholders, the "***Secured Notes Parties***"). |

| | |
|---|---|
| **Senior Unsecured Notes** | The unsecured notes due 2025 (the "***Senior Unsecured Secured Notes***," and the holders thereof, the "***Senior Unsecured Noteholders***") issued pursuant to that certain indenture, dated as of July 14, 2017 (as amended, amended and restated, modified, or otherwise supplemented from time to time, the "***Senior Unsecured Notes Indenture***") by and among Venator Finance S.á r.l. and Venator Finance LLC, as issuers, each of the guarantors named therein, and Wilmington Trust, National Association, as trustee (the "***Senior Unsecured Notes Trustee***" and, together with the Secured Noteholders, the "***Senior Unsecured Notes Parties***," and together with the Term Loan Facility Agent, and the Secured Notes Trustee, the "***Prepetition Agents/Trustees***"). |
| **Term Lender Group** | Means that certain group of holders of Company indebtedness represented by White & Case LLP and Houlihan Lokey. |
| **Term Loan Facility** | That certain credit agreement, dated as of August 8, 2017 (as amended, amended and restated, modified, or otherwise supplemented from time to time, the "***Term Loan Credit Agreement***"), by and among Venator Holdings PLC, as Borrower, the guarantors named therein, Acquiom Agency Services LLC and Seaport Loan Products LLC, as co-administrative agents, and Acquiom Agency Services LLC, as collateral agent (the "***Term Loan Facility Agent***"), and the lenders named therein (the "***Term Loan Lenders***"). |

**<u>Annex A</u>**[4]

**Carve Out**

---

[4]   NTD: Carve Out remains subject to ongoing review and revision.

(a)     <u>Carve Out</u>.  As used in this Interim Order, the "<u>Carve Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $[●] incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and the Creditors' Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $[●] incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "<u>Post-Carve Out Trigger Notice Cap</u>").  For purposes of the foregoing, "<u>Carve Out Trigger Notice</u>" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)      <u>Carve Out Reserves</u>.  On the day on which a Carve Out Trigger Notice is given by the DIP Agent to the Debtors with a copy to counsel to the Committee (the "<u>Termination Declaration Date</u>"), the Carve Out Trigger Notice shall (i) be deemed a draw request and notice of borrowing by the Debtors for [Delayed Draw Term] Loans under the [Delayed Draw Term] Loan Commitment (each, as defined in the DIP Credit Agreement) (on a pro rata basis based on the then outstanding [Delayed Draw Term] Loan Commitments), in an amount equal to the then unpaid amounts of the Allowed Professional Fees (any such amounts actually advanced shall constitute [Delayed Draw Term] Loans) and (ii) also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such then unpaid Allowed Professional Fees (the "<u>Pre-Carve Out Trigger Notice Reserve</u>") prior to any and all other claims.  On the Termination Declaration Date, the Carve Out Trigger Notice shall also (i) be deemed a request by the Debtors for [Delayed Draw Term] Loans under the [Delayed Draw Term] Loan Commitment (on a pro rata basis based on the then outstanding [Delayed Draw Term] Loan Commitments), in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute [Delayed Draw Term] Loans) and (ii) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap.  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "<u>Post-Carve Out Trigger Notice Reserve</u>" and, together with the Pre-Carve Out Trigger

Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.  On the first business day after the DIP Agent gives such notice to such [Delayed Draw Term] Lenders (as defined in the DIP Credit Agreement), notwithstanding anything in the DIP Credit Agreement to the contrary, including with respect to the existence of a Default (as defined in the DIP Credit Agreement) or Event of Default, the failure of the Debtors to satisfy any or all of the conditions precedent for [Delayed Draw Term] Loans under the [Delayed Draw Term] Facility, any termination of the [Delayed Draw Term] Loan Commitments following an Event of Default, or the occurrence of the Maturity Date (as defined in the DIP Credit Agreement), each [Delayed Draw Term] Lender with an outstanding Commitment (on a pro rata basis based on the then outstanding Commitments) shall make available to the DIP Agent such [Delayed Draw Term] Lender's pro rata share with respect to such borrowing in accordance with the [Delayed Draw Term] Facility.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments have been

terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date.  Notwithstanding anything to the contrary in the DIP Documents, or this Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph [●], then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph [●], prior to making any payments to the DIP Agent or the Prepetition Secured Parties, as applicable.  Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, following delivery of a Carve Out Trigger Notice, the DIP Agent, and the Prepetition Agents/Trustees shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agent for application in accordance with the DIP Documents.  Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute [Loans] (as defined in the DIP Credit Agreement) or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order, the DIP Facility, or in any Prepetition Secured Facilities, the Carve Out shall be senior to all liens and claims securing the

DIP Facility, the Adequate Protection Liens, and the 507(b) Claim, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Secured Debt.

(c)     <u>Payment of Allowed Professional Fees Prior to the Termination Declaration Date</u>.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(d)     <u>No Direct Obligation To Pay Allowed Professional Fees</u>.  None of the DIP Agent, DIP Lenders, or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(e)     <u>Payment of Carve Out On or After the Termination Declaration Date</u>.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Documents, the Bankruptcy Code, and applicable law.

## Annex B

**Form of DIP Budget**

**Venator Cashflow Model**

DIP Model Reporting Output
*$ in thousands*

| | FILING | | | | | | | EMERGENCE | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | 19-May-23 | 26-May-23 | 2-Jun-23 | 9-Jun-23 | 16-Jun-23 | 23-Jun-23 | 30-Jun-23 | 7-Jul-23 | 14-Jul-23 | 21-Jul-23 | 28-Jul-23 | 4-Aug-23 | 11-Aug-23 |
| Week # | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 |
| Forecast Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| Chapter 11 Period? | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | N | N | N |
| **Receipts** | | | | | | | | | | | | | |
| Accounts Receivable [3rd Party] | 38,968 | 34,684 | 41,436 | 23,674 | 35,529 | 26,763 | 35,381 | 30,664 | 31,212 | 34,587 | 33,904 | 35,007 | 32,424 |
| JV Reimbursement / Distribution | - | 1,200 | - | - | - | - | 5,950 | - | 1,100 | - | 4,750 | - | - |
| Other | - | - | 2,469 | - | - | - | 6,085 | - | 1,832 | - | 4,232 | - | - |
| **Receipts** | **38,968** | **35,884** | **43,906** | **23,674** | **35,529** | **26,763** | **47,417** | **30,664** | **34,144** | **34,587** | **42,886** | **35,007** | **32,424** |
| **Disbursements** | | | | | | | | | | | | | |
| Accounts Payable [3rd Party] | (34,254) | (33,625) | (21,679) | (9,581) | (31,133) | (11,392) | (27,448) | (11,939) | (29,630) | (15,186) | (30,415) | (17,752) | (25,947) |
| JV Cash Call | - | - | - | - | (11,650) | - | - | - | - | - | - | - | (7,350) |
| Ore | (21,079) | (8,954) | (10,771) | (2,570) | (5,630) | (18,716) | (5,951) | (12,070) | (11,148) | (8,204) | (5,180) | (9,800) | (4,650) |
| Energy | (5,862) | (16,710) | (2,038) | (6,454) | (6,679) | (16,713) | (1,412) | (6,662) | (6,741) | (15,712) | (1,271) | (5,011) | (6,803) |
| Payroll | (3,320) | (7,446) | (8,425) | (1,879) | (3,192) | (3,626) | (11,474) | (3,161) | (2,587) | (1,066) | (13,027) | (890) | (1,697) |
| Tax | - | - | (714) | - | - | - | 2,530 | - | - | - | - | (830) | - |
| Other | (440) | - | - | - | - | - | - | (28,580) | - | - | (207) | - | - |
| **Disbursements** | **(64,955)** | **(66,733)** | **(43,627)** | **(20,484)** | **(58,284)** | **(50,447)** | **(43,756)** | **(62,412)** | **(50,105)** | **(40,167)** | **(50,099)** | **(34,283)** | **(46,447)** |
| **Professional Fees** | **-** | **-** | **(150)** | **-** | **(2,011)** | **-** | **-** | **(150)** | **(36,409)** | **-** | **-** | **-** | **-** |
| **Operating Cashflow** | **(25,987)** | **(30,850)** | **129** | **3,190** | **(24,767)** | **(23,684)** | **3,661** | **(31,898)** | **(52,371)** | **(5,581)** | **(7,212)** | **724** | **(14,023)** |
| **Financing Cashflow** | **-** | **-** | **(100)** | **-** | **(3,451)** | **-** | **(1,488)** | **(69)** | **(2,964)** | **(502)** | **-** | **(100)** | **-** |
| **Total Cashflow (Pre-Drawdown)** | **(25,987)** | **(30,850)** | **29** | **3,190** | **(28,219)** | **(23,684)** | **2,173** | **(31,967)** | **(55,335)** | **(6,083)** | **(7,212)** | **624** | **(14,023)** |
| **DIP Drawdown** | **49,339** | **30,850** | **(29)** | **(3,190)** | **28,219** | **23,684** | **(2,173)** | **31,967** | **55,335** | **6,083** | **7,212** | **(624)** | **14,023** |
| **Total Cashflow (Post-Drawdown)** | **23,352** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |
| **Liquidity Schedule** | | | | | | | | | | | | | |
| **Cash - Opening Balance** | 16,648 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 |
| Cash Flows | 23,352 | - | - | - | - | - | - | - | - | - | - | - | - |
| **Readily Available Cash - Closing Balance** | **40,000** | **40,000** | **40,000** | **40,000** | **40,000** | **40,000** | **40,000** | **40,000** | **40,000** | **40,000** | **40,000** | **40,000** | **40,000** |
| **DIP - Opening Balance** | - | 50,661 | 19,811 | 19,840 | 198,030 | 169,811 | 146,127 | 148,300 | 116,333 | 60,998 | 54,916 | 47,703 | 48,327 |
| Additional available funds | 100,000 | - | - | 175,000 | - | - | - | - | - | - | - | - | - |
| Drawdown | (49,339) | (30,850) | 29 | 3,190 | (28,219) | (23,684) | 2,173 | (31,967) | (55,335) | (6,083) | (7,212) | 624 | (14,023) |
| **DIP - Closing Balance** | **50,661** | **19,811** | **19,840** | **198,030** | **169,811** | **146,127** | **148,300** | **116,333** | **60,998** | **54,916** | **47,703** | **48,327** | **34,304** |

Note - Excludes emergence sources and uses and post-emergence normalisation of business (eg. return to historical trade terms) and does therefore not tie to business plan

**Annex C**

**Relative Priorities of DIP Liens, ABL Roll-Up Liens, and Adequate Protection Liens**

| **Term Loan Priority Collateral** | **ABL Priority Collateral** | **All Other Assets** |
|---|---|---|
| New Money DIP Liens | ABL Roll-Up Liens | New Money DIP Liens |
| Term Loan Adequate Protection Liens and Secured Notes Adequate Protection Liens (on a *pari passu* basis) | New Money DIP Liens | Term Loan Adequate Protection Liens and Secured Notes Adequate Protection Liens (on a *pari passu* basis) |
| Existing Term Loan Liens and Existing Secured Notes Liens (on a *pari passu* basis) | Term Loan Adequate Protection Liens and Secured Notes Adequate Protection Liens (on a *pari passu* basis) | |
| ABL Roll-Up Liens | Existing Term Loan Liens and Existing Secured Notes Liens (on a *pari passu* basis) | |

**EXHIBIT D**

**Form of Joinder Agreement**

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**")[1] by and among Venator Materials PLC and its affiliates and subsidiaries bound thereto and the Consenting Creditors and agrees to be bound by the terms and conditions of the Agreement as a Consenting Creditor, and shall be deemed a "**Consenting Creditor**" under the terms of the Agreement.

The Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained in the Agreement as of the date of this Joinder and any further date specified in the Agreement.

This Joinder shall be governed by the governing law set forth in the Agreement.

Date Executed:

**[JOINDER PARTY]**

_____
Name:
Title:

Address:

E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| Term Loans | |
| Senior Secured Notes | |
| Senior Unsecured Notes | |
| Equity Interests | |

---

[1]    Capitalized terms used but not otherwise defined herein shall having the meaning ascribed to such terms in the Agreement.

## EXHIBIT E

### Provision for Transfer Agreement

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**"),[1] by and among Venator Materials PLC and its affiliates and subsidiaries bound thereto and the Consenting Creditors, including the transferor to the Transferee of any Company Claims/Interests (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "Consenting Creditor" and a ["Consenting Secured Noteholder"] ["Consenting Term Lender"] ["Consenting Unsecured Noteholder"] under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____
Name:
Title:
Address:
E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
| --- | --- |
| Term Loans | |
| Senior Secured Notes | |
| Senior Unsecured Notes | |
| Equity Interests | |

---

[1]   Capitalized terms used but not otherwise defined herein shall having the meaning ascribed to such terms in the Agreement.

**ANNEX 2**
**DIP FINANCING TERM SHEET**

*Execution Version*

## DIP TERM SHEET

## VENATOR FINANCE S.À R.L. AND VENATOR MATERIALS LLC

This summary of terms and conditions (this "***DIP Term Sheet***") sets forth the principal terms of the senior secured superpriority, priming debtor-in-possession credit facility (the "***DIP Facility***," the credit agreement evidencing the DIP Facility, the "***DIP Credit Agreement***"[1] and any other DIP Documents (as defined herein), each of which shall be in form and substance acceptable to the Debtors, the DIP Agent and the DIP Lenders (each as defined herein)) that the DIP Lenders are contemplating providing to Venator Finance S.à r.l. and Venator Materials LLC (the "***Borrowers***") and certain of Borrowers' affiliates and subsidiaries that will be debtors and debtors in possession (collectively, the "***Debtors***") in connection with the chapter 11 cases (the "***Chapter 11 Cases***") to be filed by the Debtors under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended (the "***Bankruptcy Code***").

This DIP Term Sheet does not attempt to describe all of the terms, conditions, and requirements that would pertain to the financing described herein, but rather is intended to be a summary outline of certain basic items, which shall be set forth in final documentation, which documentation shall be acceptable in all respects to the DIP Agent and the DIP Lenders in their sole discretion.  This DIP Term Sheet should not be construed as a commitment to lend or to arrange for any credit facility and is for discussion purposes only.

| | |
|---|---|
| **Borrowers** | Venator Finance S.à r.l. and Venator Materials LLC |
| **Guarantors** | The obligations of the Borrowers shall be unconditionally guaranteed, on a joint and several basis, by each Debtor (each, a "***Guarantor***" and, collectively, the "***Guarantors***" and the Guarantors, together with the Borrowers, the "***DIP Parties***"), subject to limitations consistent with those contained in the Term Loan Credit Agreement and related prepetition documents on upstream guarantees by non-US Guarantors as may be required by local law. |
| **DIP Facility** | The DIP Facility commitments total $275 million (the loans under the DIP Facility, the "***DIP Loans***," and the commitments thereunder, the "***DIP Commitments***" including all accrued interest and fees, the "***DIP Obligations***"), as follows:<br><br>(a) $100 million upon the entry of an interim order by the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***") approving the DIP Facility (the "***Interim DIP Order***"); and<br><br>(b) $175 million within one (1) business day upon the entry of a final order by the Bankruptcy Court approving the DIP Facility (the |

---

[1]  Unless and until the DIP Credit Agreement is executed by the applicable parties, references herein to the DIP Credit Agreement shall refer to this DIP Term Sheet.

| | |
|---|---|
| | "***Final DIP Order***" and, together with the Interim DIP Order, the "***DIP Orders***"). |
| | The DIP Credit Agreement shall be executed by the applicable parties prior to the Bankruptcy Court's entry of the Interim DIP Order. |
| **Interest Rate** | Subject to the Cash/PIK Election, the DIP Loans will bear interest at a rate equal to SOFR plus 10.00% per annum; *provided*, that in the event the Majority Lenders elect to receive an interest payment in kind pursuant to the Cash/PIK Election, the Debtors shall pay in cash SOFR plus 1.50% per annum (the "***Minimum Cash Pay Requirement***") plus additional interest shall accrue in kind at a rate equal to 8.50% per annum. |
| **Fees and Premiums** | **Backstop Fee**: The Borrowers shall pay to the DIP Agent, for the ratable account of each Backstop Party, a fee in an amount equal to 10.00% of the DIP Commitments, which fee shall be payable in kind. |
| | **Commitment Fee**: The Borrowers shall pay to the DIP Agent, for the ratable account of each DIP Lender, a fee, payable in DIP Loans, in an amount equal to 2.00% of the DIP Commitments. |
| | **Exit Fee**: |
| | • If the DIP Obligations are satisfied in full in cash, a fee of 2.50% of the aggregate principal amount of the DIP Loans (including any amounts paid in kind) and remaining outstanding DIP Commitments shall be fully earned on the date of the effectiveness of the DIP Facility (the "***Closing Date***") and shall be payable in cash to the DIP Lenders on a *pro rata* basis on the earlier of (i) the Maturity Date and (ii) the date on which the DIP Obligations are paid in full in cash. |
| | • If the DIP Obligations are satisfied other than in full in cash, a fee of 5.00% of the aggregate principal amount of the DIP Loans (including any amounts paid in kind) and remaining outstanding DIP Commitments shall be fully earned on the Closing Date and shall be payable in cash to the DIP Lenders on a pro rata basis as a condition to the Plan Effective Date. |
| | **Extension Fee**: Subject to the Cash/PIK Election, as a condition precedent to any Extension, the Borrowers shall pay to the DIP Agent for the benefit of the DIP Lenders an extension fee of 1.25% in cash or 2.50% in kind (the "***Extension Fee***") on the then aggregate outstanding principal amount of the DIP Loans (including any amounts paid in kind) and remaining outstanding DIP Commitments, payable to each DIP Lender based on each DIP Lender's proportion of its share of the then aggregate |

| | |
|---|---|
| | outstanding principal amount of such DIP Loans and remaining outstanding DIP Commitments. |
| **DIP Agent** | Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent for the DIP Lenders. |
| **DIP Lenders** | Following entry of the Interim DIP Order and upon entry of the Final DIP Order, participation in the DIP Facility shall be offered ratably to all Term Loan Lenders, Secured Noteholders, and Senior Unsecured Noteholders (in each case in its capacity under the DIP Facility, including its registered assigns, the "***DIP Lender***," and together the "***DIP Lenders***") with 90.0% of the DIP Commitments offered to Term Loan Lenders and Secured Noteholders on a *pro rata* basis and 10.0% of the DIP Commitments offered to the Senior Unsecured Noteholders on a *pro rata* basis.<br><br>DIP Lenders and Backstop Parties, as applicable, shall be entitled to designate participation in the DIP Commitments to one or more affiliates or funds or accounts managed, advised or sub-advised by such DIP Lenders or Backstop Parties, as applicable. |
| **Backstop Parties**[2] | Members of the (i) Term Lender Group who sign the Restructuring Support Agreement and (ii) Cross-Holder Group who sign the Restructuring Support Agreement; provided that (a) holders of Senior Secured Claims who are Backstop Parties shall be entitled to provide 90.0% of the backstop for the DIP Commitments on a *pro rata* basis; and (b) holders of Senior Unsecured Notes Claims who are Backstop Parties shall be entitled to provide 10.0% of the backstop for the DIP Commitments on a *pro rata* basis. |
| **DIP Loan Maturity Date** | Other customary chapter 11 maturity triggers, including, the earliest to occur of (i) the date (the "***Stated Maturity Date***") falling four months after the commencement of the Chapter 11 Cases, subject to three one-month extensions (each, an "***Extension***") at the sole discretion of the Majority Lenders, (ii) the Plan Effective Date, (iii) the date of prepayment in cash in full by the Debtors of all DIP Obligations and termination of all of the DIP Commitments in accordance with the terms of the DIP Facility, (iv) the date of termination of the DIP Commitments and acceleration of any outstanding extensions of credit following the occurrence and during the continuance of an Event of Default under the DIP Facility (subject to any applicable cure or noticing periods set forth in the DIP Orders), and (v) the date upon which the Debtors sell all or substantially all of their assets (such earliest date, the "***Maturity Date***") |

---

[2]   Terms used herein but not otherwise defined shall have the meaning set forth in the Restructuring Support Agreement.

| | |
|---|---|
| **Roll-Up Obligations Payment Date** | The Roll-Up Obligations shall be payable on the Stated Maturity Date of the DIP Facility as in effect on the closing date, subject to three one-month extensions by the ABL Agent acting at the direction of the requisite ABL Lenders (the consent to such extensions not to be unreasonably withheld). |
| **Non-Debtor Assets** | In furtherance of providing the DIP Lenders with perfected and enforceable first ranking liens and claims on the Previously Unencumbered Property, the Debtors agree that they shall use commercially reasonable efforts (subject to applicable local law limitations), in advance of entry of the Final DIP Order, to identify any Previously Unencumbered Property of the Debtors and, if practicable, cause non-Debtor subsidiaries to pledge any applicable assets to secure the DIP Commitments, or such other actions as may be reasonably requested by the Majority Lenders. |
| **Collateral** | Subject to the carve out (as attached here as **Annex A**, the "***Carve Out***") the DIP Facility shall be secured by automatically perfected liens on and security interests in (collectively, the "***DIP Liens***"):<br><br>(a) all Term Loan Priority Collateral (as defined in the ABL Intercreditor Agreement), on a superiority priming basis and with a first priority ranking basis senior to any other lien or claim;<br><br>(b) all ABL Priority Collateral (as defined in the ABL Intercreditor Agreement), on a junior basis to the liens of the ABL Lenders securing the Roll-Up Obligations but senior to all other liens;<br><br>(c) all property of the DIP Parties other than Term Loan Priority Collateral or ABL Priority Collateral that is subject to valid, perfected, and non-avoidable liens in existence immediately prior to the Petition Date or valid and non-avoidable liens perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code ("***Other Permitted Prior Liens***") on a junior basis to such Other Permitted Prior Liens but senior to all other liens;<br><br>(d) all property of the DIP Parties, consistent with the terms hereof and the DIP Orders, whether existing on the Petition Date or thereafter acquired that is not subject to valid, perfected, and non-avoidable liens or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code (the "***Previously Unencumbered Property***"), on a first priority ranking basis senior to any other lien or claim;<br><br>(e) the proceeds of any actions brought under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral (as defined below) to the extent the DIP Liens on such |

DIP Collateral are first priority ("**Transfer Actions**") but in no event shall the DIP Liens extend to Transfer Actions;

(f) subject to and upon entry of the Final DIP Order, the proceeds of any claims or causes of action arising under or pursuant to chapter 5 of the Bankruptcy Code, section 724(a) of the Bankruptcy Code or any other similar provisions of applicable state, federal or foreign law (including any other avoidance actions under the Bankruptcy Code) ("**Avoidance Actions**") but in no event shall the DIP Liens extend to Avoidance Actions; and

(g) subject to and upon entry of the Final DIP Order, the proceeds of any exercise of the Debtors' rights under section 506(c) and 550 of the Bankruptcy Code ("**Recovery Actions**") but in no event shall the DIP Liens extend to the Recovery Actions.

(collectively, the "**DIP Collateral**").

The DIP Facility shall also benefit from superpriority administrative expense claims against all Debtors that are senior to all other administrative expenses or other claims against the Debtors, but which shall be junior to the Carve Out, and in respect of assets that constitute ABL Priority Collateral, junior to the ABL Roll-Up Liens and the administrative expense claims granted in respect of the ABL Roll-Up Obligations.

The DIP Liens on the Previously Unencumbered Property shall only be subject and subordinate to the Carve Out.

The DIP Liens described herein shall, to the fullest extent permitted by applicable law, be effective and perfected upon entry of the Interim DIP Order (as defined below) and/or Final DIP Order, as applicable, and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements, and the Debtors shall not be required to take any action to create or perfect the liens in the DIP Collateral, except as otherwise agreed between the Debtors and the Majority Lenders. The Interim DIP Order and Final DIP Order will contain customary intercreditor agreement provisions, including, without limitation, turn-over and enforcement rights consistent with the lien priority provided herein.

Upon the request of the DIP Agent (at the direction of the Majority Lenders), each applicable Debtor shall use commercially reasonable efforts to execute, acknowledge, and deliver, or shall cause to be executed, acknowledged, and delivered, all such further agreements, instruments, certificates or documents, that the DIP Agent (at the direction of the Majority Lenders) shall reasonably request in order to

|  | ensure and perfect, as applicable, the priorities, rights, security interests and remedies of the DIP Collateral for the benefit of the DIP Agent and the DIP Lenders with respect to the DIP Collateral, including any filings or other action with respect to the perfection of security interests in any jurisdiction outside of the United States. Further, the DIP Agent (at the direction of the Majority Lenders) may require the Debtors to enter into non-U.S. security documentation with respect to collateral owned by non-U.S. Debtors or located in non-U.S. jurisdictions and each Debtor and its respective officers or agents are authorized to execute, file and record any documents or instruments as the DIP Agent (at the direction of the Majority Lenders) shall request, and all such documents and instruments shall be deemed to have been filed or recorded at the time and on the date of entry of the Interim DIP Order.<br><br>To the extent that any Prepetition Agent is a secured party under any account control agreement, listed as an additional insured, loss payee under any of the Debtors' insurance policies, or is the secured party under any loan document, financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction to validate, attach, perfect, or prioritize liens (any such instrument or document, a "***Security Document***"), the DIP Agent shall also be deemed to be the secured party under each such Security Document, and shall have all the rights and powers attendant to that position (including, without limitation, rights of enforcement), and shall act in that capacity and distribute any proceeds recovered or received subject to the Carve Out and in accordance with the terms of the Interim DIP Order and/or the Final DIP Order, as applicable, and the other DIP Documents. Each Prepetition Agent shall serve as a gratuitous bailee for the DIP Agent solely for the purposes of perfecting its security interests in and liens on all DIP Collateral that is of a type such that perfection of a security interest therein (but for the entry of the Interim DIP Order) may be accomplished only by possession or control by a secured party to the extent such Prepetition Agent possesses or controls any such DIP Collateral. |
|---|---|
| **Use of Proceeds** | Substantially in accordance with the DIP Budget (subject to Permitted Deviations and which shall not operate as a cap in respect of professional fees), the proceeds of the DIP Facility and/or Cash Collateral shall be available, subject to and upon entry of the Interim DIP Order and Final DIP Order, as applicable, (i) for the Debtors' working capital needs, including to fund the costs of the administration of the chapter 11 cases and to pay adequate protection payments as authorized by the Bankruptcy Court in the Interim DIP Order and the Final DIP Order, in each case in a manner consistent with the DIP Budget, (ii) to pay professional fees and expenses, and (iii) to pay obligations arising from or related to the Carve Out. |

|  | No portion of the Cash Collateral (as such term is defined in section 363(a) of the Bankruptcy Code), the proceeds of the DIP Facility, the Collateral (as defined below), or the Carve Out (as defined below) may be used:<br><br>(a) for any purpose that is prohibited under the Bankruptcy Code or the DIP Orders;<br>(b) unless expressly provided in the DIP Budget, to make any payment or distribution, directly or indirectly, to any insider of the Debtors that is outside of the ordinary course;<br>(c) to make any payment, advance, intercompany advance, or any other remittance or transfer whatsoever (including any intercompany loans and investments (including to and in foreign subsidiaries)) that is not in accordance with the DIP Budget (subject to Permitted Deviations); and<br>(d) to finance or reimburse for expenses incurred or to be incurred, in both instances, directly or directly and in any way: (i) any adversary action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the interests of any or all of the DIP Agent, the DIP Lenders, the Prepetition Agents/Trustees, the Prepetition Secured Parties, or their respective rights and remedies under the DIP Credit Agreement and any other agreements, instruments, pledge agreements, intercreditor agreements, guarantees, fee letters, control agreements, and other ancillary documents related thereto (including any security agreements, intellectual property security agreements, or notes) (as amended, restated, supplemented, waived, and/or modified from time to time, collectively with the DIP Credit Agreement and the DIP Orders, the "***DIP Documents***"), the Interim DIP Order, or the Final DIP Order or (ii) any other action, which with the giving of notice or passing of time, would result in an Event of Default (as defined in the DIP Credit Agreement) under the DIP Documents. |
|---|---|
| **Covenants** | Those contained in the Term Loan Credit Agreement (but subject to customary modifications required to reflect the proposed DIP Facility and the Chapter 11 Cases). |
| **Roll-Up Facility Borrowing Base** | The Debtors shall provide the ABL Agent with a Borrowing Base Certificate (as defined in the ABL Credit Agreement) monthly in accordance with the terms of the ABL Credit Agreement, and consistent in form with the most recent monthly Borrowing Base Certificate delivered to the ABL Agent. |

| | |
|---|---|
| | Notwithstanding any provision of the ABL Credit Agreement, the ABL Agent shall not institute any new discretionary Reserves (as defined in the ABL Credit Agreement) against the Borrowing Base (as defined in the ABL Credit Agreement) that are not in place on the Petition Date other than a Carve Out Reserve (as defined below).<br><br>Notwithstanding anything in the ABL Credit Agreement to the contrary, the ABL Agent may not give effect to the results of any new appraisals or field examinations in respect of the collateral (including by updating the Net Orderly Liquidation Values (as defined in the ABL Credit Agreement) attributed to any inventory collateral) prior to the Borrowing Base Certificate to be delivered in July, 2023. Starting with the Borrowing Base Certificate delivered in July, 2023 and onwards, the ABL Agent may make adjustments in respect of field examinations and appraisals in accordance with the terms of the ABL Credit Agreement.<br><br>On the Petition Date, the ABL Agent may institute a Reserve in the amount of the Carve Out (the "***Carve Out Reserve***"). |
| **Roll-Up Borrowing Base Reserve** | The Debtors shall not permit the Borrowing Base to be less than the sum of (i) the ABL Roll-Up Obligations (but for the purposes of this calculation only, excluding the Ancillary Facility (as defined in the ABL Credit Agreement) and the Specified Hedge Obligations (as defined in the ABL Credit Agreement), plus (ii) $40 million during the Chapter 11 Cases (an "***Availability Event***"). Upon the occurrence of an Availability Event, the Debtors shall promptly, and in no event later than two (2) business days following delivery of the Borrowing Base Certificate that gives rise to the Availability Event, deposit cash into an account controlled by the ABL Agent (a "***Borrowing Base Collateral Account***") in an amount sufficient, such that when such cash is added to the Borrowing Base, no Availability Event would be in effect. Any cash in the Borrowing Base Collateral Account shall constitute ABL Priority Collateral.<br><br>All cash deposited into the Borrowing Base Collateral Account shall be added on a dollar for dollar basis to the Borrowing Base. If after delivery of any Borrowing Base Certificate, the Borrowing Base is greater than the sum of the ABL Roll-Up Obligations plus $40 million, the Debtors may request and receive withdrawal of cash from the Borrowing Base Collateral Account in the amount of such excess. |
| **Automatic Stay Acknowledgement** | Each DIP Lender hereby expressly acknowledges that it is bound by the automatic stay under 11 U.S.C. § 362 and will therefore not, unless otherwise permitted under the DIP Documents or the Restructuring Support Agreement or any other order of the Bankruptcy Court, claim payment of any other outstanding prepetition claims against Venator Holdings Germany GmbH, Venator Germany GmbH, Venator Uerdingen |

| | |
|---|---|
| | GmbH, and Venator Wasserchemie Holding GmbH during the relevant chapter 11 proceedings over such Borrower or Guarantor (as applicable) in violation of such automatic stay. |
| **Finnish Companies Act Acknowledgement** | The liabilities and obligations of Venator P&A Finland Oy under any DIP Document, DIP Order, or any other document to which it is a party shall be limited to the extent it would constitute (i) unlawful financial assistance within the meaning of Chapter 13 Section 10 of the Finnish Companies Act, or (ii) unlawful distribution of assets within the meaning of Chapter 13 Section 1 of the Finnish Companies Act (or their equivalents from time to time). |
| **Mandatory Prepayments and Asset Sale Covenant** | In addition to mandatory prepayment requirements usual and customary for transactions of this type from proceeds of asset sales, insurance (subject to reinvestment rights), and condemnation, and proceeds of certain indebtedness, an asset sale negative covenant usual and customary for transactions of this type including a prohibition on out of the ordinary course sales of assets and the sale of the Debtors' interest in the Lake Charles JV. |
| **Approved DIP Budget** | The Debtors shall, immediately upon receipt of the proceeds of the DIP Facility, deposit such amounts into a segregated bank account that may only be drawn in accordance with the DIP Budget (as defined below) with all funds held in the account deemed to be DIP Collateral, and such account shall be maintained by the DIP Agent.  The release of funds from such account shall be subject to the DIP Budget and the mechanics for the release set forth in the DIP Credit Agreement.  The Debtors shall use commercially reasonable efforts to place a control agreement over such account.<br><br>The "***DIP Budget***" means the rolling 13-week operating cash flow forecast/budget of the Debtors, to be approved by the Majority Lenders.  Any updated DIP Budget shall be subject to approval in form and substance by the Majority Lenders and otherwise subject to updates by the Debtors every fourth Friday following the week in which filing occurred (such updates to be approved by the Majority Lenders; it being agreed and understood that a form substantially consistent with the form attached as **Annex B** is acceptable to the Majority Lenders).  The DIP Budget shall include a line-item for weekly professional fee forecasts for each professional in the budget.  In the event a DIP Budget is not approved or if the Debtors and the Majority Lenders otherwise affirmatively agree, the prior DIP Budget shall continue to govern.<br><br>A "***Testing Period***" means each rolling cumulative four-week period beginning with the first full week after the Petition Date. |

| | |
|---|---|
| | A "*Variance Test*" means for the relevant Testing Period, the negative difference (if any) expressed as a percentage, of (x) projected cumulative receipts or disbursements for such period as reflected in the then-approved DIP Budget in the aggregate to (y) actual receipts or disbursements for such period in the aggregate; provided that such calculation shall in all cases exclude any payment of professional fees; *provided* that receipts shall be excluded from each Variance Test that is prior to the date that is 60 days after the Petition Date.

"*Permitted Deviation*" means, (a) with respect to each Variance Test based on receipts, an aggregate unfavorable variance equal to or less than 25.0% (the "***Receipts Permitted Deviation***"), and (b) with respect to each Variance Test based on disbursements, an aggregate unfavorable variance equal to or less than 15.0%.  All spending must be consistent with the disbursements in the DIP Budget (subject to Permitted Deviations).

It shall be a condition precedent to the effectiveness of the DIP Facility that the Debtors shall have delivered a DIP Budget in form and substance acceptable to the Majority Lenders (including with respect to any updated DIP Budget; it being agreed and understood that a form substantially consistent with the form attached as **Annex B** is acceptable to the Majority Lenders).  Compliance with the initial DIP Budget and each subsequent DIP Budget shall be tested via Variance Test, subject to Permitted Deviations, to be conducted on the Weekly Reporting Date following the applicable Testing Period; *provided* that, upon a Variance Test showing noncompliance with the Receipts Permitted Deviation, the Debtors' shall not be permitted further drawings of funds from the DIP Account (subject to the Carve Out) but such noncompliance with the Receipts Permitted Deviation shall not constitute an Event of Default in the DIP Documents or a Consenting Creditor Termination Event in the Restructuring Support Agreement. |
| **Reporting** | So long as any obligations remain outstanding under this DIP Term Sheet or the DIP Orders, the Debtors shall timely provide the DIP Lenders, the ABL Agent, and their respective advisors with the following (in each case, as may be extended by the advisors to the DIP Lenders and the ABL Agent (which may be by email)):

- *Weekly Reporting*:  Weekly reporting from the Debtors or their advisors on professional fees and variance reports with regard to the DIP Budget (provided that, for the avoidance of doubt, (i) such report shall include a comparison of actual receipts for such period in the aggregate against projected receipts for such period in the aggregate and disbursements for such period in the aggregate against projected disbursements for such period in the aggregate and (ii) Variance Tests shall only be performed at the end of the |

applicable Testing Period, which such weekly updates and variance reports in respect of a particular week shall be delivered no later than Friday of the immediately following week (such date, the "***Weekly Reporting Date***").

- *Management Conference Calls.*  Weekly, or at the reasonable request of the Majority Lenders or their advisors, the Debtors and their advisors shall participate in a teleconference call with the DIP Lenders and their advisors to be held at such times as may be reasonably agreed by the parties.  The Debtors and the advisors shall provide a status update on the following topics, with additional topics as requested by the DIP Lenders or their advisors (with questions provided in advance of such call if practical):  (i) general business update; (ii) budget variance reporting; and (iii) status of the Chapter 11 Cases and foreign operations.

- *Monthly Financial Statements.*  As soon as available, and in any event within 30 days after the end of each of month, the consolidated balance sheet of the Borrowers and their subsidiaries as at the end of such month and the related consolidated statements of income, stockholders' equity and cash flows of the Borrowers and its subsidiaries for such month and for the period from the beginning of the then current fiscal year to the end of such month, and setting forth in each case in comparative form the corresponding figures for the corresponding periods in a manner consistent with the Debtors' existing reporting obligations of the business plan, all in reasonable detail, together with a Financial Officer Certification.

- *Monthly Borrowing Base Reporting.*  The Debtors shall provide monthly borrowing base certificates in form and substance consistent with the terms of the ABL Credit Agreement, which shall also be provided to the DIP Lenders; *provided* that, for the avoidance of doubt, the monthly borrowing base certificate shall be due monthly.

- *Sales Volume Reporting*:  Weekly reporting of weekly sale volumes versus the Debtors' internal monthly sales forecast, which shall be delivered no later than Friday of the immediately following week.

- *Monthly Performance*:  As soon as available, and in any event within 30 days after the end of each of month, flash reports depicting monthly financial performance, including sales volumes, average realized pricing, revenues, EBITDA, Capex, operational restructuring expenses, cash flow, and other

| | categories to be reasonably agreed between the Majority Lenders and the Debtors. |
|---|---|
| **Representations and Warranties** | Those contained in the Term Loan Credit Agreement (but subject to customary modifications required to reflect the proposed DIP Facility and the Chapter 11 Cases). |
| **Events of Default / Cash Collateral Termination** | Those contained in the Term Loan Credit Agreement (but subject to customary modifications required to reflect the proposed DIP Facility and the Chapter 11 Cases), including usual and customary events of default ("***Events of Default***"), and including but not limited to, the following Events of Default, unless consented to by the Majority Lenders:<br><br>• any Debtor or non-Debtor subsidiary fails to preserve, renew, and keep in full force and effect their legal existence;<br><br>• any Debtor is:  (i) enjoined from conducting any material portion of its business; or (ii) has any material damage to or loss of material assets of its business operations;<br><br>• any Debtor or non-Debtor subsidiary files (or fails to oppose) any motion seeking an order authorizing the sale of all or substantially all of the assets of the Debtors or any non-Debtor subsidiary without the prior written consent of the Majority Lenders; and<br><br>• other than in connection with the Chapter 11 Cases, the Debtors or any non-Debtor subsidiaries (a) commence any case, proceeding or other action (i) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (ii) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or (b) make a general assignment for the benefit of its creditors.<br><br>Events of Default shall be subject to notice and cure periods as and to the extent set forth in the DIP Credit Agreement.  In the case of the enforcement of liens and other remedies with respect to the DIP Collateral, the DIP Agent (at the direction of the Majority Lenders) shall first file a motion with the Bankruptcy Court seeking relief from the automatic stay to exercise such remedies, and an emergency hearing before the Bankruptcy Court for authorization of such relief, on at least five (5) business days' written notice of an Event of Default.  Upon the occurrence and during the continuation of an Event of Default, the Debtors shall be permitted to use Cash Collateral (x) with respect to any amounts already drawn, in the ordinary course of business, subject to the |

| | |
|---|---|
| | DIP Budget in accordance with the DIP Documents, and (y) for the funding of the Carve Out.<br><br>The DIP Credit Agreement shall provide for customary remedies for an Event of Default that remains uncured including, but not limited to, the accrual of default interest at 2.00%, and the DIP Documents shall provide, subject to the Carve Out, that the Debtors shall not be permitted to make any draws under the DIP Facility during the continuance of a default or an Event of Default. |
| **ALB Roll-Up Facility Events of Default** | The ABL Roll-Up Facility shall have the same events of default as provided under the DIP Facility, with modifications only as necessary to ensure that such events apply to the ABL Priority Collateral or ABL Roll-Up Facility, including:<br><br><ul><li>The creation of any liens on ABL Priority Collateral that are *pari passu* or senior to the liens in favor of the ABL Roll-Up Facility (except as otherwise expressly permitted under the DIP Orders, including the Carve Out);</li><li>The filing of any motion, plan, disclosure statement, or any other pleading or document by the Debtors, or the Debtors support or do not object to a motion, plan, disclosure statement or any other pleading or documents, that provides for treatment of the Roll-up Obligations under a plan of reorganization in any manner other than payment in full in cash on or before the Plan Effective Date;</li><li>The confirmation of a plan of reorganization that provides for treatment of the Roll-Up Obligations other than payment in full in cash on or before the effective date; and</li><li>The failure by the Debtors to deposit funds into the Borrowing Base Collateral Account when required under the terms of the DIP Orders.</li></ul> |
| **ABL Roll-Up Obligations** | The obligations arising under the ABL Facility (the "***ABL Obligations***") (which, for the avoidance of doubt, shall include all obligations under clauses (1), (2), (3), and (4) of the definition of "Obligations" under the ABL Credit Agreement from time to time outstanding under the Loan Documents, including all reimbursement obligations now or hereafter owing under issued and outstanding Letters of Credit (as defined in the ABL Credit Agreement), obligations under Hedge Agreements (as defined in the ABL Credit Agreement) and any amounts owing to any lenders or agents under the ABL Credit Agreement in respect of cash management services) shall be rolled up and deemed post-petition, debtor in possession financing obligations (the "***ABL Roll-Up Obligations***") upon entry of the Interim DIP Order (the "***ABL Roll-Up Facility***"). |

The ABL Roll-Up Obligations shall be entitled to joint and several superpriority claims under section 507 of the bankruptcy code against the Debtors and shall have first priority, senior and automatically secured priming liens from each Debtor under section 364(d) of the bankruptcy code on the ABL Priority Collateral whether now existing or hereinafter arising (as defined in the ABL Intercreditor Agreement) and junior liens on all Term Loan Priority Collateral of the Debtors whether now existing or hereinafter arising (collectively, the "***ABL Roll-Up Liens***"). Subject to the Carve Out, there shall be no liens or claims (whether prepetition or post-petition) granted to any other party that are pari passu or senior to any ABL Obligations, adequate protection claims granted with respect thereto or ABL Roll-Up Obligations on the ABL Priority Collateral.

The ABL Roll-Up Obligations shall be paid current interest during the course of any chapter 11 proceeding at the default rate in accordance with the applicable rates set forth under the ABL Credit Agreement or any Hedge Agreement, as applicable.

Without limiting borrowing base protections and reporting customarily granted in cases similar to this, the ABL Roll-Up Obligations shall be entitled to rights and remedies no less favorable than granted to the DIP Lenders.

The ABL Roll-Up Facility and the associated DIP Orders shall include borrowing base protections and other terms customary for cases of this nature.

The Definitive Documents (including the Plan) shall provide for the un-impairment of the ABL Roll-Up Obligations and shall provide for payment in full in cash of the ABL Roll-Up Obligations on or before the Plan Effective Date. Any deviation or modification or proposed deviation or modification from the foregoing treatment shall constitute an event of default under the ABL Roll-Up Facility subject to the applicable cure period.

The Debtor shall pay the following invoiced fees, costs and expenses of the ABL Agent (including one primary and one local counsel) and the ABL Lenders (including the fees and expenses of Simpson Thacher & Bartlett LLP, AlixPartners, LLP, and one local counsel) that accrue prior or during the Chapter 11 Cases.

For the avoidance of doubt, as used herein, DIP Commitments, DIP Obligations, DIP Loans, DIP Facility, and DIP Lenders expressly excludes the ABL DIP Facility and ABL Roll-Up Obligations. The

| | ABL Lenders are not and shall not be deemed to be DIP Lenders or Backstop Parties. |
|---|---|
| **Adequate Protection for the Term Loan Lenders**[3] | Pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, as protection in respect of the imposition of the automatic stay and the Debtors' use of the Term Loan Collateral (as defined below) during the pendency of the Debtors' bankruptcy cases, the Debtors and the Term Loan Lenders agree, subject to approval of the Bankruptcy Court and unless waived by the Term Loan Lenders, to all of the following forms of adequate protection (the "***Term Loan Adequate Protection***"):<br><br>a) validly binding, enforceable, unavoidable and perfected additional and replacement liens on and security interests in (in each case to the extent necessary to adequately protect the Term Loan Lenders from any diminution in the value of their interests in the collateral (including as a result of the use, sale, or lease by the Debtors of such collateral, the imposition of the automatic stay under section 362(a) of the Bankruptcy Code, priming, and the Carve Out, "***Diminution in Value***") securing all obligations arising under the Term Loan Credit Agreement (the "***Term Loan Obligations***," and such collateral, the "***Term Loan Collateral***")) (i) subject to the Final DIP Order, liens on any proceeds of property recovered due to Avoidance Actions, in each case subject and subordinate to the Carve Out and junior in all respects to the DIP Liens and (ii) all of the Debtors' other assets, subject and subordinate to the Carve Out and junior in all respects to the DIP Liens and existing valid, perfected, unavoidable and superior liens on such assets (collectively, the "***Term Loan Adequate Protection Liens***");<br><br>b) allowed superpriority administrative expense claims as contemplated by section 507(b) of the Bankruptcy Code solely for any Diminution in Value of the Term Loan Lenders' interests in the Term Loan Collateral, consistent with that certain Pari Passu Intercreditor Agreement and the ABL Intercreditor Agreement, which claims shall have priority over all priority claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 506(c), 507(a), 507(b), 546(c), 726(b), and 1114 of the Bankruptcy Code or otherwise (the "***Term Loan Adequate Protection Claims***"); *provided* that such claims shall be subject and subordinate to the Carve Out and junior in all respects to the DIP Obligations and, on |

---

[113]  Relative priorities of DIP Liens, ABL Roll-Up Liens, and Adequate Protection Liens are illustrated on the chart attached hereto as **Annex C**.

| | the ABL Priority Collateral, junior to the ABL Roll-Up Liens and the administrative expense claims granted in respect thereof; and |
| | c) a prohibition on the Debtors' creation of, incurrence of, or suffering any other claim that is *pari passu* with or senior to the claims held by the Term Loan Lenders on the Term Loan Priority Collateral (other than the Carve Out, the DIP Liens, and those secured by valid and perfected senior pre-petition liens). |
| **Adequate Protection for the Prepetition Secured Noteholders** | Pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, as protection in respect of the imposition of the automatic stay and the Debtors' use of the Secured Notes Collateral (as defined below) during the pendency of the Debtors' bankruptcy cases, the Debtors and the Secured Noteholders agree, subject to approval of the Bankruptcy Court, to all of the following forms of adequate protection (the "***Secured Notes Adequate Protection***" and, together with the Term Loan Adequate Protection, the "***Adequate Protection***"): |
| | a) validly binding, enforceable, unavoidable and perfected additional and replacement liens on and security interests in (in each case to the extent necessary to adequately protect the Secured Noteholders from any Diminution in Value of their interests in the collateral securing all obligations arising under the Secured Notes Indenture (the "***Secured Notes Obligations***," and collectively with the Term Loan Obligations, the "***Prepetition Obligations***" and such collateral, the "***Secured Notes Collateral***," and collectively with the Term Loan Collateral, the "***Prepetition Collateral***")) (i) subject to the Final DIP Order, liens on any proceeds of property recovered due to Avoidance Actions, in each case subject and subordinate to the Carve Out and junior in all respects to the DIP Liens (ii) all of the Debtors' other assets, subject and subordinate to the Carve Out and junior in all respects to the DIP Liens and existing valid, perfected, unavoidable and superior liens on such assets (collectively, the "***Secured Notes Adequate Protection Liens***," and together with the Term Loan Adequate Protection Liens, the "***Adequate Protection Liens***"); and |
| | b) allowed superpriority administrative expense claims as contemplated by section 507(b) of the Bankruptcy Code solely for any Diminution in Value of the Secured Noteholders' interests in the Secured Notes Collateral, consistent with the Pari Passu Intercreditor Agreement, which claims shall have priority over all priority claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 506(c), 507(a), 507(b), 546(c), 726(b), and |

| | |
|---|---|
| | 1114 of the Bankruptcy Code or otherwise (the "***Secured Notes Adequate Protection Claims***," and together with the Term Loan Adequate Protection Claims, the "***507(b) Claims***"); *provided* that such claims shall be subject and subordinate to the Carve Out and junior in all respects to the DIP Obligations, and, on the ABL Priority Collateral, junior to the ABL Roll-Up Liens and the administrative expense claims granted in respect thereof. |
| **Marshaling Doctrine, 506(c) Waiver** | Subject to and effective upon (a) entry of the Final DIP Order, with respect to the Prepetition Collateral and (b) entry of the Interim DIP Order, with respect to the DIP Collateral and the collateral securing the ABL Roll-Up Liens, in each case except to the extent of the Carve Out, authorization for the Debtors to waive (a) any right to surcharge any collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise, (b) the equitable doctrine of marshaling and other similar doctrines, and (c) the "equities of the case" exception under section 552(b) of the Bankruptcy Code; *provided* that the foregoing shall be without prejudice to the terms of the Final DIP Order with respect to the period from and after entry of the Final DIP Order. |
| **DIP Interest, Fees, Costs, Indemnities, and Expenses** | The DIP Orders to provide for customary payments in relation to the DIP Facility including fees, costs, indemnities, expenses of the DIP Agent, the DIP Lenders, and their advisors and consultants without any obligation for such parties to seek Bankruptcy Court approval or otherwise comply with any applicable U.S. Trustee Guidelines. |
| **Stipulations and Releases** | Subject to entry of the Interim DIP Order, but subject to a customary "challenge" period, the DIP Parties will provide customary stipulations and releases for any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, or obligations related to or arising out of the Prepetition Obligations, the Prepetition Collateral, and documentation related thereto. |
| **Ratings** | The Debtors and the DIP Lenders shall use commercially reasonable efforts to obtain ratings of DIP Facility from Moody's, Standard & Poor's and/or Fitch within 90 days after the Petition Date. |
| **CLO Adjustments** | The Debtors shall work in good faith with the DIP Lenders to address any structural requirements of any CLO funds and fund advisors under their constituent documents or investment criteria in regard to exchanging any DIP New Money Claims (as defined in the Plan) for DIP Shares (as defined in the Plan) at the Discount Value (as defined in the Plan) while providing substantially similar economics set forth herein and in the Restructuring Support Agreement. |
| **Advisors to the DIP Lenders** | <u>**Advisors to the Term Lender Group**</u>:  White & Case LLP; Houlihan Lokey and other local and foreign counsels. |

| | |
|---|---|
| | **Advisors to the Cross-Holder Group**:   Gibson Dunn & Crutcher; Lazard Frères & Co. LLC and other local and foreign counsels. |
| **Governing Law** | New York but excluding any principles of conflicts of law or other rule of law that would cause the application of the law of any jurisdiction other than the State of New York (and, to the extent applicable, the Bankruptcy Code); provided that certain collateral documents shall be governed by applicable local law. |
| **Assignments and Participations** | Assignments under the DIP Facility are subject to the consent of the Borrowers and the DIP Agent (which consent shall not be unreasonably withheld or delayed), unless such assignment is (i) to a DIP Lender, (ii) to an affiliate of the transferor or (iii) solely with regards to the Borrower's consent right, during the continuance of an Event of Default. No participation shall include voting rights, other than for matters requiring consent of 100% of the DIP Lenders or each adversely affected DIP Lender.<br><br>Notwithstanding the foregoing, assignments or participations with respect to bona fide competitors of the Borrower and any affiliates of such bona fide competitors identified by the Borrower in writing (excluding any affiliate that is a bona fide debt fund) shall require the consent of the Borrower (in its sole discretion). In addition, other customary borrower protections in respect of assignments to certain categories of transferees, including natural persons, among others, shall apply. |
| **Intercreditor Agreements** | The ABL Intercreditor Agreement and the Pari Passu Intercreditor Agreement shall remain in full force and effect throughout the Chapter 11 Cases. |
| **Definitions** | |
| **ABL Facility** | That certain credit agreement, dated as of October 15, 2021 (as amended, amended and restated, modified, or otherwise supplemented from time to time, the "***ABL Credit Agreement***"), by and among Venator Materials PLC, as Holdings, certain subsidiaries as Borrower named therein, JPMorgan Chase Bank, N.A., as administrative and collateral agent (the "***ABL Agent***"), the guarantors named therein, and the lenders named therein (the "***ABL Lenders***"). |
| **ABL Intercreditor Agreement** | That certain ABL Intercreditor Agreement, dated as of August 8, 2017 (as amended, amended and restated, modified, or otherwise supplemented from time to time, the "***ABL Intercreditor Agreement***"), by and among JPMorgan Chase Bank, N.A. as common collateral agent, JPMorgan Chase Bank, N.A. as administrative and collateral agent for the ABL Lenders, and Acquiom Agency Services LLC and Seaport Loan Products |

18

|  | LLC, as co-administrative agents, and Acquiom Agency Services LLC, as collateral agent for the Term Loan Lenders. |
|---|---|
| **ABL Required Lenders** | Has the meaning given to the defined term "Required Lenders" in the ABL Credit Agreement. |
| **Cash/PIK Election** | Means, subject to the Minimum Cash Pay Requirement, the election of the Majority Lenders (to be made before the applicable payment) to receive each interest payment and/or the Extension Fee in cash or in kind. |
| **Cross-Holder Group** | Means that certain group of holders of Term Loan Claims, Senior Secured Notes Claims, and Senior Unsecured Notes Claims represented by Gibson Dunn & Crutcher and Lazard Frères & Co. LLC. |
| **Lake Charles JV** | Means Louisiana Pigment Company, L.P. |
| **Majority Lenders** | The Required Consenting Creditors (as defined in the Restructuring Support Agreement). |
| **Pari Passu Intercreditor Agreement** | That certain *Pari Passu* Intercreditor Agreement, dated as of May 22, 2020 (as amended, amended and restated, modified, or otherwise supplemented from time to time, the "***Pari Passu Intercreditor Agreement***"), by and among Acquiom Agency Services LLC, as term loan collateral agent for the Credit Agreement Secured Parties, Wilmington Trust, National Association, as first lien notes collateral agent for the First Lien Notes Secured Parties, and each additional agent from time to time party hereto |
| **Plan Effective Date** | Means the date upon which the conditions precedent to the effectiveness of a plan of reorganization implementing the terms and conditions set forth in the Plan (as defined in the Restructuring Support Agreement) shall have been satisfied or validly waived. |
| **Prepetition Secured Parties** | The Term Loan Lenders and the Secured Noteholders. |
| **Secured Notes** | The 9.50% secured notes due 2025 (the "***Secured Notes***," and the holders thereof, the "***Secured Noteholders***") issued pursuant to that certain indenture, dated as of May 22, 2020 (as amended, amended and restated, modified, or otherwise supplemented from time to time, the "***Secured Notes Indenture***") by and among Venator Finance S.á r.l. and Venator Finance LLC, as issuers, each of the guarantors named therein, and Wilmington Trust, National Association, as trustee and notes collateral agent (the "***Secured Notes Trustee***" and, together with the Secured Noteholders, the "***Secured Notes Parties***"). |

| | |
|---|---|
| **Senior Unsecured Notes** | The unsecured notes due 2025 (the "***Senior Unsecured Secured Notes***," and the holders thereof, the "***Senior Unsecured Noteholders***") issued pursuant to that certain indenture, dated as of July 14, 2017 (as amended, amended and restated, modified, or otherwise supplemented from time to time, the "***Senior Unsecured Notes Indenture***") by and among Venator Finance S.á r.l. and Venator Finance LLC, as issuers, each of the guarantors named therein, and Wilmington Trust, National Association, as trustee (the "***Senior Unsecured Notes Trustee***" and, together with the Secured Noteholders, the "***Senior Unsecured Notes Parties***," and together with the Term Loan Facility Agent, and the Secured Notes Trustee, the "***Prepetition Agents/Trustees***"). |
| **Term Lender Group** | Means that certain group of holders of Company indebtedness represented by White & Case LLP and Houlihan Lokey. |
| **Term Loan Facility** | That certain credit agreement, dated as of August 8, 2017 (as amended, amended and restated, modified, or otherwise supplemented from time to time, the "***Term Loan Credit Agreement***"), by and among Venator Holdings PLC, as Borrower, the guarantors named therein, Acquiom Agency Services LLC and Seaport Loan Products LLC, as co-administrative agents, and Acquiom Agency Services LLC, as collateral agent (the "***Term Loan Facility Agent***"), and the lenders named therein (the "***Term Loan Lenders***"). |